**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION**

| | |
|---|---|
| CONNOR B., a minor child, by his<br>    next friend, Rochelle Vigurs,<br><br>ADAM S., a minor child, by his<br>    next friend, Denise Sullivan,<br><br>CAMILA R., a minor child, by her<br>    next friend, Bryan Clauson,<br><br>ANDRE S., a minor child, by his<br>    next friend, Julia Pearson,<br><br>SETH T., a minor child, by his<br>    next friend, Susan Kramer, and<br><br>RAKEEM D., a minor child, by his<br>    next friend, Bryan Clauson,<br><br>Individually and on behalf of all<br>    others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEVAL L. PATRICK, in his official<br>    capacity as Governor of the<br>    Commonwealth of Massachusetts,<br><br>JUDYANN BIGBY, in her official<br>    capacity as Secretary of the<br>    Massachusetts Executive Office of<br>    Health & Human Services, and<br><br>ANGELO MCCLAIN, in his official<br>    capacity as Commissioner of the<br>    Massachusetts Department of<br>    Children and Families,<br><br>        Defendants. | CASE NO. _____ |

**COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

JURISDICTION, VENUE AND ASSIGNMENT ........................................................4

PARTIES ..........................................................................................................................6

Named Plaintiffs ............................................................................................................6

    Connor B. ....................................................................................................................6

    Adam S. .....................................................................................................................10

    Camila R. ...................................................................................................................13

    Andre S. .....................................................................................................................17

    Seth T. .......................................................................................................................21

    Rakeem D. .................................................................................................................23

    Named Plaintiffs, Collectively...................................................................................27

Next Friends....................................................................................................................28

Defendants .......................................................................................................................30

CLASS ACTION ALLEGATIONS ..............................................................................31

GENERAL ALLEGATIONS ........................................................................................33

I.    Defendants Are Causing Harm To Children In Foster Care...............................33

    A.    Defendants Fail To Protect Children From Abuse And Neglect In Foster Care...................................................................................................35

    B.    Defendants Unnecessarily Move Children Among Multiple Foster Care Placements................................................................................................37

    C.    Defendants Place Children In Unsuitable Or Inappropriate Foster Homes Unable To Properly Care For Them ......................................... 38

    D.    Defendants Fail To Provide Children With Permanent Families As Soon As Safely Possible ............................................................................39

        1.    Defendants Fail To Safely Reunify Children With Their Families ................40

i

2. Defendants Fail To Timely Place Children With Adoptive Families When Reunification Is Not Possible ...............................................................41

3. Defendants Fail To Prepare Children Who "Age Out" Of Foster Care To Live As Independent Adults ..............................................................42

E. Defendants Fail To Provide Children With Essential Services ..........................................................................................................43

1. Defendants Fail To Provide Children With Adequate Visitation With Parents And Siblings, Damaging Their Family Relationships ...............43

2. Children Do Not Receive Adequate Medical, Dental And Mental Health Care ..............................................................................................44

3. DCF Fails To Assure That Children Receive Adequate Educational Services .................................................................................................46

II. The Harms And Risk Of Harms Suffered By Children Result From Defendants' Failure To Properly Manage The DCF Foster Care System .........................47

A. Defendants Fail To Maintain An Adequately Staffed And Appropriately Trained Child Welfare Workforce...........................................47

1. Caseworkers Carry Unmanageable Caseloads.................................................47

2. DCF Fails To Provide Adequate Training To Its Child Welfare Workforce ...............................................................................................49

B. Defendants Fail To Properly Manage DCF's Foster Care Placements.................50

1. DCF Fails To Recruit And Retain An Adequate Number Of Foster Homes ...................................................................................................50

2. DCF Fails To Timely And Appropriately Make Use Of Kin Placements .............................................................................................54

3. DCF Does Not Appropriately Match Children To Foster Care Placements Capable Of Meeting Their Needs .................................................55

4. DCF Fails To Assure Foster Home Safety ....................................................57

C. DCF Fails To Properly Develop And Implement Case Plans And Service Plans For Foster Children And Their Families ...................................60

1. DCF Fails To Sustain Family Ties And Support Reunification When It Is Safely Possible ............................................................................60

2. DCF Fails To Assure Timely Adoptions .......................................................62

       3.   DCF Fails To Adequately Prepare Youth Aging Out To Live
Independently As Adults....................................................................................63

   D.       DCF Fails To Access Available Federal Funding .................................................64

COUNT I ...................................................................................................................................65

COUNT II ..................................................................................................................................67

COUNT III.................................................................................................................................67

COUNT IV.................................................................................................................................68

PRAYER FOR RELIEF ............................................................................................................69

## INTRODUCTION

1.      This is a civil rights class action brought on behalf of all children who are now or will be in the foster care custody of the Massachusetts Department of Children and Families ("DCF")[1] as a result of abuse or neglect ("Plaintiff Children").  Defendants, each sued in his or her official capacity only and not individually, are Deval L. Patrick, Governor of the Commonwealth of Massachusetts ("Massachusetts"); JudyAnn Bigby, Secretary of the Massachusetts Executive Office of Health and Human Services ("EOHHS"); and Angelo McClain, Commissioner of DCF (collectively, "Defendants").

2.      Plaintiff Children, each of whom relies on DCF for basic care and protection, seek both declaratory and injunctive relief to remedy violations of their legal rights and to prevent Defendants, by their actions and their failure to act as lawfully required, from continuing to cause them harm.

3.      The foster care system operated by DCF is responsible, under federal and state law, for investigating allegations of child abuse and neglect, for delivering in-home services to preserve families when safely possible, for providing temporary care and protection for children who cannot safely remain at home, for securing safe and stable families as soon as possible for children removed into state care, whether by reunification, adoption or legal guardianship, and for preparing those youth who will age out of foster care to live independently as adults.

4.      The Massachusetts foster care system, however, is causing physical and psychological harm to the abused and neglected children it is mandated to protect.  The myriad systemic defects afflicting the Massachusetts foster care system have long been known to

---

[1] DCF was known as the Department of Social Services ("DSS") until 2008.  To avoid confusion, the department will be uniformly referred to as "DCF" in this pleading.

Defendants, who are responsible by law for the approximately 8,500 vulnerable children and youth currently in state foster care. Defendants are failing to take the necessary action to discharge their obligations to ensure the safety and well-being of the children taken into their custody.

5. DCF has harmed and continues to harm abused and neglected children in foster care in numerous ways, including:

    a. Children are abused and neglected while in Massachusetts foster care custody at an alarming rate. Among the 47 jurisdictions[2] reporting maltreatment data in 2008, Massachusetts ranked 4th worst in the rate of abuse and neglect of children in foster care. DCF performance in this vital safety measure deteriorated further in 2009.

    b. Children in DCF foster care are moved from foster home to foster home with damaging frequency, many moved between five or more different foster homes while in state care. According to the most recent federal audit of DCF performance, Massachusetts ranks 8th worst among the 51 jurisdictions reporting data on placement stability.

    c. Many of the approximately 2,500 children in DCF foster care with a permanency goal of adoption languish in foster care for years; some literally grow up in state care. According to the most recent federal audit of DCF performance, Massachusetts ranks 13th worst among the 47 jurisdictions reporting data on timeliness of adoptions.

    d. Approximately 900 children "age out" of DCF foster care every year with no permanent family, a substantial number of them inadequately prepared to live independently as adults.

    e. Approximately one in six children who are reunified with their families after removal into foster care return to foster care due to further abuse or neglect.

6. These and other harms to children are caused by Defendants' failure to effectively manage the agency's workforce, resources and practices. A number of systemic problems undermine the agency's ability to fulfill its legal obligations, including:

---

[2] The federal government collects data concerning 52 jurisdictions that participate in the Title IV-E foster program implemented under the Social Security Act. Those 52 jurisdictions are the 50 states, the District of Columbia and Puerto Rico.

a. DCF caseworkers carry unmanageable caseloads vastly exceeding what is considered appropriate according to generally accepted professional standards. Excessive caseloads make it difficult in the best of circumstances, and oftentimes impossible, to meet even minimum standards of care and protection for children.

b. DCF does not require or adequately provide ongoing training for caseworkers and supervisors.

c. DCF fails to recruit and maintain a sufficient number and array of safe and appropriate family foster homes and therapeutic placements. The serious shortage of foster care placements prevents DCF from matching children with caretakers able to meet their needs and often forces DCF to make resource-driven placement decisions based simply on available beds rather than on children's needs.

d. Family relationships are unnecessarily disrupted, and sometimes permanently severed, because DCF does not ensure regular or meaningful child-parent and sibling visitation, and because parents do not receive the services which might enable their children to safely return home.

e. DCF fails to provide foster parents with the necessary supports and services to care for the children placed with them. Among other things, DCF pays grossly inadequate monthly foster care maintenance payments, approximately 40% below the minimum level required by federal law.

f. DCF has failed to make child and family services and foster care placements equally accessible to children across the state.

7.     As the custodian of children in foster care, DCF assumes constitutional obligations that include protecting children in state care from harm and preserving the children's relationships with their parents and siblings whenever safely possible. Furthermore, because it receives federal funding under Titles IV-B and IV-E of the Social Security Act, as administered by the United States Department of Health and Human Services ("U.S. HHS"), Massachusetts must conform to federal laws and regulations concerning the care of children in their custody. Defendants fail to meet these constitutional and statutory obligations.

8.      DCF has not implemented the reforms necessary to remedy the severe and persistent legal violations within its foster care system, despite its longstanding knowledge of these systemic ills.

9.      Defendants fail to exercise professional judgment in their care and protection of Plaintiff Children and, through their actions and inactions, demonstrate deliberate indifference toward the safety and well-being of the children in their custody.

10.      Over the last 18 months, Defendants have exacerbated longstanding systemic problems, and aggravated the resulting harm to children, by cutting the child welfare workforce; by failing to provide promised increases in foster care maintenance payment rates; by reducing essential services for children and families; and by decreasing the resources and administrative support necessary to support a full continuum of foster care placements and services.

11.      The Plaintiff Children have waited far too long for state officials to meet their constitutional and federal law obligations.  They now respectfully seek equitable relief from this Court so that they may experience the safe and nurturing childhoods to which they are entitled.

## JURISDICTION, VENUE AND ASSIGNMENT

12.      This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution and federal statutes.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

13.      Venue is proper pursuant to 28 U.S.C. § 1391(b).  The claims arise in this District.

14.     Assignment in the Western Division is proper pursuant to LR.

40.1(D)(1)(b) because a majority of the Named Plaintiffs – Connor B., Adam S., Camila R. and

Rakeem D. – reside in the Western Division:

a.   Named Plaintiff Connor B. resides in Hampshire County:  Connor was removed from his parental home in Hampshire County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Franklin/Hampshire Counties Division of the Juvenile Court.  The DCF Area Office in Greenfield, Massachusetts handles day-to-day responsibilities on Connor's case.

b.   Named Plaintiff Adam S. resides in Franklin County:  Adam was removed from his parental home in Franklin County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Franklin/Hampshire Counties Division of the Juvenile Court.  The DCF Area Office in Greenfield, Massachusetts handles day-to-day responsibilities on Adam's case.

c.   Named Plaintiff Camila R. resides in Hampden County:  Camila was removed from her parental home in Hampden County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Hampden County Division of the Juvenile Court.  A DCF Area Office in Springfield, Massachusetts handles day-to-day responsibilities on Camila's case.

d.   Named Plaintiff Andre S. resides in Essex County:  Andre was removed from his parental home in Essex County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Essex County Division of the Juvenile Court.  The DCF Area Office in Lynn, Massachusetts handles day-to-day responsibilities on Andre's case.

e.   Named Plaintiff Seth T. resides in Norfolk County:  Seth was removed from his parental home in Norfolk County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Norfolk County Division of the Juvenile Court.  The DCF Area Office in South Weymouth, Massachusetts handles day-to-day responsibilities on Seth's case.

f.   Named Plaintiff Rakeem D. resides in Hampden County:  Rakeem was removed from his parental home in Hampden County and placed into the foster care custody of DCF pursuant to an action commenced by DCF in the Hampden County Division of the Juvenile Court.  A DCF Area Office in Springfield, Massachusetts handles day-to-day responsibilities on Rakeem's case.

## PARTIES

## Named Plaintiffs[3]

### Connor B.

15.     In early 2007, when Connor B. was six years old, DCF removed him from the care of his mother and took him into foster care custody.  Connor was removed, along with his younger sister, because his mother was neglecting his medical care and was exposing her children to risk from a live-in boyfriend who had previously sexually abused his own daughter.

16.     Connor, now nine years old, remains in foster care.  Since Connor's removal three years ago, DCF has moved him no fewer than six times among seven different placements spanning four different counties.  In addition, he experienced one four-and-one-half-month long hospitalization.  Connor was moved at least five times in his first year in foster care alone, and he was sexually abused in his very first foster care placement.

17.     When DCF first removed Connor from his mother's home in early 2007, DCF placed him in a foster home along with a 17-year-old boy who had previously received an Assessment for Safe and Appropriate Placement, which is used with youth who have engaged in inappropriate, coercive or aggressive sexual behavior.  At the time DCF chose this placement for Connor, DCF knew that the assessment had shown that the teenager posed a serious risk of sexual abuse to others.

18.     Despite its knowledge of this threat, DCF did not select another foster home for Connor.  Instead, DCF placed Connor in the home subject to a purported "safety plan," which consisted of installing an alarm intended to monitor the teenager's access to Connor.  The

---

[3] In accordance with LR. 5.3, the identities of the minor Named Plaintiffs have been protected.  Because some of the Named Plaintiffs share common initials, pseudonyms have been used to avoid confusion.

safety plan proved ineffective.  Within two months, the teenager began entering Connor's

bedroom at night, and sexually abused him on multiple occasions.

   19. Connor told his school principal about the sexual abuse, and the principal

reported it to DCF.  DCF removed Connor from the foster home and placed him in a "night-to-

night" or "hotline" foster home, a form of emergency placement intended for overnight use while

an appropriate foster home is being identified.

   20. Five days later, Connor was again moved to another foster home, where

DCF knew another teenage boy was living.  Almost immediately, Connor began to manifest

extreme emotional distress, including threatening his foster mother with a knife, setting a fire in

his foster home and having an emotional outburst where he knocked over displays at a

department store.  Within weeks, with his psychological condition rapidly deteriorating, Connor

was brought to the hospital.

   21. On May 1, 2007, Connor, still only six years old, was admitted to the

hospital, where he was placed in a locked psychiatric unit.  He lived in various programs within

the hospital campus for the next four and one-half months.

   22. While hospitalized, Connor received multiple psychiatric evaluations.  The

hospital pediatric psychiatrist diagnosed Connor as suffering from Post-Traumatic Stress

Disorder ("PTSD") with anxiety and Attention Deficit and Hyperactive Disorder ("ADHD"), and

found that his previous foster care placements had damaged him.  On two separate occasions, the

psychiatrist recommended that, after discharge, Connor be placed in a residential treatment

program to stabilize him.  She also recommended ongoing individual and specialized therapy.

The psychiatrist advised that after stabilizing Connor in a residential placement, DCF should

place him in an intensive family foster home, which would provide enhanced case management

support and services.  Hospital doctors also prescribed several psychotropic medications for

Connor.  These would continue after his discharge.

23.     Connor was also evaluated in the hospital by a clinician who specialized in

the needs of sexually abused children.  This clinician agreed with the conclusions and

recommendations of the hospital psychiatrist, including that Connor should be placed in a

residential treatment program and that the multiple placements Connor had experienced in less

than a year had damaged him.

24.     DCF disregarded these multiple clinical recommendations regarding

Connor's placement and service needs and did not place him in a residential treatment program.

Instead, on September 13, 2007, DCF moved Connor to a Stabilization, Assessment and Rapid

Reintegration ("STARR") facility, a short-term shelter and/or diagnostic placement for children

in DCF custody.  Thus, after Connor had spent several months in a hospital setting where

multiple diagnostic assessments were completed, DCF inappropriately moved him to a

temporary, diagnostic facility.

25.     To make matters worse, DCF rushed this move to the temporary facility.

DCF did not provide Connor with adequate psychological preparation for his placement change.

Furthermore, DCF did not provide the STARR staff with Connor's complete history or all of his

medications.

26.     Connor lived at this STARR facility for about six weeks.  On October 27,

2007, DCF moved him again, to another STARR facility located approximately 40 miles away

from the first facility.  The move required him to travel some two hours a day to and from his

school.

27.     STARR facilities, such as those where Connor was placed, are generally considered appropriate for no more than 45-day stays.  In Connor's case, he was held in consecutive STARR placements, together lasting four months.

28.     The STARR staff, like the psychiatrist and clinician who had assessed Connor at the hospital, recommended that Connor should next be placed in a residential treatment program and should receive ongoing individual and group therapy.

29.     DCF again disregarded the clinical recommendation that Connor be placed in a residential treatment program.  Instead, on January 17, 2008, DCF moved Connor from the STARR facility to yet another inappropriate facility, a 12-bed group home for boys aged 8 to 13.  This facility was not only against clinical recommendation, but also was not age-appropriate, as Connor had only just turned seven.

30.     This move was rushed as well.  DCF informed Connor of his impending move from the STARR facility to the group home on the very day he was moved.  No effort was made to prepare Connor for the move, such as having him visit the group home before the placement.  Nor did DCF arrange therapy appointments, school transportation or any medication transfers before subjecting him to this sudden move.

31.     The group home where Connor was placed did not provide him with the on-site educational services and intensive therapeutic and stabilization services that had been repeatedly recommended for him in the wake of his sexual abuse.  For his first two months in the group home, Connor did not receive any individual therapy.  In fact, during the extremely volatile period of Connor's first eighteen months in foster care, there were extended periods when Connor was not seeing an ongoing, consistent therapist, despite repeated clinical recommendations that such therapy be prioritized.

32.     In July 2009, after eighteen months living in a group home and nearly three years living in foster care, Connor was moved to an intensive family foster home, where he lives today.

33.     In September 2008, DCF changed Connor's permanency goal from reunification to adoption and informed Connor that he would not return home to his mother. However, the actions necessary to free Connor for adoption have not been taken, now almost two years later. Meanwhile, visitation continues with his mother, who recently had a baby girl to whom Connor has begun to feel attached.

34.     Connor's future remains uncertain. His current foster parents have indicated that they do not plan to adopt him, and DCF has no alternative plan to secure a permanent family for Connor.

**Adam S.**

35.     Adam S. is 16 years old and has lived nearly half his life in the foster care custody of DCF. Adam has endured repeated, severe physical and psychological abuse in two of the seven or more placements that DCF has chosen for him over his many years in foster care.

36.     DCF removed Adam at a very young age from his biological mother's home due to neglect. At that time, DCF placed him with foster parents in a remote location, away from any immediate neighbors. DCF had approved the couple as both foster and adoptive parents. When Adam was placed with them, they had already adopted two daughters from DCF custody, and had other foster children living in the home. Later, the couple adopted Adam.

37.     In October 2003, when he was nine years old, Adam informed his school teacher that his adoptive parents regularly forced him to get down on his hands and knees so they could beat him. DCF investigated and found the evidence insufficient to support removing the adopted children from the home. Nevertheless, DCF and the couple agreed to close the home as

10

a foster placement.  As a result, DCF caseworkers no longer visited the home.  Shortly thereafter, Adam's adoptive parents pulled him out of school, saying they planned to home-school him.

38.     Adam's adoptive father passed away shortly thereafter.

39.     In April 2004, Adam's older adoptive sister reported to school authorities that their younger adoptive sister had been badly beaten by their adoptive mother the previous day.

40.     Initially, after interviewing the mother and the children, the investigators concluded that no abuse had occurred.  The older sister, insisting otherwise, produced photographs of her sister's bruises.  With that, DCF removed all three children from the home.

41.     Adam's adoptive mother was subsequently convicted of child abuse.

42.     The children later reported that they had been regularly beaten in the home with a large wooden paddle, which their adoptive parents called the "Board of Education."  The psychological impact of this physical abuse persists for Adam.  Adam recently asserted that he accepts being hit because he believes that, as he put it, "if they beat me, I will learn."

43.     When Adam and his two sisters were removed from their adoptive mother's custody, DCF initially placed all three children together in a foster home.  Within a week of this placement, Adam threatened to hurt himself and was admitted to the hospital.  After this, Adam was never placed with his siblings again, and he has seen them only sporadically since.

44.     Adam remained hospitalized in a locked psychiatric unit for approximately two months.

45.     On discharge, Adam was moved to an intensive foster home with a young couple who were unable to meet his significant needs.  Shortly after Adam was placed with

them, the foster parents called the police indicating that Adam was displaying uncontrollable behaviors in their home.  The police removed Adam, then age ten, from the home and brought him to the police station, where a crisis stabilization team intervened.

46.     Adam was admitted to a crisis stabilization unit for treatment.  While there, he was prescribed multiple psychotropic medications, including antipsychotic drugs.

47.     In late 2004, Adam was moved to a residential treatment program for children ages 6 to 13.

48.     At the time DCF placed him in the residential treatment program, which provided on-site schooling, Adam had not regularly attended school for nearly a year.

49.     Adam remained in the residential treatment program for approximately four years.  Although he had difficulty establishing trusting relationships with his teachers and other program staff, Adam achieved some stability and emotional well-being at the program.

50.     When Adam was 13, DCF moved him from the residential treatment program to a foster home.  Adam quickly deteriorated in the home, and the foster parents told DCF that they could not handle him.

51.     DCF's next placement for Adam was another residential treatment program.  This residential treatment program was primarily designated for youth sex offenders, making it completely inappropriate for Adam, who had never exhibited such behavior.

52.     Shortly after this placement, Adam was brutally beaten by a group of teenagers in the program.  Adam sustained serious physical injuries, which required hospitalization.

53.     DCF investigated the incident and concluded that Adam had been the victim of a "fight club" orchestrated by a staff member at the facility.  The staff member was

later convicted of charges arising from the incident.  The facility was subsequently closed,

though it is unclear whether the events surrounding Adam in any way informed that decision.

54.     During his hospitalization, Adam reported that he had also been repeatedly

raped by another boy in the program.  Adam said that, when he cried for help, staff would turn

up the volume of the television over his pleas.  DCF investigated Adam's reports and concluded

that there was no wrongdoing on the part of facility staff.

55.     Soon after this hospitalization, DCF moved Adam to another residential

treatment program, where he has now lived for almost two years.

56.     Because of DCF's failure to secure Adam's safety in his placements and to

provide him appropriate treatment and case planning services, Adam remains unstable and

continues to suffer from extensive behavioral and emotional problems.  At age 16, with less than

two years before he will age out of foster care, Adam has no prospects for a permanent family,

and is in a placement that will not adequately prepare him to live independently as an adult.

**Camila R.**

57.     Camila R. is 13 years old and has spent the last two years living in the

foster care custody of DCF.  In that time, DCF has separated her from her two sisters and moved

her more than ten times among at least eleven different placements.  Throughout this traumatic

period, Camila has not received the educational and mental health services she requires.  As a

result of the separation from her sisters, repeated moves and the denial of necessary care and

services, Camila has suffered multiple emotional traumas and continues to suffer significant

harm.

58.     Camila and her two sisters were first taken into the foster care custody of

DCF in 2001, when Camila was four years old.  A DCF investigation had shown that the

children had been physically abused in their mother's home, including being burned with

cigarettes, beaten and submerged in water.  In addition, the girls had endured educational and other neglect in the home, where they were exposed to domestic violence and drug use.  Over the course of the year following removal, the three young girls were moved among at least three different homes before DCF returned them to their mother's custody.

59.     In 2006 and early 2007, DCF began receiving new reports that Camila and her sisters were missing school, and that physical abuse and neglect were occurring in the home. DCF investigated these reports but, after three months, closed the investigation and stopped visiting the home.

60.     In late 2007 and early 2008, DCF again received reports that Camila and her two sisters were not attending school and that Camila's older sister had been physically abused in the home.  DCF opened a case and provided the family with some referrals for services.

61.     In late January 2008, Camila's mother told DCF that she was unable to care for Camila's older sister and voluntarily surrendered her to the foster care custody of DCF. Camila was not removed from the home at that time.

62.     In June 2008, when Camila was 12 years old, DCF again removed her from her mother's home and took her into foster care custody.  The reasons for this removal were physical abuse, ongoing educational neglect and domestic violence in the home.  At the same time, DCF removed Camila's younger sister.

63.     DCF placed Camila and her sister in a foster home.  Almost immediately, 12-year-old Camila ran away to try to find her older sister, from whom she had been separated for nearly six months.

64.     Camila made contact with her DCF caseworker shortly thereafter, and DCF placed her in a different foster home, where she remained for several months.

65.     In fall 2008, DCF referred Camila for a psychological evaluation.  She was diagnosed with PTSD, depression and anxiety, and therapy was recommended.  DCF referred Camila for therapy, but she did not in fact meet with a therapist until fall 2009, nearly a full year later.

66.     This year-long delay in providing Camila therapy occurred for a number of reasons.  DCF initially failed to confirm whether Camila's foster parents had actually scheduled Camila's prescribed in-home therapy appointments.  Later, DCF failed to transport Camila to out-of-home therapy appointments when her foster parents were unwilling or unable to do so.  Further delays can be attributed to Camila's multiple placement moves; to wait lists for therapy appointments; to switches in therapists; and to poor communication between DCF and provider agencies.

67.     As a result, Camila did not receive the therapy she required during an acutely traumatic period in her life, and her situation deteriorated.

68.     During the fall of 2008, Camila was regularly suspended from school, and spent these days in either in-school suspension or the DCF office.  At around the same time, Camila began experiencing problems in her foster home, and DCF moved her to another foster home.

69.     In January 2009, DCF learned that Camila was failing most of her classes, due in part to the repeated absences resulting from her suspensions.

70.     In early March 2009, DCF moved Camila yet again, placing her in a night-to-night foster home.  She remained there for the weekend while DCF sought out a longer-term

placement.  This placement search resulted in DCF returning Camila to a foster home that had previously failed.  DCF did not make a sufficient effort to determine whether the caretaker could meet Camila's needs any better than before.  DCF also failed to provide any additional services to Camila or the foster home that might have stabilized her or improved a placement situation that had failed once already.

71.     By the end of March 2009, the school had informed DCF that Camila would most likely fail sixth grade.  Three months after learning this information, and five months after learning that Camila was failing most of her classes, DCF finally requested that Camila's school evaluate whether she presented special education needs.  This evaluation confirmed those needs and that Camila required special education services.  Having removed Camila from her mother due in part to educational neglect, DCF failed to secure an assessment of Camila's educational needs until nearly a year after her removal, undermining, if not altogether halting, her education.

72.     By June 2009, Camila's foster parents had told DCF that they no longer wanted Camila in their home.  DCF moved her from this home for the second time, placing her in another night-to-night foster home.  Almost immediately, she ran away to her sister's foster home.

73.     DCF next placed Camila in a STARR facility for two weeks, and then into another foster home.

74.     Three months later, Camila's foster mother, unable to meet Camila's needs, requested that DCF remove Camila from the home.

75.     At this time, DCF moved Camila to a time-limited (six-week) intensive foster home.  As an intensive foster care placement, the foster home received additional case

management support and services for Camila and the foster parents.  Camila adjusted well to this

home and showed marked improvement at school while living there.  Nevertheless, once the six-

week time period elapsed, DCF immediately withdrew the intensive services and returned

Camila to basic foster care.

76.     Camila began a sharp downward spiral.  She ran away from the new foster

home almost immediately.  Over the next several months, DCF moved Camila through one basic

foster home after another, with Camila running away from each one.  Each time she returned,

DCF simply placed her in a new foster home without adequately assessing whether or not it

could meet her needs and without implementing supports and services designed to address those

needs.

77.     Recently, DCF reversed course and returned Camila to an intensive foster

care setting, where she now lives.

78.     DCF's permanency goal for Camila is "guardianship with kin."  However,

in Camila's two years in foster care, DCF has never placed her with kin, or even started

visitation for her with any potential kin guardians.  Camila has no other current prospects for a

permanent family, either through adoption or guardianship.

**Andre S.**

79.     Andre has grown up as a child of the Massachusetts foster care system.

DCF removed him from his mother's custody more than twelve years ago when he was just three

years old.  Now fifteen, Andre is fast approaching adulthood without ever having had a stable

family.  Though Andre has eleven siblings, and a large extended family that might provide adult

connections for him, DCF has not taken the necessary actions to preserve any of these family

relationships, and Andre is largely disconnected from his family today.

80.     In January 1998, when Andre was three years old, DCF removed him and his younger sister from the custody of their mother due to severe neglect.  Less than one year later, in September 1998, DCF changed Andre's permanency goal from reunification to adoption because his parents stopped appearing for scheduled visits and demonstrated no significant interest in regaining custody.

81.     Eighteen months later, in February 2000, the parental rights of Andre's mother and father were terminated.

82.     Over the course of the next ten years, DCF has not found a permanent home for Andre.  Instead, DCF has exposed Andre to at least six different foster care placements, largely ill-suited to meet his needs.

83.      DCF initially placed Andre and his sister in a maternal aunt's home without taking adequate steps to determine the needs of the children and the capacity of their aunt to meet those needs.  Only a few weeks later, Andre's aunt informed DCF that she could not handle the children.  At that juncture, DCF failed to make any meaningful effort to maintain the children in their aunt's home by providing additional supports to the aunt and services to the children.  Instead, in February 1998, DCF simply moved Andre and his sister to another foster home, where the children lived for the next ten months.

84.     In October 1998, DCF briefly moved Andre and his sister into a pre-adoptive trial placement.  When the pre-adoptive parents chose not to adopt Andre and his sister, DCF returned them to their prior foster home.

85.     In August 2000, DCF placed both Andre and his sister into another kinship foster home, this time with a paternal cousin.

86.     Soon after arriving in the home, Andre, then six years old, began to exhibit aggressive and sexualized behaviors.  DCF removed Andre from the home in November 2000 and hospitalized him for two months.  During this time, Andre's sister remained with the paternal cousin, and she was later adopted by another family.

87.     Upon Andre's discharge from the hospital in January 2001, DCF placed him in an intensive foster home.  Eight months later, DCF moved Andre out of the home after his foster mother reported that she had observed Andre exhibiting sexualized behaviors toward other children.

88.     In September 2001, DCF placed Andre, then age seven, into a residential treatment program – and left him there for five years.

89.     When DCF placed him there, the program knew that Andre had exhibited inappropriate behaviors toward other children, suggesting that Andre had been the victim of sexual abuse.  However, Andre did not receive treatment specifically targeted to address these issues.

90.     In January 2002, DCF received further information supporting the already substantial evidence of Andre's need for sexual abuse treatment.  DCF investigated and confirmed that Andre's sister, while still living in the home of the children's paternal cousin, was the victim of abuse and neglect.  DCF referred Andre's sister for a sexual abuse evaluation.  During her evaluation, Andre's sister disclosed that she and Andre had engaged in inappropriate sexual contact with one another when they had lived together in the kin home.  The clinician who conducted the sexual abuse evaluation credited her report, and indicated that it was imperative that Andre also receive a sexual abuse evaluation and any necessary treatment.

91.     Following this recommendation, and indeed for his remaining four years in the residential treatment program, Andre was never evaluated for sexual abuse or given any form of specialized treatment to meet this critical need.

92.     When in 2005 DCF considered abandoning the goal of adoption for Andre, Andre's attorney insisted on Andre's behalf that a clinical assessment be provided to determine whether such a revised permanency plan was appropriate.  Among its findings, the adoption assessment indicated that it was strongly suspected that Andre had been the victim of sexual abuse.  The assessment recommended that adoption should remain Andre's goal.  It advised that, since Andre had not resided outside an institution for three years, he should first be transitioned to an intensive foster care home, and, when ready, to a pre-adoptive home.

93.     In June 2006, DCF finally moved Andre, then twelve, out of the residential treatment program.  At that time, however, DCF placed Andre into yet another residential facility.  Unlike the first institution, this residential program operated a "step down" placement model that, consistent with the recommendations of the assessment, could prepare him to transition and to successfully live in a family home.

94.     Eighteen months later, in December 2007, the program initiated visits between Andre and potential foster parents so that Andre could establish a relationship with them over time before he was moved to live with them.

95.     In June 2008, after Andre had lived in residential facilities for almost seven years, DCF moved him to live with these foster parents.  Nearly two years later, Andre still resides in this intensive foster home.

96.    In late 2008, DCF changed Andre's permanency goal from adoption to "permanency through placement with kin."  Yet, DCF has not taken any meaningful steps to find kin that are willing and able to provide permanent care for him.

97.    Andre continues to express a desire to be adopted or placed in a guardianship arrangement.  In Andre's twelve years in foster care and ten years of being legally freed for adoption, DCF has not found him a permanent nurturing family home.

**Seth T.**

98.    Seth has lived in DCF foster care for five of his thirteen years. In April 2005, DCF removed Seth, then just eight years old, and his two brothers from their mother due to a finding of neglect.  By December 2006, DCF had changed Seth's permanency goal to adoption and obtained a court order terminating the parental rights of his mother.  Yet, as of now, over three years later, Seth remains in DCF custody.

99.    During his first sixteen months in its custody, DCF moved Seth between five different foster care placements.  Thereafter, since August 2006, Seth has lived in an intensive foster home with foster parents who have stated they are not available to act as his legal guardians because they need the supports DCF provides to high-needs children in foster care like Seth.  Nearly five years after Seth's removal from his mother, DCF has failed to secure an adoptive or other form of permanent family for him, though potential adoptive parents recently have taken interest in Seth.

100.   Since taking action to free Seth for adoption in 2006, DCF has not adequately developed or implemented a child-specific recruitment plan tailored to locate a permanent family for Seth.  Moreover, although Seth's paternal grandparents early on expressed their interest in providing a home for Seth, DCF failed to fully explore this kinship option either for purposes of a temporary placement or as a potential permanent home.

101.    Beyond its failure to provide timely and competent permanency planning for Seth, DCF failed to take the necessary steps to preserve Seth's relationships with his brothers. After changing Seth's permanency goal to adoption, DCF reduced the frequency of Seth's visits with his two brothers to six per year, in disregard of a clinical finding that it would be harmful to Seth and his brothers not to have adequate visitation to maintain their relationships.  The visits with his older brother were subsequently reduced even further, to only four per year, when the brother secured a permanent placement with a legal guardian living out of state.  Seth struggles to cope with the separation from his siblings and the uncertainty of temporary foster care.

102.    DCF removed Seth and his brothers from his mother's care in 2005, after finding the family home unsanitary and receiving a report that Seth had been left alone unsupervised.  Seth's mother, grappling with mental health issues at that time, was overwhelmed managing the care of her three sons, all of whom had learning disabilities.  Seth, in particular, exhibited difficult behaviors which his mother believed stemmed from past sexual abuse by one of her ex-boyfriends.

103.    DCF first placed Seth, eight years old, in a residential treatment program to stabilize his behaviors.  Shortly thereafter, Seth's paternal grandparents expressed their desire to take care of him.  DCF declined to even conduct a home study of this potential kin placement.

104.    A clinical assessment of Seth completed two months later, in June 2005, recommended that Seth be placed in intensive foster care with his older brother.  DCF never placed Seth with his older brother as recommended.

105.    Instead, in August 2005, Seth was moved to a therapeutic foster home with his younger brother.  Within a month, Seth acted out sexually with this brother and was for that reason moved to a different therapeutic foster home, apart from all of his siblings.

106.    When Seth was eight years old, DCF assigned Seth a permanency goal of "long-term substitute care." This is generally considered to be an inappropriate permanency goal for an eight-year-old child. When reunification appears unsafe or impractical, DCF should provide some other permanent arrangement for the child. Here, DCF instead relegated eight-year-old Seth to long-term foster care – an unacceptable option.

107.    In June 2006, after Seth's then-current foster parents complained about his erratic behavior, DCF moved Seth to a STARR facility.

108.    In August 2006, Seth was moved to the family foster home where he still lives.

109.    In September 2006, DCF changed Seth's permanency goal from long-term substitute care to adoption, and petitioned for termination of Seth's mother's parental rights. His visits with his mother were reduced from every other week to four per year, with the visits taking place in a DCF office for two hours each.

110.    Having entered foster care at age eight, Seth has reached his teen years having spent more than a third of his life in temporary foster placements, with no permanent family and minimal contact with his siblings.

**Rakeem D.**

111.    Rakeem is a 15-year-old youth who has spent his last two and one-half years in DCF foster care. His foster care experience has been marked by an absence of thoughtful case planning by DCF, resulting in Rakeem's life being unstable and lacking in basic safety.

112.    Since entering foster care, Rakeem has consistently expressed his desire to live with family. At first, Rakeem asked to live with his grandmother. Following his

grandmother's death in October 2008, Rakeem repeatedly requested that DCF place him with other family members. DCF has never placed Rakeem with family.

113.   Instead, DCF has placed Rakeem in a series of stranger foster homes and group facilities. These placements have failed to meet his emotional and educational needs and have contributed to his sense of isolation. As a result, Rakeem has run away from several of these placements, repeatedly running to his grandmother's house. Each time Rakeem has returned to DCF's care, DCF has failed to make appropriate adjustments to his case plan in order to stabilize him and better meet his needs.

114.   Over the past two and one-half years, DCF has moved Rakeem through at least eight different placements, cycling him through some more than once. At present, DCF has failed to secure even temporary stability for Rakeem, much less to establish a permanency plan tailored to meet Rakeem's wishes for his own life. Rakeem, therefore, remains without any stable relationship or home environment, with adulthood just over two years away.

115.   During the over two years of constant instability that resulted from DCF's poor case management, Rakeem's educational progress has also suffered. Although he entered foster care due in large part to educational neglect, DCF has never adequately addressed this issue, despite multiple requests from Rakeem's court-appointed educational surrogate parent and others for DCF to do so.

116.   DCF removed Rakeem and his three siblings from their home and took them into foster care in November 2007, when Rakeem was 13 years old, , primarily due to educational neglect. The four children were immediately separated and have never again lived in the same home.

117.    Rakeem's first foster care placement was an intensive foster home.  From the very start of this placement, Rakeem repeatedly told his caseworker that he wanted to live with his grandmother.  Additionally, he asked why he was being denied the chance to spend time with friends.  The caseworker told Rakeem that he would not have free time outside the home for at least a period of three weeks.  She also explained that he would not be placed with his grandmother, leaving Rakeem sad, frustrated and alone.

118.    By January 2008, Rakeem continued to feel confined in the foster home because of the restrictions placed on the time he could spend with family and friends.  At this point, Rakeem was allowed recreational time outside of the foster home for just three hours a week.

119.    Though dissatisfied with his foster home, Rakeem nevertheless was making an effort to adjust.  At a January 17, 2008 foster care review, his private agency caseworker observed that Rakeem was doing well in the foster home.  This caseworker also shared that Rakeem continued to express a strong desire to live with his grandmother.

120.    After three months, in February 2008, DCF moved Rakeem to another intensive foster home, where he remained until approximately May 2008.  As of late April, Rakeem's caseworker observed that Rakeem was doing well in the new foster home, but that his school attendance had become a problem.  Just two weeks later, Rakeem's caseworker observed that he was doing better than he ever had since removal from his mother.  Nevertheless, the caseworker, in an effort to persuade Rakeem to attend school and keep his curfew, had also advised him that he might be moved into a residential facility if his behavior at school and outside the home did not improve.

121.    At the end of May 2008, Rakeem, then age fourteen, ran away from his foster home.  He was missing for nearly a month.  Though DCF believed that he had run to live at his grandmother's house, DCF made minimal efforts to find Rakeem.

122.    One month later, after Rakeem was found, DCF placed him in a STARR facility.  While there, Rakeem continued to question why he could not live with his grandmother.  Several weeks after his placement in the STARR, Rakeem was informed by his caseworker that, due to his behaviors, DCF had decided that placement in a residential program outside of his home city would be best for him.  Rakeem became very upset.  He ran away from the STARR within 30 days.

123.    In late September 2008, after Rakeem had once again been located, DCF moved him to a Behavioral Treatment Residence ("BTR"), a group care facility that provides on-site therapeutic treatment.  The BTR that DCF chose for Rakeem was approximately 50 miles away from his family, including his mother, grandmother and siblings.

124.    Within days of this placement, Rakeem's grandmother died.  DCF did not permit Rakeem to attend her funeral.

125.    DCF changed Rakeem's permanency goal from reunification with his mother to "permanency through placement with kin" in October 2008.  Yet, four months later, Rakeem was still living at the BTR far from his family home, and DCF had yet to take any meaningful steps to locate or evaluate an appropriate kin placement for him.

126.    In early February 2009, DCF met with BTR and other private agency staff, along with Rakeem, to discuss his case.  At the meeting, a private agency indicated that it would be willing to provide transportation so that Rakeem could visit his mother and siblings on a

weekly basis.  DCF rejected this offer, indicating that increased visitation would not be considered until Rakeem's behavior improved.

127.    Rakeem ran away from the BTR that afternoon and was discovered, approximately three weeks later, back in the city where his family lives.

128.    In early March 2009, DCF placed Rakeem at a BTR in his home city. Rakeem lived at the BTR for nearly seven months.  Although he periodically ran away, he was running for shorter periods of time and less often, which the program recognized as progress. While at the BTR, he achieved stability and a measure of happiness.  He became more engaged at school and focused in his activities.

129.    In late September 2009, DCF moved Rakeem again.

130.    Rakeem ran away less than a month later and was missing for the next several months.

131.    On January 6, 2010, Rakeem resurfaced at school.  The school called DCF, and Rakeem was brought to the DCF office.  While he was there, he again implored DCF to place him with family.  When DCF refused, he ran from the DCF office.

132.    On January 25, 2010, Rakeem again resurfaced at school, which informed DCF of his return.  DCF then placed Rakeem in a foster home, which he ran away from shortly thereafter.

133.    Since then, Rakeem returned again and DCF placed him in another STARR facility, where he currently resides.

**Named Plaintiffs, Collectively**

134.    Defendants' actions and inactions with respect to the Named Plaintiffs are part of a systemic pattern of conduct that has caused, and continues to cause, irreparable harm. Defendants have violated and acted with deliberate indifference to and beyond the bounds of

professional judgment regarding the Named Plaintiffs' constitutional and statutory rights by failing to provide necessary services and appropriate placements for them; by failing to make periodic comprehensive assessments of their needs and providing services consistent with those needs; by failing to make timely and meaningful casework contacts and monitor their progress in foster care in order to ensure their safety and well-being; by failing to provide them with monitoring and services necessary to prevent them from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to pay foster care maintenance payments on their behalf that cover the reasonable costs of caring for them; by failing to support their family relationships, in particular by not providing child-parent and sibling visits; by failing to provide appropriate management and supervision while they have been in DCF custody in accordance with their individual needs, best interests and professional standards; by failing to provide case management and planning in accordance with their individual needs, best interests and professional standards; and by failing to develop and implement a viable permanency plan that will allow them to leave foster care and secure safe and appropriate permanent homes in accordance with their individual needs, best interests and professional standards.

## Next Friends

135.   Named Plaintiff Connor B. appears by his next friend, Rochelle Vigurs. Ms. Vigurs served as Connor's Court-Appointed Special Advocate in the Hampshire County Juvenile Court for approximately one year.  She knows Connor personally, generally knows the issues regarding his foster care custody described here and is suited to represent his best interests in this case.  She maintains her principal residence in South Worthington, Massachusetts.

136.   Named Plaintiff Adam S. appears by his next friend, Denise Sullivan.  Ms. Sullivan provides regular consultation as an educational advocate and surrogate and frequently

serves the best interests of children as a court-appointed guardian ad litem in Massachusetts. Adam has expressed a desire to be a Named Plaintiff, and Ms. Sullivan is suited to represent his best interests in this case.  She maintains her principal residence in Chicopee, Massachusetts.

137.    Named Plaintiff Camila R. appears by her next friend, Bryan Clauson. Mr. Clauson serves as Camila's court-appointed educational surrogate parent.  In that role, Mr. Clauson has advocated, and continues to advocate, for Camila's educational rights and, for that purpose, has maintained contact with Camila, as well as with her assigned DCF caseworker.  He knows Camila personally, generally knows the issues regarding her foster care custody described here, and is suited to represent her best interests in this case.  Mr. Clauson is a licensed attorney in Massachusetts and maintains his principal office in Springfield, Massachusetts.

138.    Named Plaintiff Andre S. appears by his next friend, Julia Pearson.  Ms. Pearson serves as Andre's court-appointed counsel in his care and protection proceeding pending in the Essex County Division of the Juvenile Court.  In that role, she maintains contact with her client as necessary to discharge her obligations as his counsel.  She knows Andre personally, generally knows the issues regarding his foster care custody described here, and is suited to represent his best interests in this case.  Ms. Pearson is a licensed attorney in Massachusetts and maintains her principal office in Roxbury, Massachusetts.

139.    Named Plaintiff Seth T. appears by his next friend, Susan Kramer.  Dr. Kramer is suited to represent Named Plaintiff Seth's best interests, and Seth wishes Dr. Kramer to appear for him in this case.  Dr. Kramer is an instructor in Psychology at Bristol Community College and has served as a foster parent for DCF since 2006.  She maintains her primary residence in Dartmouth, Massachusetts.

140.     Named Plaintiff Rakeem D. appears by his next friend, Bryan Clauson.

Mr. Clauson serves as Rakeem's court-appointed educational surrogate parent.  In that role, Mr.

Clauson has advocated, and continues to advocate, for Rakeem's educational rights and, for that

purpose, has maintained contact with Rakeem, as well as with his assigned DCF caseworker.  He

knows Rakeem personally, generally knows the issues regarding his foster care custody

described here, and is suited to represent his best interests in this case.  Mr. Clauson is a licensed

attorney in Massachusetts and maintains his principal office in Springfield, Massachusetts.

### Defendants

141.     Defendant DEVAL L. PATRICK is Governor of the Commonwealth of

Massachusetts and is sued solely in his official capacity.  Pursuant to Part II, Chapter II, Section

1, Article 1 of the Constitution of the Commonwealth of Massachusetts, the executive power of

the Commonwealth is vested in the governor.  Under M.G.L. c. 6A §§ 2 and 4, the governor has

the ultimate authority to direct and control the operation of EOHHS and DCF.  Governor Patrick

currently maintains his principal office at the Massachusetts State House, Office of the

Governor, Room 280, Boston, Massachusetts, 02133.

142.     Defendant JUDYANN BIGBY is the secretary of EOHHS and is sued

solely in her official capacity.  EOHHS is created under M.G.L. c. 6A § 2 and under M.G.L. c.

6A § 16 and is vested with the duty to administer the Commonwealth's human services

programs, including the child welfare operations of DCF.  Pursuant to M.G.L. c. 6A § 3, the

secretary is the head of EOHHS and is appointed by the governor.  Secretary Bigby currently

maintains her principal office at One Ashburton Place, 11th Floor, Boston, Massachusetts 02108.

143.     Defendant ANGELO MCCLAIN is the commissioner of DCF and is sued

solely in his official capacity.  DCF is created under M.G.L. c. 18B § 1 and is vested with the

duty to administer a "comprehensive child welfare program for children and families."  Pursuant

to M.G.L. c. 18B § 6, the commissioner is the executive and administrative head of DCF, and is appointed by the secretary of EOHHS, with the approval of the governor.  Commissioner McClain currently maintains his principal office at 24 Farnsworth Street, Boston, Massachusetts 02210.

144.    DCF maintains six regional offices that oversee day-to-day operations at 29 Area Offices located throughout the state.  Leadership and administrative duties for DCF are guided by its Central Office, located in Boston.

145.    As of September 30, 2009, DCF had 8,413 children in its foster care custody.

## CLASS ACTION ALLEGATIONS

146.    This action is properly maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

147.    The class is defined as all children who are now or will be in the foster care custody of DCF as a result of abuse or neglect.

148.    The class of approximately 8,500 children is sufficiently numerous to make individual joinder impracticable.

149.    The questions of law and fact raised by the Named Plaintiffs are common to and typical of the putative class they seek to represent.  Each child relies on Defendants for child welfare placement, services and permanency, and is dependent on Defendants for his or her basic safety and well-being.  Each child is being harmed, or is at risk of being harmed, by the systemic deficiencies within the Massachusetts foster care system.

150.    Questions of fact common to the class include:

a.    whether Defendants fail to provide Plaintiff Children safe, appropriate and stable foster care placements as required by law and by reasonable professional standards;

31

b.   whether Defendants fail to provide Plaintiff Children with timely and appropriate services and care necessary to keep them safe and to prevent them from deteriorating physically, psychologically or otherwise while in state custody as required by law and by reasonable professional standards;

c.   whether Defendants fail to provide Plaintiff Children with timely and appropriate services necessary to ensure that they are either safely reunited with their families when appropriate or, when that is not possible, promptly freed for adoption and placed with a permanent family as required by law and by reasonable professional standards; and

d.   whether Defendants fail to provide Plaintiff Children with the supports necessary to maintain family relationships including the provision of child-parent visits and sibling visits, as required by law and by reasonable professional standards.

151.   Questions of law common to the class include:

a.   whether Defendants' actions and inactions violate Plaintiff Children's substantive rights under the due process clause of the Fourteenth Amendment to the United States Constitution to be free from harm while in state custody;

b.   whether Defendants' actions and inactions violate Plaintiff Children's rights to family association under the First, Ninth and Fourteenth Amendments to the United States Constitution;

c.   whether Defendants' actions and inactions violate Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), as amended by the Adoption and Safe Families Act of 1997 ("ASFA"), and relevant federal regulations to timely adoption and adequate foster care maintenance payments; and

d.   whether Defendants' actions and inactions violate Plaintiff Children's procedural rights not to be deprived of legal entitlements – including (i) the rights in relation to "placement of children in private families; early and periodic screening, diagnostic and treatment standards; individualized health care plan" as provided in M.G.L. c. 119 § 32; (ii) the right to a "medical passport" as set forth in 110 CMR § 7.124; (iii) the rights to sibling visitation as provided in M.G.L. c. 119 § 26B(b), (d); and (iv) the right to be considered for placement with relatives, other adult persons who have played significant positive roles in the child's life, and any minor siblings or half-siblings, as provided in M.G.L. c. 119 § 23(c) – without a meaningful opportunity to be heard

under the due process clause of the Fourteenth Amendment to the United States Constitution.

152.    The Named Plaintiffs will fairly and adequately protect the interests of the entire class of Plaintiff Children.

153.    The violations of law and resulting harms averred by the Named Plaintiffs are typical of the legal violations and harms suffered by all class members.

154.    Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

155.    Plaintiff Children are represented by attorneys employed by Children's Rights, a non-profit legal organization whose attorneys have substantial experience and expertise in child welfare institutional reform class actions; and Nutter McClennen & Fish, LLP, a private law firm located in Boston, Massachusetts with extensive experience in complex civil litigation.

156.    Plaintiff Children's attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the class.

157.    Defendants have acted or failed to act on grounds generally applicable to all Plaintiff Children, necessitating declaratory and injunctive relief for the class.  Plaintiff Children's counsel knows of no conflicts among class members.

## GENERAL ALLEGATIONS

## I.  DEFENDANTS ARE CAUSING HARM TO CHILDREN IN FOSTER CARE

158.    DCF is causing harm to children in its foster care custody in the following ways:

    a.  it fails to protect children from abuse and neglect in foster care;

    b.  it unnecessarily moves children among multiple foster care placements;

c.   it places children in unsuitable or inappropriate foster homes that cannot properly care for them;

d.   it fails to reunify children with their families safely, or to provide them with an adoptive or other permanent family when it finds that safe reunification is not possible; and

e.   it fails to provide needed medical, dental, mental health, educational and other services necessary for children's safety, permanency and well-being.

159.   DCF thereby violates the constitutional and federal statutory rights of the Plaintiff Children.

160.   DCF and state officials have long been aware of these systemic failings and the resultant harm to vulnerable children.  Since 2000, DCF has undergone two federal performance audits of its child welfare system, known as Child and Family Services Reviews ("CFSR").  These reviews are conducted by U.S. HHS to assess the performance of a child welfare system, including the outcomes achieved for children, to identify areas in which systemic improvement is required to assure appropriate outcomes for children, and to implement corrective actions on performance areas found to be deficient.  Both federal audits revealed myriad areas in which the DCF foster care system was causing harm to the children under its care.

161.   The CFSR process includes two categories of performance measures relating to outcomes for children.  First, the performance of the audited system across the entire population of children served is evaluated in relation to six safety and permanency indicators based on a national database of child welfare outcomes.  Second, a randomly selected set of child case files from the audited system is reviewed by federal auditors and assessed in relation to seven safety, permanency and well-being outcome measures.

162.     The first CFSR audit of DCF took place during the week of July 23, 2001, and determined that DCF failed to conform to federal expectations in each of the six safety and permanency indicators and in each of the seven safety, permanency and well-being outcome measures.  Six years later, during the week of July 23, 2007, DCF underwent its second round CFSR audit.  The federal government then determined that DCF still failed to conform to federal expectations in all six safety and permanency performance indicators, and also failed to meet six of the seven safety, permanency and well-being outcome measures.

163.     Notwithstanding an almost nine-year opportunity to improve systemic performance since its first CFSR audit, DCF continues to place children at significant risk of harm.  As to even the most fundamental obligation of a child welfare system – protecting children from further abuse and neglect – DCF performance has actually declined since the 2001 CFSR.  DCF has not and is not acting with sufficient urgency to meet its constitutional and federal obligations.

A.     **Defendants Fail To Protect Children From Abuse And Neglect In Foster Care**

164.     Maltreatment of children in foster care has been a significant problem in Massachusetts for years.  According to federal data, DCF ranked 4th worst in the rate of child maltreatment in foster care among the 47 states reporting on this safety element in calendar year 2008; 7th worst among the 45 states reporting in 2007; 4th worst among the 46 states reporting in 2006; 2nd worst among the 43 states reporting in 2005; and 3rd worst among the 37 states reporting in 2004.

165.     Fully aware of this history of high rates of abuse or neglect in foster care, Defendants are failing to implement the changes required to protect children in foster care from maltreatment.  During 2009, an average of five children in foster care per week were the victims

of abuse or neglect by their foster care providers.  In DCF's *Child Welfare Act Reports, Fiscal Year 2009*, Defendants reported a rate of maltreatment in foster care that exceeds the federal CFSR expectation for child safety by nearly 400%.   Between 2008 and 2009, the overall rate of substantiated abuse or neglect in foster care increased by 13%.

166.    The high rate of maltreatment in care in Massachusetts is an inevitable result of a system burdened with high caseworker caseloads, inadequate caseworker and supervisor training, poor caseworker-child visitation practices and an inadequate array of appropriate foster homes and attendant support services.

167.    The problem of child maltreatment in Massachusetts foster care has received wide publicity, including, inter alia:

a.   On March 6, 2005, four-year-old Dontel Jeffers died after he was tied to a radiator by his foster mother, tortured for days, and kicked so hard that his bladder burst.

b.   In April 2006, four-year-old Isaiah Barboza was hospitalized for second-degree burns from his waist to his toes after being exposed to scalding water while under the supervision of his foster mother.

c.   On April 6, 2008, fourteen-year-old Acia Johnson died in an arson fire in her biological mother's home.  The fire was set by the mother's lover.  DCF had previously removed Acia from that home due to domestic violence, among other things.  Acia resided in multiple foster homes following her removal by DCF and, at the time of the fire, was placed with her grandmother for temporary foster care.  Due to inadequate supervision and oversight by DCF, Acia was able to leave her grandmother's home and move back into the home of her biological mother, where she died.  DCF claimed it had no idea that the mother had taken the child back into her home, even though DCF had received continued reports of abuse and neglect by the mother, including one alleging that the mother had been chasing Acia's brother around the house with a hammer.  In December 2008, the Massachusetts Office of the Child Advocate concluded that DCF had failed to perform even the most rudimentary checks when investigating these reports.

    d.  In January 2009, a four-year-old boy was severely burned with a hair-straightening iron by his foster mother; this injury was so serious that it required skin graft surgery.

**B.**    <u>Defendants Unnecessarily Move Children Among Multiple Foster Care Placements</u>

168.    Multiple foster care placements harm children.  The DCF *Practice Point for Trauma-Informed Casework Practice* states:

> Every move may be experienced by the child as another traumatic event, regardless of the reason for the move.  Stability in living situation is a foundation to permanency.  Instability of placement, multiple moves, and our inability to achieve timely permanency can increase a child's sense of anxiety and heighten a child's feelings of insecurity or 'not belonging.'

169.    As recognized by DCF in its *Child and Family Services Plan for FY2010–FY2014:*

> Multiple moves disrupt a child's ability to maintain connections with family and/or to develop the connections they need for positive emotional, social growth.  Instability in placement also significantly impacts a child's educational achievement.  Research has shown that the more frequently a child moves subsequent to a home removal, the longer it is before they are able to return home and the less likely they are to progress in their education.

170.    Beyond the obvious changes in home environment and primary caretaker, placement moves often result in changes in a child's caseworker, therapist and other service providers, school and friends, as well as in the frequency or nature of family visitation.

171.    DCF moves children among foster care placements at a rate that places Massachusetts among the eight worst foster care systems in the country in terms of placement stability.  According to federal data from the July 2007 CFSR, 51.4% of children who had been in Massachusetts foster care for one to two years had experienced three or more placements, and 77.5% of children in foster care for more than two years had experienced three or more

placements. Even within the first twelve months of their placement into foster care, 28.1% of children in DCF custody had already experienced multiple placement moves in 2007.

172.    Thousands of children in DCF custody have been through five or more placements.

173.    Of the 812 youth who aged out of state foster care in 2005, DCF had subjected 319 of them to ten or more placements.

174.    The frequency of moves for children in DCF foster care is an inevitable result of a system with an inadequate array of suitable foster homes, ineffective matching between children and foster homes, and a lack of services, specialized programs and financial supports to enable foster parents to manage child needs.

### C.    Defendants Place Children In Unsuitable Or Inappropriate Foster Homes Unable To Properly Care For Them

175.    DCF harms children by selecting foster homes that are ill-suited and ill-equipped to meet their needs. For example, DCF placed: a child who only speaks English in a home where English is not spoken; a toddler with foster parents who specifically requested teens and were unable to provide the daycare needed for younger children; an asthmatic child in a home with smokers; and a gay teen in a home intolerant of differences in sexual orientation.

176.    DCF also harms children by making inappropriate decisions regarding residential and group placements. Due to the trauma they have experienced, some children are unable to live in an intimate family setting without prior therapeutic intervention and stabilization. For these children, temporary placement in a more structured congregate setting is often clinically recommended.

177.    Defendants frequently do not follow clinical recommendations that a child be placed in a more restrictive and structured foster care setting such as a residential treatment

center.  Conversely, Defendants too often fail to return children placed in residential care to more family-like settings when they are ready.

178.    Some children present needs that do not require residential care, but nonetheless require supports that are not available in basic family foster care.  For these children, DCF procures, through private providers, an array of "intensive" foster care homes, which provide additional case management support and services.  However, DCF fails to consistently make appropriate decisions regarding when to place or keep a child in an intensive foster care home.

179.    Given its inadequate number and array of foster care placements, DCF also experiences an elevated rate of children running away from foster care placements that fail to meet their needs.  Though the national rate for youth "on the run" is approximately 2% of the foster care population, DCF experienced rates as high as 4 to 7% in numerous regions of the state in state fiscal year 2008.  The DCF Area Office for Springfield reported a rate of 7% in state fiscal year 2008 and 9% the preceding year – 350 to 450% of the national average.  DCF has failed to implement meaningful programmatic or policy solutions to address this serious safety threat.

180.    This poor decision making is an inevitable result of a system with overwhelmingly high caseloads, poor caseworker training and supervision and an overarching lack of organizational and individual accountability to assure acceptable results for children.

   **D.    Defendants Fail To Provide Children With Permanent Families As Soon As Safely Possible**

181.    Foster care is intended to be temporary.  Children who do not grow up in stable family environments are less likely to complete their education, to form healthy relationships or to be otherwise prepared to live healthy, satisfying adult lives.  Accordingly,

professional standards provide that foster children should be placed in permanent, safe, loving homes as quickly as possible, whether with their parents or with an adoptive family.

182.    Plaintiff Children are frequently harmed because DCF permits them to languish for years in foster care.  As of September 30, 2009, DCF reported that 2,038 children had remained in foster care for two to four years, and 1,594 for more than four years.

### 1. Defendants Fail To Safely Reunify Children With Their Families

183.    Federal and state law provide that DCF must, in the first instance, make a reasonable effort to preserve family relationships.  After a child is removed from home due to abuse or neglect, federal law and policy dictate that the preferred course of action is to reunify the child with his or her parents.  Reunification, however, is only appropriate where the reason for removal has been addressed through appropriate services to the family so that child safety is assured.

184.    Children reunified with their families by DCF too often re-enter foster care due to further abuse and neglect.  Failed reunifications cause harm to children both as a result of additional maltreatment and the trauma that accompanies repeated family separation.

185.    DCF returns a significant number of children in foster care to their parents without taking adequate measures to assure the children's safety.  According to federal data from the 2007 CFSR, 15.7% of children in DCF foster care who had been returned to their families re-entered foster care within 12 months.  DCF subsequently reported a re-entry rate of 16% for children who were reunified with their families for the period from April 1, 2007 to March 31, 2008.  This rate exceeds the federal expectation by nearly 60%.

186.    The high rate of re-entry is an inevitable result of a system with a lack of adequate parental involvement in case planning, untrained caseworkers with high caseloads, poor caseworker supervision and an insufficient array of child and family services.

187.    In the worst cases, inappropriate reunifications lead to severe injury or even death.  On March 19, 2010, Kim Peno killed her two-year-old son, Timothy.  Timothy had previously been in DCF custody, but had been reunified with his mother between six months and a year before his death.  Medical reports revealed that Timothy died after suffering multiple blows to the head, which probably caused a severe brain injury, and that his body was covered in bruises.

188.    In November 2007, nine-month-old Jocelyn Ward Anderson was killed by her mother after having been reunified with her after a four-month episode in foster care. Examination revealed that Jocelyn had been the victim of three separate attacks by her mother in the days leading up to her death – one in which her arm was violently twisted, another in which she was thrown down on her bottom causing spinal injuries, and a final episode in which she was violently shaken and slammed onto an object, causing a fatal skull fracture.

### 2. *Defendants Fail To Timely Place Children With Adoptive Families When Reunification Is Not Possible*

189.    DCF is required to make prompt efforts to find children alternative permanent homes, typically through adoption, when reunification is not safely possible.

190.    DCF fails to secure timely adoptions for scores of children in its custody who cannot be safely returned to their families.  Many children with a goal of adoption languish in foster care for years, some literally growing up in state care.

191.    According to federal data from the 2007 CFSR, Massachusetts ranked 13th worst among the 47 reporting states in achieving timely adoptions for children.  Current DCF data reveals that necessary improvements have not been made in this vital area.

192.    As of September 30, 2009, 2,486 children in DCF foster care (2,112 of whom were ages 11 and younger) had the goal of adoption and were waiting for DCF to unite

them with permanent families.  Moreover, 46% of all children with the goal of adoption had already been in foster care for two years or more, and 13% had already been in care for more than four years.

193.    Over the last 15 years, there has been a dramatic decline in the annual number of finalized public adoptions in Massachusetts.  In state fiscal years 1995 through 1998, DCF reported 1,073, 1,113, 1,161 and 1,100 total finalized adoptions per year, respectively.  In contrast, in state fiscal years 2003 through 2006, DCF reported only 733, 812, 832 and 874 total finalized adoptions per year, respectively.  In state fiscal year 2009, DCF finalized only 764 adoptions.

194.    The lagging adoption rates in Massachusetts are an inevitable result of a system with excessive caseloads for adoption workers, inadequate caseworker training, insufficient financial supports for foster and adoptive parents, and inadequate efforts to recruit adoptive parents.

### 3.  *Defendants Fail To Prepare Children Who "Age Out" Of Foster Care To Live As Independent Adults*

195.    A June 2008 study by the Boston Foundation of youth aging out in 2005, *Preparing Our Kids for Education, Work and Life*, states: "[Y]outh who age out of [DCF] are still at considerable risk, particularly for homelessness, significant mental health needs, early pregnancy, physical violence and unwanted sexual contact."  The study reported that, of the youth surveyed, within three years of aging out of foster care:

    a.  37% experienced homelessness;

    b.  54% were unemployed; of those who were employed, 47% were employed 20 hours or less per week and only 10% received health benefits through employment;

    c.  30% were threatened or injured with a weapon in the last 12 months;

d.   11% suffered sexual contact against their will within the last 12 months;

e.   25% had been arrested and 8% had been incarcerated within the last 12 months;

f.   34% had used illegal drugs and 31% had drunk heavily in the past 30 days;

g.   43% had been pregnant or had impregnated someone; and

h.   59% reported feeling "sad or hopeless almost every day for two weeks or more in a row" during the last 12 months, which is an indicator of depression.

196.    Nearly 900 children aged out of Massachusetts foster care in 2009, approximately half of whom had spent three years or more in state care.

197.    According to a 2008 report issued by The Pew Charitable Trusts, Massachusetts was among the three states with the highest percentage of youth who aged out of foster care in 2006.

**E.      Defendants Fail To Provide Children With Essential Services**

*1.      Defendants Fail To Provide Children With Adequate Visitation With Parents And Siblings, Damaging Their Family Relationships*

198.    When a child who has been separated from his or her parents and siblings also loses meaningful contact with them, the trauma of separation is aggravated and successful reunification (if that is the goal) becomes more difficult.  Sibling connections can be severed irreversibly.  DCF, therefore, is required to ensure that children in foster care are regularly able to visit with their parents and siblings.  In far too many cases, DCF fails to meet these obligations.

199.    In the 2007 CFSR audit, the federal government determined that in only 76% of children's cases had the agency "made concerted efforts to ensure that [child-parent and

43

sibling] visitation was of sufficient frequency to meet the needs of the family"; this performance falls below the federal benchmark of 90% for this outcome measure.

200.    The 2007 CFSR audit also determined that:

a.    In 47% of audited cases, children in foster care visited with siblings less frequently than once per month;

b.    In 39% of audited cases, children in foster care had no visitation whatsoever with their fathers; and

c.    In 34% of audited cases, children in foster care visited with their mothers less frequently than once per month.

201.    DCF itself acknowledged in the course of the 2007 CFSR that "the child and family's opportunity to engage in quality visits during the time the child is in out-of-home placement positively impact the likelihood of reunification in a timely manner.  The availability of transportation for child/parents to visit also impacts both the quality and frequency of visitation."

202.    Even when DCF facilitates family visitation, the visits frequently take place for a mere hour, often in small, dingy and bare rooms that inhibit spontaneity and relaxed, natural or loving interactions.

## 2.   *Children Do Not Receive Adequate Medical, Dental And Mental Health Care*

203.    DCF fails to consistently and timely provide required medical, dental and mental health screenings and follow-up care to children in its custody.  Federal and Massachusetts law require that DCF assure to all children in foster care the screenings and follow-up care as set forth by the state under the "Early and Periodic Screening, Diagnosis and Treatment" ("EPSDT") provisions of Medicaid.

204.     The 2007 CFSR audit determined that only 75.4% of children were receiving adequate medical, dental and mental health care, well below the federal benchmark of 95%.

205.     Some three years later, DCF internal data reflects no material improvement in the delivery of medical, dental and mental health screenings.  Indeed, in its FY 2010-2014 Child and Family Services Plan, DCF acknowledges that its current performance target for timely provision of initial and comprehensive health assessments amounts to only 50% compliance with DCF policy.

206.     Massachusetts law requires DCF to furnish all foster caretakers with a "medical passport" setting forth the complete medical, dental and mental health history of the child placed with them.  DCF is required to assure that these medical passports are routinely updated and delivered to new foster caretakers whenever a child's placement is changed.   The medical passport is intended to assure that all relevant medical history for a child is readily available to substitute care providers and physicians who encounter the child and provide care.  This is particularly important for children in foster care because of their frequent placement moves, often between different neighborhoods and even counties.  DCF fails to meet its medical passport obligations.  This critical information is frequently not provided to foster parents and, even when provided, is often incomplete and outdated.

207.     DCF does not implement adequate procedural safeguards to assure that children receive psychotropic drugs only when medically necessary, and not just to control difficult behavior.  Public reports indicate that between two-thirds and three-quarters of children in DCF custody are receiving psychotropic medications.  Although state law requires judicial

oversight of certain anti-psychotic medications, no such oversight is required for other psychotropic medications, such as antidepressants.

208.    All children in DCF foster care are automatically eligible for Medicaid coverage and, therefore, are part of the certified class in *Rosie D. v. Patrick,* Civ. No. 01-30199. Plaintiffs here do not seek to relitigate the legal rights determined in *Rosie D.* and made subject to the *Rosie D.* remedial order.  Plaintiffs expressly reserve their right to seek a judicial remedy here for any failing by DCF to address their medical, dental and mental health needs, whether Medicaid-covered or not, that are not subject to the *Rosie D.* remedial order.

### 3.  *DCF Fails To Assure That Children Receive Adequate Educational Services*

209.    DCF policy recognize that all children in foster care must: attend school full-time; be provided educational assessments and services; receive the education most appropriate to their needs, including special education; and receive supplementary educational support as necessary.

210.    DCF frequently fails to meet the educational needs of children in its custody.  Though DCF had made strides in this service area as of 2007, since then resource reductions have led to a decline in performance.

211.    When DCF moves children from one placement to another, it makes inadequate efforts to maintain children in the same schools.  As a result, children are forced to change schools repeatedly, disrupting their education.

212.    Significant numbers of children in DCF custody require special education services, yet DCF fails to ensure that these needs are met.  Pursuant to DCF policy and guidelines, an adult must be appointed to exercise special education decision-making authority for children in foster care needing special education.  DCF does not consistently ensure that such a person is appointed or available.

213.     When DCF does provide an educational advocate, he or she often lacks the requisite knowledge and qualifications to effectively advocate for the child.  Though DCF has a stated preference that a child's foster parent function as his or her educational advocate, DCF fails to provide adequate training to prepare foster parents to fulfill that vital role.

214.     As a result of DCF's failure to assure necessary educational advocacy and services for children, a substantial number of children in DCF care fails to attain a high school diploma or even a General Educational Development ("GED") credential.

## II.  THE HARMS AND RISK OF HARMS SUFFERED BY CHILDREN RESULT FROM DEFENDANTS' FAILURE TO PROPERLY MANAGE THE DCF FOSTER CARE SYSTEM

215.     The harms described above in paragraphs 158 -- 214 result from Defendants' failure to address structural and systemic problems that have been known to DCF for years.  Among these systemic and structural problems are:  (a) an overburdened and undertrained workforce; (b) the failure to recruit and retain an adequate number and array of foster homes and other placement settings; (c) the failure to develop and implement appropriate case plans and services plans for foster children and their biological parents; and (d) the failure to effectively manage agency staff and programmatic resources.

### A.     Defendants Fail To Maintain An Adequately Staffed And Appropriately Trained Child Welfare Workforce

#### 1.  *Caseworkers Carry Unmanageable Caseloads*

216.     No foster care system can effectively perform its basic functions absent a well-trained, experienced and adequately staffed workforce.  Caseworkers are responsible for ensuring that children in foster care receive vital safety, health, educational and permanency services critical to their well-being.

217.    The Child Welfare League of America ("CWLA"), a coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice,  has established nationally-recognized standards for caseworker caseloads.  The standards governing foster care caseworkers limit caseloads to between 12 and 15 *children* per worker.  The Council on Accreditation ("COA"), an accrediting body that partners with human service organizations to improve child welfare service delivery outcomes, recommends that caseloads for foster care caseworkers be limited to 8 to 18 children per worker, depending on the needs of the children.

218.    By contrast, DCF caseloads exceed the CWLA and COA caseload standards by a wide margin.  These excessive caseloads overburden caseworkers and prevent them from performing casework in conformance with DCF policy and generally accepted standards of professional child welfare case practice.  DCF's contract with the union representing its caseworkers sets the cap for ongoing foster care workers at a ratio of 18 *families* per caseworker.  Because there are several siblings in many families, this 18:1 ratio translates into a caseload of 35 or more *children* per ongoing foster care worker.

219.    In reality, caseloads are substantially higher than the contracted ratio of 18:1.  Ongoing caseworkers across the state routinely carry caseloads of 22 to 27 families.  DCF foster care caseworkers typically carry caseloads *3 to 6 times* the CWLA and COA standards.

220.    DCF Commissioner McClain has recognized in the DCF Child and Family Services Plan for FY2010-FY2014, prepared and submitted to the federal government under his authority, that manageable caseloads are a "critical variable" in assuring that workers are able to address the goals of safety, permanency and well-being.

221.    To date, Defendants have not taken any meaningful action to bring caseloads to manageable levels.

### 2.  DCF Fails To Provide Adequate Training To Its Child Welfare Workforce

222.    A foster care system cannot provide for the safety and well-being of children absent a well-trained caseworker staff that is fluent in governing policy and procedure and familiar with current best practices.  A well-managed foster care system includes both pre-service training requirements, which must be fulfilled by caseworkers before they can carry an active caseload, and a mandatory annual in-service training requirement designed to refresh caseworkers in basic policy and procedure and to teach advances in policy and in the field.

223.    Though DCF requires the completion of a pre-service training curriculum before a caseworker can carry a caseload, DCF has no mandatory annual in-service training requirement.

224.    This shortcoming is especially problematic in Massachusetts, where there is no requirement that a prospective caseworker demonstrate any prior formal education or training in child welfare.

225.    DCF receives annual state funding to operate an intra-agency educational unit called the "Child Welfare Institute" ("CWI").  Defendants fail to make effective use of this important resource.  Caseworkers are not required to enroll in CWI programs.  While some caseworkers take advantage of continuing education offered by CWI, a significant number of caseworkers either choose not to attend these trainings or are unable to attend due to the burdens imposed by their high caseloads.

226.    As a direct result of DCF caseworkers' inadequate training, children frequently suffer harm because their assigned caseworkers are ill-prepared to make the judgments necessary to promote the children's safety and well-being.

**B.      Defendants Fail To Properly Manage DCF's Foster Care Placements**

227.     When DCF removes a child from his or her family home, it is obligated to provide a safe and suitable temporary home for that child until the child returns home or a new permanent family arrangement can be secured.  In selecting a particular foster care placement or institution for a child, DCF is obligated to assess the child's individual needs and to match those needs to a suitable and safe placement.  DCF's many management failures include:  (1) failure to recruit an adequate number of placements; (2) failure to timely and appropriately make use of kin placements; (3) lack of a uniform, effective system for appropriately matching children to the best available foster homes; and (4) failure to adequately monitor and oversee foster placements.

*1.  DCF Fails To Recruit And Retain An Adequate Number Of Foster Homes*

228.     A foster care system must, of course, maintain a sufficient number of homes to accommodate the number of children currently in custody and additional children as they enter the system on an ongoing basis.  In addition, child welfare practice requires that a sufficient array of placement types be available.  The types of placement will range from "basic" foster homes that provide ordinary parental care to children without heightened therapeutic needs, to more "therapeutic," "intensive" or "specialized" foster homes that receive additional training and support for the care of more high-needs children, to more highly structured or "restrictive" group homes and residential programs (known as "congregate care") suitable for children who cannot yet thrive in a family setting.

229.     Under federal law and policy, the preferred type of placement for any child is the least restrictive one that can meet the child's needs.  Further, children who are in more restrictive placements should be "stepped down" to less restrictive ones when they are safely able to do so.

230.    DCF regularly fails to recruit and retain an adequate number and array of foster homes.

231.    For example, DCF fails to retain a sufficient number of foster homes willing and able to care for teens.  As a result, DCF frequently places teens in congregate settings, even though the needs of many of these teens can be adequately met in a family home.

232.    The severe shortage of foster homes is reflected in DCF's overuse and misuse of "night-to-night" or "hotline" homes.  These "night-to-night" homes are designed to provide one-time, emergency beds for children removed from their homes late in the evening or on weekends.  However, DCF frequently uses these placements for longer periods of time because it cannot find appropriate, stable foster homes.  As found in the 2007 CFSR:

> In some regions, the agency uses "hotline" homes to place children (usually youth) until an appropriate placement is established.  In many of these homes, children do not have the option of being there during the day, so they spend time at the area offices awaiting confirmation of their next placement. For some youth, this pattern of "night-to-night" placement may occur with regularity.

233.    Though DCF policy and applicable licensing regulations place limits on the number of children who may be placed in a single foster home to assure child safety and well-being, DCF regularly must waive these restrictions due to the overall shortage of foster homes.

234.    One significant barrier to the recruitment and retention rate of foster homes is that DCF does not provide adequate financial supports to foster parents.

235.    Federal law requires any state receiving federal foster care funds to pay foster care maintenance payments, or "per diem" or "board" rates, to foster parents to cover the costs associated with the foster care of a child, including food, clothing, shelter, daily

supervision, school supplies, incidentals, liability insurance and reasonable travel to the child's home for visitation.

236.    DCF's foster care maintenance payments are inadequate to cover the costs that Massachusetts is required to pay foster parents under this law.  As of 2008, the United States Department of Agriculture ("USDA") estimated that the average monthly expenditures for a child in middle income, husband-wife families in the urban Northeast ranged from $1,043 to $1,228, net of health care, depending on the age of child.

237.    Under a different methodology, the National Foster Parent Association, the University of Maryland School of Social Work and Children's Rights estimated in a 2007 study that the monthly cost of caring for a child in foster care in Massachusetts ranges from $766 to $962, depending on age.

238.    The monthly payment provided to foster parents by DCF ranges from $520 to $565.  Thus, Massachusetts' foster care maintenance payments are 47 to 70% below the minimum required to meet the costs of raising a child in Massachusetts foster care.

239.    In a 2009 survey of 319 foster parents conducted by the Massachusetts Society for the Prevention of Cruelty to Children ("MSPCC"), 74% of the parents surveyed reported that the financial support they receive from DCF does not cover the costs of fostering a child, with their estimates of the shortfall ranging to over $200 per month.

240.    In 2008, Massachusetts enacted a law to raise the foster care maintenance rates, subject to appropriations, to meet the USDA estimates.  However, no rate increases have taken place.

241.   Defendant McClain acknowledged in his budget testimony in March 2009 that "[f]ailure to address rates could result in . . . difficulty in retaining current and recruiting new foster families."

242.   DCF also routinely fails to provide other necessary financial support to foster parents, such as daycare services and reimbursements for extraordinary child care expenses.

243.   DCF recruits two-earner families as foster homes.  These foster families require dependable and consistent daycare in order to meet the needs of the children who are placed with them.  However, DCF does not subsidize a sufficient number of daycare slots to meet foster parent demand.

244.   The 2009 MSPCC survey of foster parents revealed that nearly half had refused placements of children.  "Daycare issues" was the most commonly stated reason for refusal.  Only 41% of the surveyed parents reported that they received needed child care for their foster children "always" or "most of the time."

245.   DCF policy, through its "receiptable reimbursement program" ("RRP"), provides for reimbursement to foster and pre-adoptive families for exceptional and essential out-of-pocket costs, such as transportation to doctors, therapists and biological family visitation; medication, medical supplies and equipment; therapy not covered by MassHealth; and replacement of eyeglasses and orthopedic shoes.

246.   Through its Parents and Children Together Program ("PACT"), DCF is also supposed to reimburse foster parents for their time and effort in meeting certain needs that are specified by DCF in children's case plans, which efforts are not otherwise paid for through foster care maintenance payments, MassHealth or other funding sources.  Such services include

care for multiply-handicapped children, physical therapy, care of a catheter and other special needs.  Approximately half of the foster parents surveyed by MSPCC in 2009 made use of PACT.

247.     In the past year, RRP and PACT funding have been severely cut.  These cuts make it impossible for many foster parents, who are unable to provide these services without reimbursement, to continue accepting DCF placements or to fully support the children placed with them.

248.     In the 2009 MSPCC survey, only 61.6% of foster parents surveyed indicated that they planned to continue fostering.

## 2.  DCF Fails To Timely And Appropriately Make Use Of Kin Placements

249.     Massachusetts law requires caseworkers to search for and place children with kin, if appropriate and safe, at the outset of a child's foster care episode in order to reduce the trauma of removal.  DCF regulations similarly require that DCF consider "placement with kinship family" before considering any other placement.  110 CMR 7.101(2).

250.     Defendants are failing to uniformly administer this policy.  DCF often does not place children with kin even when appropriate kin placements are available, thus aggravating the trauma of the children's removal from their parents.  The 2007 CFSR audit determined that in nearly one out of every four applicable cases, DCF failed to make diligent efforts to locate and assess a child's relatives as possible foster care placements.

251.     The failure to timely identify potential kin placements also results in subsequent placement instability.  DCF frequently finds a potential kin resource only after initial placement of a child with a stranger foster parent; in these situations, the child must endure the trauma of an additional placement move in order to live with kin.

252.     Under Massachusetts law, kinship foster care providers are required to obtain the same license that is required of third-party foster parents.  Licensure not only permits the kin to provide foster care, but also entitles them to the same supports and protections, including Medicaid coverage, services, caseworker visits, supervision of parental visits and foster care maintenance payments, that are provided to third-party foster caretakers.

253.     DCF frequently facilitates placement of abused and neglected children with unlicensed kin, when circumstances prevent the licensure of that kin home and a court is nonetheless willing to place direct legal custody of the child with the identified kin.  DCF has not promulgated any policy regarding the use and support of unlicensed kin, but instead allows area offices throughout the state to place children in these unlicensed homes on an ad hoc basis.  As a result, in many areas of the state, DCF is placing children in the homes of relatives without adequately assuring the safety and stability of these placements.

### 3.     DCF Does Not Appropriately Match Children To Foster Care Placements Capable Of Meeting Their Needs

#### a)     DCF Is Placing Children Wherever There Is An Available Bed Rather Than On The Basis Of Need

254.     DCF has not implemented an adequate system for appropriately matching foster children to foster homes.  Rather than assessing all relevant circumstances, including the capacity of foster care providers to serve a child's needs, DCF often chooses placements for children haphazardly or on the basis of mere availability.  As concluded in the 2007 CFSR, "[c]hildren may be placed wherever there is a bed, and this may result in poor matches."

255.     The chronic shortage of appropriate foster homes contributes to DCF's failure to appropriately match children to foster homes, since caseworkers often have few or no placement options for children at the time they are removed.

256.    In the 2007 CFSR, DCF itself admitted that the instability of foster placements in Massachusetts stems from myriad systemic flaws including: (a) "ineffective matches between children and resource [foster] homes," (b) "foster parents who have not been adequately trained or supported in caring for the child," and (c) "inadequate information provided to family foster care and congregate care providers during emergency placement of children."

### b) DCF Fails To Use Residential Care When Needed, Instead Waiting For Children To "Fail Up" The System

257.    DCF routinely denies children placements in residential treatment facilities, even when these placements are clinically recommended, forcing children instead to "fail up" the system.  DCF initially places these high-need children in basic foster homes; these placements inevitably fail due to the inability of the foster parents to meet the children's needs. Only after the children's conditions have deteriorated even further due to a lack of appropriate services and the trauma of repeated placement moves does DCF finally authorize the residential care that was clearly needed in the first place.

258.    Once children are in residential care, DCF often "steps them down" prematurely, leading to a new series of failed placements and further emotional deterioration.

259.    The Child Welfare League of Massachusetts reported in its 2009 study, *Public Secrets: Silent Suffering*, that: "Children with serious emotional and behavioral issues are being referred to foster care homes instead of residential programs against clinical advice."  The report also stated:

> [A] non-profit provider indicated an increase in activity to move their current kids to lower levels of care.  DCF social workers with whom this provider interacts are reporting that placement decisions are now often made based on financial concerns, and against their professional recommendation.

56

### 4. DCF Fails To Assure Foster Home Safety

#### a) DCF Fails To Assure Regular Caseworker Visits To Children In Foster Homes or Congregate Care

260.    Without direct observation by trained caseworkers of the conditions in foster homes and congregate care facilities, the foster care system cannot adequately assure child safety.

261.    DCF Commissioner McClain, in a March 27, 2008 Boston Globe article, acknowledged the threat of harm to children in DCF custody when caseworkers do not regularly visit them, stating: "[R]esearch shows there's a correlation between frequency of worker contact and good outcomes for kids and families, *especially keeping kids safe.*" (Emphasis added.)

262.    Defendant McClain also stated in the DCF Child and Family Services Plan For FY2010-FY2014 that regular worker visits with children are a "cornerstone of child welfare practice," and one of the basic "nuts and bolts" of good casework practice.

263.    DCF caseworkers agree.  As stated by an officer of the Service Employees International Union ("SEIU") Local 509, which represents DCF caseworkers: "Our staff is overburdened, and to be perfectly honest, we're worried a kid is going to get hurt.  If we can't get out there to see these kids, we're worried someone will slip through the cracks."

264.    Thousands of children in DCF custody are not receiving required monthly caseworker visits.  In connection with the 2007 CFSR, DCF reported that only 70% of children were receiving monthly visits from their caseworkers as required.  More specifically, across all DCF regions, the percentage of children receiving monthly visits from their caseworkers ranged from 68 to 73%.

265.    Only 53.2% of the 319 foster parents surveyed by MSPCC in 2009 reported seeing their foster child's caseworker monthly, and 29.7% reported that the caseworker spent no time alone with the foster child at all.

266.    Caseworkers frequently fail to visit with foster children for periods of two, three or more consecutive months.  When such visits do occur, they are often brief and do not always involve direct conversation between the caseworker and the child outside the presence of the foster parent.

267.    Though both management and caseworker staff recognize the vital importance of caseworker-child visitation, DCF is unable to determine whether caseworkers are visiting children as required.  DCF reported in its Child and Family Services Plan for FY2010-FY2014:

> It is unclear whether our current performance is attributable to a lack of actual visits, data definition/entry issues, or some combination of both.  This is compounded by the lack of an institutionalized quality assurance process that could potentially identify systemic and practice issues.  This challenge has implications in other practice areas, as well.

268.    DCF is therefore violating federal law requiring DCF to collect and report data relating to (1) the percentage of children in foster care who were visited during each and every calendar month and (2) the percentage of visits that occurred in the child's residence.

### b)  DCF Fails To Effectively Monitor Foster Placements Recruited, Managed And Supervised By Private Agencies

269.    DCF places children removed from home due to abuse or neglect in foster care settings either directly supervised by DCF caseworkers or indirectly managed by DCF through private agencies.  When DCF engages a private agency to provide supervision and care for a child, DCF retains ultimate responsibility for that child's safety, permanency and well-being.

270.    The foster care settings directly recruited and supervised by DCF are all basic foster family homes.  DCF provides intensive foster care and congregate care for children with elevated needs by procuring those services from private agencies.

271.    As of December 31, 2008, DCF had placed 40% of all children in out-of-home care in placements run by private agencies.

272.    Since state fiscal year 2005, DCF has contracted with an array of "Lead Agencies" to administer the delivery of foster care services provided by the private providers under contract with the state.  DCF calls this management model for purchased services "Family Networks."  There is one Lead Agency for each of the 29 DCF Area Offices.

273.    The Lead Agencies that operate the Family Networks system are responsible for, inter alia: (a) assessing and coordinating the needs of individual children whether in private or public placements; (b) performing case management activities for children in private contract agency placements; (c) facilitating Family Team Meetings; (d) managing private contract agency providers and networks; (e) developing a network of community-based child welfare resources; (f) providing educational coordinators for children; and (g) performing utilization reviews to assure that purchase of service contracts are implemented consistent with the overall DCF budget.

274.    By building the Family Networks structure, DCF has outsourced a large portion of the administration and management responsibilities for its foster care placement and services needs.  DCF does not possess an effective internal contract monitoring function to oversee the Lead Agencies and the private providers they manage for DCF.  DCF does not conduct periodic on-site reviews of its private providers to monitor child safety, contract compliance and policy compliance or to assess outcomes achieved for children in their care.

Private agencies receive only a biannual licensing inspection by the Department of Early

Education and Care, which performs private agency licensing pursuant to a memorandum of

understanding with EOHHS.  Thus, the private agencies are essentially self-policing.

275.    DCF is currently in the process of dismantling the Family Networks

purchased services management model.  With no developed and funded plan to increase DCF

administrative staff to take over the functions now performed by the Lead Agencies, children in

private placements will be left with even less system oversight.

C.    **DCF Fails To Properly Develop And Implement Case Plans And Service Plans For Foster Children And Their Families**

276.    Federal law mandates that state child welfare agencies assign an

appropriate permanency goal to children in foster care on a timely basis, and then provide

casework and services, as needed, to achieve children's permanency goals as quickly as possible.

DCF routinely fails to do this for children in its custody.  DCF's failures include: (a) the failure

to develop and implement appropriate service plans to reunify families safely and permanently

when appropriate; (b) the failure to accomplish adoptions on a timely basis; and (c) the failure to

provide necessary independent living services.

*1.  DCF Fails To Sustain Family Ties And Support Reunification When It Is Safely Possible*

277.    Under federal policy, a child welfare agency must make reasonable efforts

to maintain and restore family relationships whenever possible.  Accordingly, when a child is

removed from his or her family, reunification is the preferred permanency goal.  DCF recognizes

that child-parent and sibling visitation are essential elements of the reunification process.

278.    DCF is required to promptly undertake all reasonable efforts to achieve

reunification, including providing those services necessary to enable parents to provide a safe

and stable home for their children.  The necessary reunification services, which are established in

a service plan between DCF and the parent(s), may include psychological evaluations and/or care; substance abuse treatment; parenting classes or assistance; or assistance with accessing adequate housing, among other things.

279.    DCF fails to involve parents in case and service planning.  Without input from parents, DCF case plans and service plans often do not address the individual needs of parents.  The 2007 CFSR found that DCF had adequately assured family involvement in services planning in only 49% of cases.

280.    Parents often find themselves confronted with service plan requirements that set them up for failure:  DCF frequently imposes service plans on parents setting forth what they must do to get their children back, but fails to provide or subsidize many of the required services, or even to direct parents where such services might be available.  For example, service plans often require psychological evaluations or therapy, but parents find themselves on long waiting lists for appointments.  When drug screening or treatment is required, parents find they have no access to drug screening or treatment services in their area.

281.    DCF does not take measures to assure adequate availability of child and family services throughout the state.  In less urban areas, services are even more likely to be unavailable or inaccessible due to distance and lack of transportation.

282.    Parents' inability to comply with DCF's service plans because services are inaccessible or unavailable delays reunification, or even results in termination of parental rights and a change in the child's permanency plan.

283.    Regular contact between caseworkers and parents is also an essential ingredient to facilitating parents' progress in meeting service plan requirements and assuring the

safe reunification of families.  The 2007 CFSR found that in 50% of cases, the assigned DCF

caseworker had failed to visit the parent(s) of children in foster care with sufficient frequency.

284.     Children are entitled to maintain their relationships with siblings and

parents through visitation.   Furthermore, DCF's Child and Family Services Plan for FY2010-

FY2014 acknowledges that frequent, high-quality visitation between children and their parents is

essential to successful reunification.

285.     Visitation practice within DCF suffers due to known systemic problems

including:  (1) failure to provide for a sufficient number of child-parent or sibling visits in the

case planning process; and (2) failure to implement the visitation provided in the case plans as

written.

## 2.  DCF Fails To Assure Timely Adoptions

286.     When reunification cannot safely be achieved for a child, federal and

Massachusetts law require DCF to provide an alternative permanent family for the child.  DCF

fails to develop and fully implement the programs and practices required to timely place children

with permanent adoptive families or permanent guardians.

287.     As of June 30, 2009, only 40% of children assigned a goal of adoption had

been legally freed for adoption through the filing by DCF, and grant by the juvenile court, of a

petition to terminate the legal rights of biological parents.  Prospective adoptive families are

frequently hesitant to consider adopting children who are not already legally free because of the

uncertainties of the termination process.

288.     Moreover, DCF is ineffective in recruiting potential adoptive families and

matching them with children available for adoption.  Even after a child's parents' rights have

been terminated, it takes on average an additional 15 months for DCF to finalize the child's

adoption, according to federal data for the period October 1, 2005 to September 30, 2006.  This

places Massachusetts in the bottom 40% of the 52 reporting jurisdictions. For 18% of children adopted in the period October 1, 2005 to September 30, 2006, more than two years had elapsed between termination of parental rights and finalization of adoption.

289.     As a further barrier to children's timely adoptions, DCF fails to maintain an adequate staff of public and private provider adoption caseworkers. CWLA has established standards for adoption caseworker caseloads to be between 10 and 12 *children* per worker for adoption services.

290.     DCF caseloads far exceed the CWLA caseload standard. DCF adoption caseworkers routinely carry caseloads of 18 *families* per worker or higher. These burdensome caseloads prevent adoption caseworkers from conducting the intensive, individually tailored recruitment activities that are required to match children with potential adoptive families on a timely basis.

291.     Another barrier to adoptive recruitment in Massachusetts is the inadequate foster care maintenance rate paid to foster parents by DCF. Under federal law, these same rates set a ceiling on the rate that can be paid to adoptive parents in the form of federal adoption subsidies.

### 3.   *DCF Fails To Adequately Prepare Youth Aging Out To Live Independently As Adults*

292.     According to professional standards, youth aging out of foster care should be provided with the skills and resources to live independently as adults. Moreover, a child welfare agency must provide adequate transitional services to youth who will age out including: job training and/or education; life skills training; and assistance in obtaining any government benefits for which they may be eligible such as subsidized housing. DCF fails to adequately

prepare youth who are aging out of foster care to live independently as adults and makes

inadequate efforts to foster connections between these youths and adult mentors.

293.    The permanency goal assigned to youth who will age out of foster care is

"another planned permanent living arrangement" ("APPLA").  Youth assigned this permanency

goal require independent living services to prepare them to live on their own.  The 2007 CFSR

reported that "the goal of [APPLA] was being addressed in an appropriate way" in only 47% of

audited children's cases.

294.    Though approximately 4,000 youth in DCF foster care were ages 14 and

above in 2009, DCF managed an active caseload of only 501 youth in state fiscal year 2009 who

were receiving independent living services.  These youth were served by a statewide adolescent

support workforce of only 17 caseworkers and 3 supervisors.  The vast majority of youth

expected to age out of DCF foster care does not receive adequate independent living services.

295.    A 2008 Boston Foundation study revealed that there is a "lack of basic

knowledge among aging-out youth concerning life skills and continuing sources of resources and

support."  The study further identified a number of systemic deficiencies that cause this lack of

preparation and the harm that results from it: "First, . . . the existing child welfare system is

focused on children, and not age appropriate for youth or young adults.  Second, due to inter-

agency collaboration problems, youth frequently 'fall through the cracks' between state systems.

Third, lack of opportunities and options, especially housing, hindered the successful transition of

aging-out youth."

D.    **DCF Fails To Access Available Federal Funding**

296.    Pursuant to Title IV-E of the Social Security Act, 42 U.S.C. §§ 670 et seq.,

the federal government provides matching funds to all state-managed foster care systems to

reimburse a portion of the costs of maintaining abused and neglected children in foster care.  The

Title IV-E foster care program is an open-ended entitlement that provides matching funds for all eligible children without the imposition of a federal spending cap. It is the obligation of the states to meet certain federal criteria to access and sustain the flow of Title IV-E funding.

297. A well-managed foster care system in the United States qualifies about 55 to 60% of its foster care population for Title IV-E reimbursements from the federal government. Massachusetts had a Title IV-E utilization or "penetration" rate of 42.5% in 1998. Just eight years later, in 2006, the penetration rate had dropped to 30%. In 2006, the average penetration rate in the United States was 57.35%. In 2007, DCF reported a penetration rate of just 27.21%.

298. Given the low Title IV-E utilization rate in Massachusetts, DCF fails to access millions of dollars in available federal funds to finance the State's overburdened foster care system, instead expending finite state funds far more than necessary. In state fiscal year 2000, Title IV-E federal funding constituted less than 35% of the total child welfare expenditures in Massachusetts, ranking Massachusetts fourth lowest among the states in relation to its utilization of federal entitlement funds for child welfare purposes.

## COUNT I

(Substantive Due Process under the U.S. Constitution)
(Asserted by all Named Plaintiffs and Plaintiff Children)

299. Each of the foregoing allegations is incorporated as if fully set forth herein.

300. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm when it takes that child into its foster care custody.

301. The foregoing actions and inactions of Defendants Deval L. Patrick, JudyAnn Bigby and Angelo McClain, in their official capacities, constitute a failure to meet their

affirmative duty to protect from harm all Named Plaintiffs and Plaintiff Children, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all Named Plaintiffs and Plaintiff Children.

302.    The forgoing actions and inactions of Defendants, Deval L. Patrick, JudyAnn Bigby and Angelo McClain, in their official capacities, constitute a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutionally-protected rights and liberty and privacy interests of all Named Plaintiffs and class members.  As a result, all Named Plaintiffs and class members have been, and are at risk of being, deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

303.    These substantive due process rights include, but are not limited to:

   a. the right to protection from unnecessary harm while in government custody;

   b. the right to a living environment that protects foster children's physical, mental and emotional safety and well-being;

   c. the right to services necessary to prevent foster children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services;

   d. the right to treatment and care consistent with the purpose of the assumption of custody by DCF;

   e. the right not to be maintained in custody longer than is necessary to accomplish the purposes to be served by taking the child into custody;

   f. the right to receive care, treatment and services determined and provided through the exercise of accepted professional judgment; and

g. the right to be placed in the least restrictive placement according to a foster child's needs.

## COUNT II

(First, Ninth, and Fourteenth Amendments to the United States Constitution)
(Asserted by all Named Plaintiffs and Plaintiff Children)

304. Each of the foregoing allegations is incorporated as if fully set forth herein.

305. The foregoing actions and inactions of the Defendants Deval L. Patrick, JudyAnn Bigby and Angelo McClain, in their official capacities, amount to a policy, pattern, practice, or custom of failure to exercise professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, all Named Plaintiffs and Plaintiff Children have been, and are at further risk of being, harmed and deprived of the liberty interests, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

## COUNT III

(The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq.)
(Asserted by all Named Plaintiffs and Plaintiff Children)

306. Each of the foregoing allegations is incorporated as if fully set forth herein.

307. As a result of the foregoing actions and inactions by Defendants, Deval L. Patrick, JudyAnn Bigby and Angelo McClain, in their official capacities, Defendants are engaging in a policy, pattern, practice, or custom of depriving all Named Plaintiffs and class members of the rights conferred on them by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 (collectively the "Adoption

Assistance Act") and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357 to

documentation, including a child-specific recruitment plan, of the steps the agency is taking to

find an adoptive family, to place a child with an adoptive family and to finalize the adoption (42

U.S.C. § 675(1)(E)) and to foster care maintenance payments paid to the foster care providers

with whom the child is placed that cover the actual cost (and the cost of providing) the Plaintiff

child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation

with family, and other expenses (42 U.S.C. §§ 671(a)(1), 671(a)(11), 671(a)(12), 672(a)(1),

675(4)(A)).

## **COUNT IV**

(Procedural Due Process)
(Asserted by all Named Plaintiffs and Plaintiff Children)

308.     Each of the foregoing allegations is incorporated as if fully set forth

herein.

309.     Defendants' actions and inactions have resulted and are continuing to

result in the deprivation of the following state-law entitlements to which each Plaintiff child has

a constitutionally protected interest, without offering the Plaintiff Children adequate and

meaningful opportunity to be heard:

  a.   The rights in relation to "placement of children in private families;
       early and periodic screening, diagnostic and treatment standards;
       individualized health care plan" as provided in M.G.L. c. 119 § 32;

  b.   The right to a "medical passport" as set forth in 110 CMR § 7.124;

  c.   The rights to sibling visitation as provided in M.G.L. c. 119 § 26B(b),
       (d); and

  d.   The right to be considered for placement with relatives, other adult
       persons who have played significant positive roles in the child's life,
       and any minor siblings or half-siblings as provided in M.G.L. c. 119 §
       23(c).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

a.  Assert jurisdiction over this action;

b.  Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c.  Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

    i.  Defendants' violation of Plaintiff Children's substantive right to be free from harm under the due process clause of the Fourteenth Amendment to the United States Constitution;

    ii.  Defendants' violation of Plaintiff Children's rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

    iii.  Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 671(a)(1), 671(a)(11), 671(a)(12), 672(a)(1), 675(1)(E) and 675(4)(A).; and

    iv.  Defendants' violation of Plaintiff Children's right to procedural due process under the Fourteenth Amendment to the United States Constitution on the basis of state-created property rights.

d.  Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights.

e.  Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Children, including, but not limited to, the following:

    i.  **Caseloads.**  DCF shall establish and implement limits on the caseloads of all case-carrying workers for children in DCF placements and private agency placements operating under contract with DCF.  These caseload limits shall be based on the standards for accreditation of public child welfare agencies set by the Council on Accreditation ("COA") and the professional standards set by the Child Welfare League of America ("CWLA").

    ii.  **Education/Training.**  DCF shall develop and implement educational qualifications and a mandatory comprehensive pre-service and in-service training program for caseworkers and

69

supervisors based on standards for acceptable management of a child welfare system;

iii. **Availability of Necessary Resources for the Placement of Children and Services for Children and Parents.**  An assessment shall be conducted by qualified professionals to determine the need for additional services and placements, including the need for family preservation services, foster and adoptive placements (including placements for children with disabilities or other behavioral needs), wraparound services, reunification services, independent living services, and medical, dental, and mental health services, for children in foster care throughout the state; and the time period during which these placements and services will be developed.  Defendants shall take the steps necessary to develop these services and placements according to the assessment and the time frames it provides;

iv. **Monitoring the Safety of Children in Placement.**  DCF workers shall visit all children in placement and their foster parents as frequently as set forth in the standards set by the COA and the CWLA in order to ensure that the children are safe.

DCF shall also comply with the standards and processes required under Massachusetts law for the approval, screening, oversight and utilization of all placement types that house foster children;

v. **Child-Parent and Sibling Visitation.**  DCF shall develop and implement policies providing for adequate visitation between parents and children of those parents removed into foster care and siblings one or more of whom has been removed into foster care; Defendants shall develop and implement policies, which adequately provide for siblings being placed together in foster care and in adoptive or guardianship settings where those permanency goals are achieved;

vi. **Case and Service Planning.**  DCF shall take necessary action to provide adequate and timely case plans and case reviews for children and adequate and timely services plans for their parents.

vii. **Quality Assurance/Data.**  DCF shall ensure that it has a quality assurance ("QA") system consistent with the standards of the COA and CWLA that is capable of measuring the quality of services provided to children in DCF custody;

viii. **Contract Monitoring and Performance-Based Monitoring.** DCF shall ensure that an adequately staffed and trained contract monitoring unit is created within the state's central office for

purposes of overseeing and managing the purchased services of the agency; DCF shall develop and implement a performance-based contracting scheme with its private foster care providers to ensure the protection of children;

ix. **Foster Care Maintenance Rates.**  DCF shall determine and pay foster care reimbursement rates that fully meet the elements set forth in 42 U.S.C section 675(4)(A);

x. **Monitoring/Enforcement.**  The provisions of the Court order entered pursuant to Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court.  In addition, the Court shall have continuing jurisdiction to oversee compliance with that order.

f.  Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.  Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm by Defendants.

71

DATED: April 15, 2010

Respectfully submitted:

By:

  _/s/ Marcia Robinson Lowry_____
Marcia Robinson Lowry
        *applicant for admission pro hac vice*
Susan Lambiase
        *applicant for admission pro hac vice*
Sara Michelle Bartosz
        *applicant for admission pro hac vice*
Laurence D. Borten
        *applicant for admission pro hac vice*
Kara Morrow
        *applicant for admission pro hac vice*
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
*mlowry@childrensrights.org*
*slambiase@childrensrights.org*


By:

  _/s/ Daniel J. Gleason_____
Daniel J. Gleason (BBO# 194900)
Mary K. Ryan (BBO# 435860)
Jonathan D. Persky (BBO# 666651)
NUTTER MCCLENNEN & FISH, LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2604
Phone:  (617) 439-2000
Facsimile:  (617) 310-9000
*dgleason@nutter.com*
*mryan@nutter.com*
*jpersky@nutter.com*