# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### WESTERN DIVISION

| | |
|---|---|
| CONNOR B., by his next friend, ROCHELLE VIGURS, et al., | CIVIL ACTION NO. 10-CV-30073-MAP |
| Plaintiffs, | |
| v. | |
| DEVAL L. PATRICK, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS COMPLAINT

HON. DEVAL L. PATRICK, GOVERNOR, JUDYANN BIGBY, SECRETARY OF THE MASSACHUSETTS EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES, AND ANGELO MCCLAIN, COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES,

 By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

Amy Spector, BBO No. 557611
Robert L. Quinan, Jr., BBO No. 553010
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 963-2076
amy.spector@state.ma.us

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL AND LEGAL ALLEGATIONS IN THE
COMPLAINT ....................................................................................................................8

THE EXTENSIVE AND ONGOING ROLE OF THE JUVENILE
COURT IN CARE AND PROTECTION PROCEEDINGS ...........................................12

     A.     Initiation of Care and Protection Proceedings .......................................14

          1.     Emergency Transfer of Temporary Custody ............................16

          2.     Non-Emergency Transfer of Temporary
                Custody ....................................................................................18

     B.     Development and Review of the Department's
           Service Plan Through the Foster Care Review
           Process ....................................................................................19

          1.     Foster Care Review.....................................................................20

          2.     Hearing and Grievance Procedure .............................................22

     C.     Juvenile Court Review of Department's
           Determinations Relating to Placement and Other
           Incidents of Custody ...............................................................22

          1.     Placement Determinations .........................................................23

          2.     Visitation....................................................................................24

          3.     Medical and Educational Needs..................................................25

          4.     Juvenile Court Review of Department's
              Determinations.........................................................................26

     D.     Permanency Hearings .........................................................................27

     E.     Hearing on the Merits of the Care and Protection
           Petition, and Issuance of Decrees Adjudicating a
           Child in Need of Care and Protection and
           Terminating Parental Rights ...................................................29

     F.     Review and Redetermination Hearings .............................................32

THE ADOPTION ASSISTANCE AND CHILD WELFARE ACT
AND FEDERAL OVERSIGHT OF THE COMMONWEALTH'S
FOSTER CARE SYSTEM .......................................................................................32

    A.    State Foster Care Plan Requirements.....................................................34

        1.    Foster Care Maintenance Payments............................................34

        2.    Child-Specific Recruitment Plans................................................35

        3.    Development and Approval of the State Plan.............................36

        4.    Data Collection ...........................................................................36

    B.    Federal Oversight and Enforcement ......................................................36

        1.    Child and Family Services Review.............................................37

            a.    Performance Measures..................................................38

        2.    Partial Reviews ...........................................................................40

        3.    Program Improvement Plans.......................................................40

        4.    The 2007 Review and the Commonwealth's
            Program Improvement Plan .........................................................41

STATE LEGISLATIVE AND JUDICIAL BRANCH
OVERSIGHT.........................................................................................................45

    A.    Legislative Reform.................................................................................46

    B.    Judicial Reform Initiatives.....................................................................49

ARGUMENT............................................................................................................50

I.    THE COURT IS REQUIRED TO ABSTAIN FROM
    EXERCISING JURISDICTION, UNDER YOUNGER V.
    HARRIS...........................................................................................................50

    A.    Each of the Named Plaintiffs, and Every Child in
        the Proposed Plaintiff Class, Is the Subject of an
        Ongoing Care and Protection Proceeding in
        Massachusetts Juvenile Court.................................................................53

    B.    The Juvenile Court Proceedings Implicate
        Important State Interests ........................................................................56

C.    The Exercise of Federal Jurisdiction Will Interfere
      With the State Court Proceedings ..........................................................57

      1.    Federal Court Orders Relating to the
            Placement and Services Received by Each
            Child in the Proposed Plaintiff Class Would
            Require Individualized Determinations That
            Would Directly Interfere with Decisions
            Made by the Juvenile Courts in Each
            Pending Care and Protection .....................................................58

      2.    The Request for Systemic Relief Does Not
            Enable Plaintiffs to Circumvent Younger .................................61

D.    The State Court Proceedings Provide an Adequate
      Opportunity for the Plaintiffs to Raise Their Federal
      Constitutional Claims ............................................................................62

E.    Cases Involving Similar Claims in Which Courts
      Declined to Abstain on the Basis That Plaintiffs
      Sought Broad-Based Relief Are at Odds With the
      Core Concerns at the Heart of Younger ................................................69

II.   PLAINTIFFS HAVE FAILED TO SUFFICIENTLY
      ALLEGE THAT DEFENDANTS HAVE ENGAGED IN
      "CONSCIENCE-SHOCKING," EGREGIOUS, AND
      DELIBERATELY WRONGFUL CONDUCT THAT
      WOULD VIOLATE THE LIMITED SUBSTANTIVE
      DUE PROCESS RIGHTS AFFORDED TO FOSTER
      CHILDREN IN STATE CUSTODY ....................................................73

A.    Count I Seeks to Impose Affirmative Obligations
      Upon the Commonwealth Beyond What the
      Constitution Requires ............................................................................76

B.    Plaintiffs Cannot Plausibly Demonstrate that
      Defendants Have Adopted Conscience-Shocking
      Policies or Deliberate Indifference to Alleged
      Ongoing Constitutional Violations .......................................................82

III.  THE ELEVENTH AMENDMENT BARS ALL OF THE
      CLAIMS AS AGAINST THE GOVERNOR ......................................89

IV.   THE ADOPTION ASSISTANCE AND CHILD
WELFARE ACT DOES NOT UNAMBIGUOUSLY
CONFER A PRIVATELY ENFORCEABLE RIGHT
UPON PLAINTIFFS AND, ACCORDINGLY, THE ACT
CANNOT BE THE BASIS OF AN ACTION UNDER 42
U.S.C. § 1983...................................................................................................91

    A.   A Statute Passed Pursuant to Congress' Spending
Power Does Not Give Rise to Privately-Enforceable
Rights Except in Rare and Clearly-Delineated Cases...........................92

    B.   The Plain Language and Structure of the Act Do
Not Evince an Intent to Create Privately-
Enforceable Rights................................................................................95

    C.   The Structure of the Act Reflects an Aggregate and
Aspirational Focus That is Fundamentally
Inconsistent With the Creation of Privately
Enforceable Rights................................................................................97

    D.   Foster Care Maintenance Payments Are Benefits
Rather Than Privately Enforceable Rights .........................................101

    E.   Permanency Recruitment Is Traditionally the
Province of State Juvenile Courts, and in the
Absence of An Express Statement by Congress,
This Court Should Not Infer a Congressional Intent
to Depart from That Tradition.............................................................104

V.   PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM
IS BARRED BY THE ELEVENTH AMENDMENT,
BECAUSE IT SEEKS RELIEF AGAINST STATE
OFFICIALS BASED ON ALLEGED VIOLATIONS OF
STATE LAW AND BECAUSE THE STATE LAWS
UPON WHICH PLAINTIFFS RELY DO NOT GIVE
RISE TO CONSTITUTIONALLY PROTECTED
INTERESTS .....................................................................................................107

    A.   Plaintiffs' Asserted Interests in Private Placements,
Kinship Placements, and Sibling Visitation Are Not
Protected by the Due Process Clause..................................................109

    B.   The Commonwealth Provides Foster Children With
Extensive Process, and Plaintiffs do Not Allege
Otherwise ...........................................................................................112

VI.  PLAINTIFFS FAIL TO STATE A CLAIM FOR
     VIOLATION OF THE RIGHT TO FAMILIAL
     ASSOCIATION ........................................................................................................114


CONCLUSION.................................................................................................................116

## INTRODUCTION

This is a proposed class action brought by six children currently in the custody of the Massachusetts Department of Children and Families ("Department"), on behalf of all children who have been (and in the future will be) placed in the Department's custody as a result of a state Juvenile Court order adjudicating them in need of "care and protection" due to abuse or neglect by their parents.[1]  Plaintiffs broadly challenge the foster care system in Massachusetts, asserting claims under the federal Constitution and under federal statutory law, and they seek far-reaching injunctive relief in an effort to re-shape the foster care system.  The defendants, all sued in their official capacities, are Angelo McClain, the Department's Commissioner; Judyann Bigby, the Secretary of the Massachusetts Executive Office of Health and Human Services, within which the Department is established; and Governor Deval Patrick.

Plaintiffs allege systemic problems in the Department's administration of its foster care system, claiming that the Department allows children to "languish" in foster care, subjecting them to multiple placements that allegedly do not meet their needs.  They further assert that the Department fails to provide them with adequate medical and educational services, does not provide them with adequate parental and sibling visitation,

---

[1]  The six named plaintiffs, all of whom are identified by pseudonyms to protect their privacy, are Connor B., Adam S., Camila R., Andre S., Seth T., and Rakeem D.  Because the six plaintiffs are minors, each of them seeks to bring this action through a putative "next friend," pursuant to Fed. R. Civ. P. 17.  Simultaneously with the filing of the Complaint, plaintiffs filed a motion for class certification.  Pursuant to a stipulation between the parties, defendants are in the process of taking limited discovery relating to the class certification issue, including the role of the putative next friends.  Pending the completion of discovery, defendants take no position on the role of the putative next friends, other than to note that they require the Court's authorization in order to proceed. Fed. R. Civ. P. 17(c)(2).

and does not take other sufficient steps to protect the integrity of their families, in

violation of their constitutional rights to substantive due process, procedural due process,

and familial association under the First, Ninth, and Fourteenth Amendments.  They also

allege that the defendants fail to provide them with adequate recruitment plans and fail to

provide proper foster care maintenance payments, allegedly in violation of the Adoption

Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq.  The reality is far

more nuanced than plaintiffs suggest.  Nonetheless, plaintiffs seek far-reaching

declaratory and injunctive relief that, if granted, will impose ongoing and costly

obligations on the Department for many years to come.

Plaintiffs ask this Court to craft an expansive injunction that, among many other

things, would require the Department to establish new caseload limits for all social

workers based on standards set by two private child welfare organizations; restructure its

child-placement decision-making process and timeline; replace the Department's policies

governing sibling and parental visitation with standards that plaintiffs deem to be proper;

re-assess the need for services, case plans, and foster care placements for children and

services for their parents; replace the Department's existing quality assurance system;

and reshape the social-worker education and training program already in place.

Complaint ("Compl."), Prayer for Relief, ¶¶ (d)(e).

As the Supreme Court has counseled, "the principles of equity . . . militate heavily

against the grant of an injunction" against "those in charge of an executive branch of an

agency of state" except "in the most extraordinary circumstances."  Rizzo v. Goode, 423

U.S. 362, 379-80 (1976) (quotation marks and citations omitted).  Such extraordinary

circumstances are not present here.  Each of the named plaintiffs, and every child in the

proposed class, is the subject of an ongoing care and protection proceeding in Massachusetts Juvenile Court, where he or she has been afforded counsel.  Given the "delicate issues of federal-state relationships" at play, see id. (quoting Mayor v. Educational Equality League, 415 U.S. 605, 615 (1974), this Court should refrain from interfering with, or otherwise supplanting, those proceedings, where plaintiffs are free to raise the central claims that they assert here.  The Court accordingly should abstain under Younger v. Harris, 401 U.S. 37 (1971), and its progeny.  Moreover, in their attempt to restructure the Commonwealth's provision of foster care and related services through a class action suit, plaintiffs assert constitutional "rights" that are unmoored from the clauses on which they rely, and they attempt to privately enforce a federal spending statute that does not give rise to a private right of action.  Therefore, in the event that this Court declines to abstain, it should dismiss plaintiffs' Complaint for failure to state a claim upon which relief may be granted.

1.  The Juvenile Court is empowered to adjudicate plaintiffs' constitutional claims and has authority to afford them relief on the key aspects of their complaint; namely, their claims challenging the adequacy of their foster-care case plans and placement, their medical and educational services, and parental and sibling visitation.  Abstention under Younger therefore is appropriate, as two circuit courts and two district courts have held when presented with virtually identical claims challenging other states' foster care systems.  31 Foster Children v. Bush, 329 F.3d 1255 (11th Cir.), cert. denied, 540 U.S. 984 (2003); J.B. v. Valdez, 186 F.3d 1280 (10th Cir. 1999); Carson P. v. Heineman, 240 F.R.D. 456 (D. Neb. 2007); Laurie Q. v. Contra Costa County, 304 F. Supp.2d 1185 (N.D. Cal. 2004).  Abstention is particularly warranted in light of the far-reaching relief

that the plaintiffs seek, which "strike[s] at the very heart of federalism and the institutional competence of the judiciary to adjudicate state budgetary and policy matters." <u>E.T. v. George</u>, 681 F. Supp. 2d 1151, 1166 (E.D. Cal. 2010).

Much of the relief sought – in particular, the relief aimed at changing children's outcomes by imposing obligations on the Department with respect to placements, case plans, assessment of services, and visitation – directly interferes with the core function of the Juvenile Court in each plaintiff's care and protection proceeding. In the course of those proceedings, a state judge oversees a child's placement, services, visitation, and permanency goals and is empowered to issue orders affecting all of those matters. The state Juvenile Court proceedings accordingly provide plaintiffs with adequate remedies to address their complaints, requiring this Court to abstain. Simply put, plaintiffs' effort to "tak[e] the responsibility for a state's child dependency proceedings away from state courts and put[] it under federal court control" is "problematic [and] call[s] for <u>Younger</u> abstention." <u>31 Foster Children</u>, 320 F.3d at 1279 (citing <u>Joseph A. v. Ingram</u>, 275 F.3d 1253, 1274 (10th Cir. 2002)).

The remainder of the relief sought contemplates a court order requiring, among other things, that the Department establish lower limits on the number of cases assigned to workers and develop better systems to monitor the quality of services provided. In pursuing "systemic" relief, plaintiffs seek an order that would supplant the policy-making functions not only of the defendants but also of the State Legislature and the federal Administration for Children and Families ("ACF"), both of which play extensive roles in shaping the Commonwealth's foster care policy, and in supervising its implementation. Plaintiffs' request for "systemic relief" does not enable them to avoid "the effects of the

Younger abstention doctrine," see Joseph A. v. Ingram, 275 F.3d 1253, 1274 (10th Cir.

2002), and such pleas for relief in any event are more properly addressed to the foregoing

state and federal legislative and executive branch officials.  As the District Court in

Carson P. cautioned, in abstaining from virtually identical claims in Nebraska,

"[l]itigating claims in federal court, with evidence presented through adversarial and

competing expert testimony, is no substitute for the contemplative and reasoned analysis"

of the state legislative, judicial, and executive branch officials, and the federal ACF, all of

whom are "entrusted with tackling this difficult problem."  240 F.R.D. at 524 n.41.

    2.  Pursuant to the Adoption Assistance and Child Welfare Act, ACF is

specifically charged with conducting regular, and comprehensive, reviews of the

Commonwealth's foster care system.  Federal matching funds are expressly conditioned

on the State's performance, and ACF has determined that Massachusetts is in sufficient

compliance with federal law – and is actively taking steps to improve its foster care

system – to retain the full extent of its funding.[2]  Massachusetts' continuing efforts to

improve its foster care system, and the fact that the Commonwealth is sufficiently in

compliance with federal law to retain its full federal funding, speak of a system that,

while not perfect, readily meets constitutional standards.

---

[2]  ACF's review of Massachusetts' foster care system is set forth in a "Child and Family Services Review," which plaintiffs themselves reference in their complaint and which the Court therefore properly may consider in connection with defendants' motion to dismiss. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); see Airframe Sys., Inc. v. Raytheon Co., 520 F.Supp. 2d 258, 263 (D. Mass. 2007), aff'd, 601 F.3d 9 (1st Cir. 2000) ("[W]here the plaintiff has referenced part of a document in the Complaint, it is proper for the Court to view the rest of that document so as to be able to understand it in context.").  In addition, ACF, which works collaboratively with the states to develop an "Improvement Plan" aimed at addressing any needed areas of improvement in a State's administration of its foster care system, has approved Massachusetts' Improvement Plan.

The extent of the Department's reform efforts – and ACF's determination to continue full federal funding – establish the implausibility of plaintiffs' central claim: namely, that the Department has violated their right to substantive due process.  A substantive due process claim is not actionable unless plaintiffs can establish that state officials engaged in "conscience-shocking" conduct, requiring "'stunning' evidence of 'arbitrariness and caprice'" of an "'egregious'" nature.  J.R. v. Gloria, 593 F.3d 73, 79-80 (1st Cir. 2010).

The facts set forth in the Complaint do not plausibly establish that defendants, all of whom are top policy-makers, adopted policies or took other actions that would meet this high standard, and plaintiffs' substantive due process claim accordingly should be dismissed for failure to state a claim upon which relief can be based.  Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1949, 1950-51 (2009) (in order to survive a motion to dismiss, a complaint must do more than allege facts sufficient to establish "the mere possibility of misconduct"; it must plead facts that establish the "plausibility of entitlement to relief") (quotation marks omitted).  Thus, even if the Court declines to abstain, it should dismiss plaintiffs' substantive due process claim for failure to state a claim upon which relief may be granted.

Plaintiffs' procedural due process claim, based on an alleged failure to provide certain services mandated by state law, similarly should be dismissed pursuant to Rule 12(b)(6).  Many of the "rights" asserted by plaintiffs in connection with their procedural due process claim are not "liberty" or "property" interests to begin with, and, in any event, the State provides extensive processes – in Juvenile Court and through the Department's fair hearing process – that satisfy the requirements of Due Process.

Plaintiffs do not allege that they have attempted to avail themselves of those processes, nor do they allege that the processes somehow are deficient.  Plaintiffs' claim based on a constitutional right to "familial association" likewise fails on the face of the Complaint, because the Constitution does not require the State to provide a certain level of visitation or services aimed at reunification, as plaintiffs suggest.

Finally, plaintiffs' federal statutory claim to child-specific recruitment plans and appropriate foster care maintenance payments under the Adoption Assistance and Child Welfare Act should be dismissed for failure to state a claim, because the Act does not confer on plaintiffs a private right of action to enforce either of the "rights" they claim that the Act establishes.

3.  A close examination of the Complaint reveals a disconnect between the minimal and unsteady foundation of plaintiffs' legal claims, and the sweeping, costly, and intrusive relief that they seek.  Beyond the undeniable fact that the requested forms of relief would depart from well-established principles of comity, they simply are not supported by the legal claims that plaintiffs assert.

Plaintiffs assert, for example, that the Due Process Clause transforms goal-oriented – and privately promulgated – standards of foster care and familial visitation into Constitutional mandates; it does not.  They claim that a federal spending statute that conditions matching federal funds on state provision of certain foster care services is privately enforceable; it is not.  They contend that the problems faced by children in foster care are best overseen by this Court, rather than on an individual level by a Juvenile Court statutorily charged with that responsibility; they are not.

Accordingly, as set forth in the pages that follow, this Court should abstain or,

alternatively, dismiss the Complaint, which fails to state a claim for the relief that plaintiffs seek.

### FACTUAL AND LEGAL ALLEGATIONS IN THE COMPLAINT

Plaintiffs, six children currently in the custody of the Department, filed this action individually and on behalf of a proposed class of all children who now are or will be in the Department's "foster care custody" as a result of suffering abuse or neglect by their parents.  Compl. ¶ 1.[3]  Plaintiffs allege that defendants have harmed them individually, and they allege widespread, systemic deficiencies in the Commonwealth's foster care system that allegedly have harmed the putative class members or place them at risk of future harm.

Plaintiffs assert three constitutional claims.  In Count I, plaintiffs allege that defendants, through their "actions and inactions," have violated plaintiffs' right to substantive due process, by depriving them of a right to be free from harm while in the Department's custody; a right to safe and secure foster care placements; a right to proper treatment, care, and services, including adequate medical, dental, psychiatric, and educational services; a right not to be maintained in custody longer than is necessary to accomplish the purposes of the Department's custody; and a right to be placed in the least

---

[3]  The Department may obtain custody over a child in a number of ways, including custody of children who have been abused or neglected and over whom the Department obtains custody through a "care and protection" proceeding under Mass. G.L. c. 119, §§ 24-26, as discussed infra at pages 12-19.  It is these children, referred to in the Complaint as being within the "Department's foster care custody," on whose behalf plaintiffs bring this action.  The action does not involve (and the proposed plaintiff class does not include) children over whom the Department has obtained custody through other means, notably children in need of services ("CHINS") under Mass. G.L. c. 119, §§ 39E et seq., or children in the Department's custody pursuant to a voluntary placement agreement signed by their parents.

restrictive placement according to their needs.  Compl. ¶¶ 303(a)-(g).  Plaintiffs further

allege, in Count II, that the defendants have deprived (and will deprive) them of various

rights under the First, Ninth, and Fourteenth Amendments to the United States

Constitution, by failing to properly make use of kinship placements, failing to sustain

family ties and support reunification, and failing to provide sufficient visitation with

siblings and parents.  Compl. ¶¶ 198, 250, 277-278, 285, 305.

In Count IV, plaintiffs assert that defendants have deprived them (and will

continue to deprive them) of certain rights secured by state law without providing

procedural due process, in particular the right to be placed with private families; the right

to medical screening, an individualized health plan, and a "medical passport"; the right to

sibling visitation; and the right to have the Department consider kinship placements.

Compl. ¶¶ 308-309.  Finally, in Count III, plaintiffs seek to assert a claim under the

Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq., by

alleging that defendants have deprived them of (1) adequate "foster care maintenance

payments" that cover the actual cost of food, clothing, shelter, daily supervision, and

other expenses, and (2) recruitment plans documenting the steps that the Department is

taking to find an adoptive family and to finalize an adoption for each child.  Compl.

¶ 307.

With regard to the six named plaintiffs, the Complaint sets forth the following

specific allegations, which plaintiffs claim are illustrative of alleged system-wide

deficiencies.  Compl. ¶¶ 146-57.

Connor B.     Plaintiffs allege that the Department subjected Connor B. (now 9

years old) to multiple foster care placements; placed him in inappropriate foster homes, in

one of which he was sexually abused; failed to provide him with needed therapy; failed to provide staff at one placement with documentation of Connor's history or medication needs; failed to place him in a residential treatment program, disregarding clinical recommendations that he needed such a program; and failed to take the necessary steps to free him for adoption or to secure a permanent placement for him.  Compl. ¶¶ 15-34.

Adam S.        As to Adam S. (16 years old), plaintiffs allege that the Department failed to secure safe placements and subjected him to multiple placements, including an initial placement with adoptive parents who physically abused him (leading to the surrender of their parental rights); placed him in two residential centers that did not meet his needs, in one of which he was beaten by other residents; failed to find a permanent home for him; and failed to prepare him to live independently.  Compl. ¶¶ 35-56.

Camila R.        Plaintiffs allege that the Department subjected Camila R. (13 years old) to multiple placements, which included being returned at one point to her mother despite earlier physical abuse by her mother; failed to ensure that Camila received necessary therapy for mental health issues, including post-traumatic stress syndrome; failed to timely assess her educational needs; and failed to seek placement with kin or to secure a permanent placement for her.  Compl. ¶¶ 57-78.

Andre S.        Plaintiffs allege that the Department subjected Andre S. (15 years old) to multiple placements that did not meet his needs, including one kinship foster home in which he may have been sexually abused; failed to take actions necessary to preserve his relationship with family members; inappropriately placed him in a residential treatment program, where he lived for five years; failed to ensure that he received an evaluation for sexual abuse; and failed to secure a permanent placement for

him although he has been in custody since he was three years old and the rights of his

biological parents have been terminated.  Compl. ¶¶ 79-97.

Seth T.          Plaintiffs allege that the Department subjected Seth T. (13 years

old) to multiple placements; failed to secure a permanent placement for him, initially

assigning him a goal of long term substitute care rather than adoption even though the

rights of his biological parents had been terminated; and failed to take necessary steps to

preserve Seth's relationship with his brother, by providing insufficient sibling visitation.

Compl. ¶¶ 98-110.

Rakeem.          Plaintiffs allege that the Department subjected Rakeem (15 years

old) to multiple placements that did not meet his needs; failed to provide him with a

kinship placement despite his expressed desire to be placed with family members; placed

him in a group facility some distance from his family members; and failed to meet his

educational needs.  Compl. ¶¶ 111-133.

The factual allegations reflect that each of the named plaintiffs has suffered severe

abuse and neglect by his or her biological parents, leading to removal from their parents

and placement in the Department's custody.  Three of the plaintiffs – Connor B., Adam

S., and Andre S. – allegedly suffered further abuse in their foster homes.  As a result of

their abuse and neglect, all six plaintiffs allegedly suffer from serious behavioral and

psychological problems and require intensive treatment, at times rising to the level of

hospitalization.

The plaintiffs further allege that the Department, although having sought

placements to meet the six plaintiffs' needs, has struggled to find them permanent homes.

The Department does not dispute that the circumstances of these six children have

resulted in multiple placements as the Department has worked to identify appropriate

foster and adoptive parents who are willing and able to provide care for them on a

permanent basis.  Given the severe parental abuse or neglect that brought these plaintiffs

into the Department's care, and in light of the serious mental health problems that they

suffer, their situations, unfortunately, have not lent themselves to easy solutions.[4]

### THE EXTENSIVE AND ONGOING ROLE OF THE JUVENILE COURT IN CARE AND PROTECTION PROCEEDINGS

Because it is critical to the abstention analysis to identify the manner in which

plaintiffs' proposed relief interferes with the role of the Juvenile Court, see infra

Argument I, defendants discuss below the structure and scope of the Juvenile Court

system and its oversight of children in the Department's custody.  The discussion focuses

on the Juvenile Court's extensive responsibility for each child removed from parental

custody and a Juvenile Court judge's authority to address, in ongoing care and protection

proceedings, the very complaints about placement, services, and visitation that plaintiffs

assert here.

Plaintiffs seek an injunction requiring the Department to assess "the need for

---

[4]  While acknowledging the difficult circumstances faced by the named plaintiffs, defendants vigorously dispute many of the specific factual allegations concerning the Department's care of these six children.  If the Court denies defendants' motion to dismiss the Complaint – which it should not – and plaintiffs' allegations are deprived of the procedural posture that affords them an assumption of truth, the facts will reveal a much different picture.  The Department will document the extensive and appropriate efforts it has made to provide safe homes and necessary services for these children, reflecting that the decisions made by Department staff in connection with placement efforts were based on the exercise of professional judgment.  Defendants also will vigorously dispute plaintiffs' class-based allegations, drawn from the particular and severe circumstances of the six named plaintiffs.  The Department thus will oppose class certification on the ground, among others, that these six plaintiffs are not representative of the roughly 8,000 children in the proposed plaintiff class, for the great majority of whom the Department has more readily been able to achieve stability.

additional services and placements" of children; provide for "adequate" visitation between children and their parents/siblings through the development and implementation of new policies; take action "to provide adequate and timely case plans and  case reviews for children" and service plans for their parents; "monitor[] the safety of children in placement"; and require the Department to comply with state law standards governing the approval of placements.  Compl., Prayer for relief ¶(e)(iii)-(vi).  As described below, all of these matters – determining the propriety and safety of placements; the adequacy of services; the frequency of visitation, and the appropriateness of the Department's service plan, including whether the Department is making reasonable efforts to achieve permanency for each child – necessarily must be addressed in the ongoing proceeding by Juvenile Court judges, who are vested with the authority and the obligation to render determinations and issue orders on each of these matters.

In Massachusetts, the Juvenile Court plays a crucial and ongoing role in adjudicating the rights of children in the state's foster care system, beginning with the initial filing of a petition alleging that a child is in need of "care and protection." Throughout the ensuing proceedings, the Juvenile Court exercises continuing jurisdiction over each child who is the subject of such a proceeding, and the court is empowered to issue orders governing custody, placement, visitation, and the treatment and services to be provided to such children.  In adjudicating the many issues affecting children in foster care who are subject to care and protection proceedings, the Juvenile Court has "a broad mandate to act in furtherance of a child's welfare," and its statutory grant of jurisdiction "'carries with it by implication power to use the necessary means to exercise and enforce that jurisdiction.'"  Custody of a Minor (No. 1), 385 Mass. 697, 704 (1982) (internal

citation omitted).  In the exercise of its jurisdiction, the Juvenile Court may consider and resolve federal and state constitutional and statutory issues.  See, e.g., Adoption of Don, 435 Mass. 158 (2001) (affirming, as consistent with Constitution's confrontation provisions, Juvenile Court determination that parents could be present in courtroom during their child's testimony against them but would not be allowed to sit face-to-face with child).

### A.    Initiation of Care and Protection Proceedings.

Care and protection proceedings in Massachusetts are governed by Mass. G.L. c. 119, which declares that it is the policy of the Commonwealth

> to direct its efforts, first, to the strengthening and encouragement of family life for the care and protection of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.

Mass. G.L. c. 119, § 1, 1st para.  Acknowledging the sad reality that, notwithstanding efforts made to preserve the family, in some cases parents are unable or unwilling to provide a safe environment for their children, the Legislature enacted chapter 119 "to [e]nsure that the children of the commonwealth are protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes."  Mass. G.L. c. 119, § 1, 2nd para.; Care and Protection of Lillian, 445 Mass. 333, 337 (2005) (purpose of statute is "protecting children from the harmful effects of their parents' destructive behavior").

The statute provides that, upon receipt of a report alleging that a child is suffering from abuse or neglect, the Department shall investigate the matter and make a written

determination as to whether there is "reasonable cause to believe that an incident . . . of abuse or neglect by a caretaker did occur."  Lindsay v. Department of Social Services, 439 Mass. 789, 797-798 (2003); Mass. G.L. c. 119, § 51B(a); 110 Code Mass. Regs. 2.00.  Upon determining that allegations of abuse or neglect are "substantiated," the Department makes a written assessment of the child's or family's need for services and, if services are appropriate, the Department develops and implements a "service plan." 110 Code Mass. Regs. 5.00, 6.00; Lindsay, 439 Mass. at 795 n.4.

When, as a result of the Department's investigation or otherwise, concerns arise as to the parents' ability to provide proper care for a child, the Department (or any person) may file a petition for "care and protection" in Juvenile Court on behalf of any child under age 18 within the court's jurisdiction.[5]  Upon the filing of such a petition, the Juvenile Court may issue a precept to bring the child before the court and shall issue a notice to the Department and summonses to both parents "to show cause why the child should not be committed to the custody of the department or why any other appropriate order should not be made."  Mass. G.L. c. 119, § 24, 2nd para.; Lillian, 445 Mass. at 335. In addition, the child and the parents are each informed of their right to counsel, including the right to court-appointed counsel if they are not able to retain counsel. Mass. G.L. c. 119, § 29.

At the outset of a care and protection proceeding, the Juvenile Court is required to

---

[5]  Such petitions may allege that the child:  (a) is without necessary and proper physical or educational care and discipline; (b) is growing up under conditions or circumstances damaging to the child's sound character development; (c) lacks proper attention of the parent, guardian with care and custody, or custodian; or (d) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention.  Mass. G.L. c. 119, § 24, 1st para.

appoint an investigator to "investigate the conditions affecting the child" and to submit a report to the court.  Mass. G.L. c. 119, § 24, 5th para.  In addition, at any time during the pendency of a care and protection proceeding, the Juvenile Court is empowered to appoint a guardian ad litem for the child for the purpose of:  investigating a particular matter; determining whether the child requires extraordinary medical treatment, see, e.g. Adoption of Peggy, 436 Mass. 690, 691, cert. denied, 537 U.S. 1020 (2002); determining the child's educational needs; and enforcing legal rights of the child (other than those as to which court-appointed counsel provides representation) such as by determining the existence of a potential tort claim on behalf of the child.  110 Code Mass. Regs. 7.129(3).[6]

Chapter 119 authorizes two different procedures by which the Juvenile Court may transfer temporary custody of a child, pending a final adjudication on the merits of the care and protection petition under section 26.  Lillian, 445 Mass. at 341.

**1.  Emergency Transfer of Temporary Custody.**

The party filing the care and protection petition (typically the Department) may seek an "emergency order" removing children who are "suffering from serious abuse or neglect" or who are "in immediate danger of serious abuse or neglect" by their parents.  Mass. G.L. c. 119, § 24, 3rd para.; Lillian, 445 Mass. 340-341.  After an initial (usually ex parte) hearing, if the Juvenile Court determines that there is "reasonable cause to believe" that "immediate removal of the child is necessary to protect the child from serious abuse or neglect," the court may issue an emergency order transferring custody of

---

[6]  Plaintiffs here did not follow the procedure for seeking appointment of a guardian ad litem to pursue litigation on behalf of the plaintiffs.

the child, for up to 72 hours, to the Department or to any licensed child care agency. Mass. G.L. c. 119, § 24, 3rd para.; Care and Protection of Robert, 408 Mass. 52, 57-58 (1990).

Within 72 hours of such an emergency order, the Juvenile Court is required to conduct a full evidentiary hearing ("the 72-hour hearing" or "temporary custody hearing"), at which the Juvenile Court is required to determine whether to continue the temporary emergency custody order beyond 72 hours, until a hearing on the merits of the care and protection petition. Mass. G. L. c. 119, § 24, 4th para. Care and Protection of Zita, 455 Mass. 272, 276 (2009); Care and Protection of Manuel, 428 Mass. 527, 532-533 (1998). At the conclusion of the 72-hour hearing, the Juvenile Court may issue an order continuing custody of the child in the Department or other licensed child care agency; placing the child in the temporary custody of "any person" whom the court finds to be "qualified to give care to the child"; or returning the child to his parents' custody. See Manuel, 428 Mass. at 533, 536 (discussing Juvenile Court's "range of options of awarding temporary care or custody of the child"); Lillian, 445 Mass. at 336; Mass. G.L. c. 119, § 24, 3rd para.[7] The determination among these "'[a]lternative custodial options'" rests "squarely within the court's discretionary powers." Manuel, 428 Mass. at 534; Care

---

[7]  As the Supreme Judicial Court has explained, "loss of custody, even emergency or temporary loss of custody, is not a predetermined outcome of proceedings under either § 24, 25, or 26. . . . The petition is only a vehicle to put the parties on notice that a child is alleged to be in need of care and protection, and to begin a process whereby a court will hold a hearing on the issue." Lillian, 445 Mass. at 338 (footnotes and internal citations omitted). If, following a temporary custody hearing, the Juvenile Court returns a child to his parents' physical custody, the court may nevertheless order that legal custody of the child remain with the Department, as might occur, for example, to enable the child to receive life-saving medical treatment to which the parents object, see Lillian, 445 Mass. at 338 (citing Custody of A Minor, 375 Mass. 733, 736, 752 (1978)).

and Protection of Jeremy, 419 Mass. 616, 619 (1995) (Mass. G.L. c. 119, §§ 24 and 25

"offer dispositional alternatives to a judge").

In issuing a temporary custody order, the Juvenile Court must, prior to

transferring custody of a child, certify in writing that continuation of the child in his

home is "contrary to his best interests"; the court also must determine whether the

Department has made "reasonable efforts," prior to placement with the Department, to

"prevent or eliminate the need for removal from the home . . . ."  Mass. G.L. c. 119, § 24,

4th para.; Mass. G.L. c. 119, § 29C, 1st para.

Temporary custody orders may be reviewed directly by a Single Justice of the

Supreme Judicial Court pursuant to its general superintendence of lower courts under

Mass. G.L. c. 211, § 3, in appropriate cases involving a "substantial claim of violation of

substantive rights."  See, e.g., Zita, 455 Mass. at 277-78; Care and Protection of Sophie,

449 Mass. 100, 104-05 (2007).

## 2.  Non-Emergency Transfer of Temporary Custody.

Pursuant to Mass. G.L. c. 119, § 25, the Juvenile Court also is authorized to

transfer temporary custody of a child who is the subject of a care and protection petition

but for whom the petitioner has not sought emergency removal.  After conducting a

temporary custody hearing, the court may transfer temporary custody of the child to the

Department, another licensed child care agency, or an individual nominated by the child

or parents and approved by the court as provided by § 26(2)(i) [now 26(b)(2)(i)].  Mass.

G.L. c. 119, § 25; Manuel, 428 Mass. at 533 (sections 24 and 25 "give the judge

essentially the same range of options" with respect to temporary custody orders); Lillian,

445 Mass. at 342 (Mass. G.L. c. 119, § 25, authorizing temporary custody order in non-

emergency cases, reflects Legislature's understanding that although a child may not be in such danger that immediate removal is necessary, "there still may be a need for the protection of a child until a hearing or trial on the merits pursuant to § 26 is completed.").

**B.     Development and Review of the Department's Service
        Plan Through the Foster Care Review Process.**

During the pendency of the care and protection proceedings, the Department is required to provide services to the child who is the subject of the petition and to the parents, through the development of a "service plan."  See generally 110 Code Mass. Regs. 6.00 et seq.  The service plan is a written document identifying the family's strengths as well as areas needing improvement; the behavioral changes needed and tasks to be undertaken by parents (or other family members) in order to meet the goal identified in the plan; the services to be provided by the Department to the family; and the plan's goal (which, in the case of a child who has been removed from his home, may be either to reunify the family or to provide an alternative permanent home for the child). 110 Code Mass. Regs. 6.01, 6.03; see, e.g., Petitions of the Dep't of Social Services to Dispense with Consent to Adoption, 399 Mass. 279, 282 (1987) (discussing Department's development of a service plan following removal of child from her mother).[8]

In the case of children who have been placed in "substitute care," that is, placed with persons other than their parents, the service plan must set forth specified information concerning the Department's placement of the child, including the type of placement (such as foster care, intensive foster care, or congregate care); history of any previous

---

[8]  The services provided by the Department to families include, among others, referral for treatment for alcohol or substance abuse; referral for domestic violence treatment; counseling; respite care; homemaker services; parent aide services; day care; and emergency shelter services.  110 Code Mass. Regs. §§ 7.00 et seq.

placements; efforts of the Department and family to prevent the need for placement; the visitation schedule between the child and his parents/siblings; the permanency plan for the child (stabilization, reunification, adoption, guardianship, placement with kin, or an alternative living arrangement); the projected date by which the child may return home or be placed in another permanent living situation; and a description of the child's specific health, dental, and educational needs while in placement.  100 Code Mass. Regs. 6.04. The Department is required to develop a service plan no later than 55 working days after the issuance of an order transferring custody of the child to the Department or within 30 working days after an emergency transfer of custody; and, except in an emergency, the Department is required to develop the service plan prior to placing a child in substitute care.  110 Code Mass. Regs. 6.05(1).

In addition, the Department is required to develop the service plan with the child's family "to the maximum extent possible" and to provide the family with a copy of the service plan, signed by the parents and a child if over the age of 14; but, in the event that a family member does not agree to the service plan proposed by the Department, he may seek a review of the service plan through the Department's grievance procedure.  110 Code Mass. Regs. 6.06.  Family members also have the opportunity to indicate their partial agreement with a service plan and/or to identify additional services that they would like to receive.  Id.

## 1.  Foster Care Review.

A child can challenge the services being provided by the Department under the service plan, and/or seek additional or different services, at the "foster care review" that

the Department is required to conduct every six months.[9]  Service plans are also reviewed

at the annual Juvenile Court permanency hearings required pursuant to Mass. G.L. c. 119,

§ 29B, discussed below, see infra pages 27-29.  The child (if over age 14), the child's

attorney or guardian ad litem (if any), the parents, the the social worker and his

supervisor, the foster parents or other substitute care provider, and "other individuals

important to the child or family" must be notified in writing and invited to participate in

the foster care review.  110 Code Mass. Regs. 6.10(4).

The foster care review, which is conducted by a three-member panel within the

Department's independent "Foster Care Review Unit," includes a review of "the

necessity and appropriateness of the services to the family"; progress of the family and/or

child on the tasks set forth in the service plan; the Department's fulfillment of its tasks

identified on the service plan;  "the safety of the child and the necessity and

appropriateness of the child's continued placement"; the extent of progress made toward

alleviating the causes necessitating the child's placement; the goals and projected date

that the child will achieve permanency, as set forth in the plan; the steps necessary to

achieve permanency and the schedule of visitation; and the child's medical and dental

check-ups.  110 Code Mass. Regs. 6.10(2).[10]  Thus, any child who believes that he is not

---

[9]  Because the plaintiffs in this case are children, the Department focuses its discussion here on the procedures available to a child who wishes to challenge the services provided to the child by the Department; but these same procedures also are available to parents receiving services from the Department, who may challenge the provision of those services, through a foster care review, as discussed above; at a fair hearing or grievance procedure, as discussed infra at page 22; or at a permanency hearing in Juvenile Court, as discussed infra at pages 27-29.  110 Code Mass. Regs. 6.10 and 10.06; Mass. G.L. c. 119, § 29B; Adoption of Gregory, 434 Mass. 117, 124-125 (2001).

[10]  The Foster Care Review panel is comprised of three persons, one of whom is required to be a volunteer who is not an employee of the Department and who must not be

receiving adequate services from the Department, or who disputes the goal set forth in the

Department's service plan, may raise these issues with the assistance of appointed

counsel at a foster care review.  See 110 Code Mass. Regs. 6.10(4)(h) (Department "shall

. . . invite . . . the child's attorney" to the foster care review).[11]

### 2.  Hearing and Grievance Procedure.

In addition to the opportunity to challenge the service plan at a foster care review,

a child receiving services from the Department may challenge the termination, reduction,

or suspension of services (or any alleged failure by the Department to follow its

regulations resulting in "substantial prejudice") by seeking a fair hearing.  110 Code

Mass. Regs. 10.06.  The Department's decisions following a fair hearing are subject to

judicial review in Massachusetts Superior Court, pursuant to Mass. G.L. c. 30A, § 14.

See 110 Code Mass. Regs.10.30.  For other services or benefits-related issues, including a

challenge to the sufficiency of services that the Department is providing, the child may

file a grievance with the Department.  See 110 Code Mass. Regs. 10.37-10.39 (available

for matters that are not subject to a fair hearing).

### C.  Juvenile Court Review of Department's Determinations Relating to Placement and Other Incidents of Custody.

Following issuance of an order by the Juvenile Court placing a child in the

Department's temporary custody, "'decisions related to normal incidents of custody . . .

---

employed by or affiliated with an agency contracted to provide services to the child or family in question.  110 Code Mass. Regs. 6.10(3).

[11]  A determination by the panel requiring a change in the goal set forth in the service plan may be appealed by the child (if over age 14), the child's attorney, parents, and foster parents by requesting a fair hearing with the Department.  110 Code Mass. Regs. §§ 6.10(12)(a) and 6.10(13).  Other determinations by the panel concerning the service plan may be appealed through the Department's administrative grievance process.  110 Code Mass. Regs. §§ 6.10(12)(a) and 10.37.

are committed to the discretion of the Department.'"  <u>Jeremy</u>, 419 Mass. at 619-620.

"Custody" is statutorily defined to include the power to determine the child's place of

abode, medical care and education; to control visits to the child; and to consent to

enlistments, marriages, and other contracts otherwise requiring parental consent.  Mass.

G.L. c. 119, § 21; <u>Care and Protection of Isaac</u>, 419 Mass. 602, 607-608 (1995).

All determinations made by the Department in carrying out its custodial authority

over a child are subject to review by the Juvenile Court through an appropriate motion

made by a child (or his parents) at any time during a care and protection proceeding,

pursuant to Mass. G.L. c. 119, § 21, asserting that the Department is abusing its

discretion in carrying out its custodial powers, as discussed in greater detail in subsection

4 below, <u>see</u> <u>infra</u> pages 26-27.

## 1.  Placement Determinations.

The statute specifies that children in the Department's custody be placed in

private foster care families, "provided, that any child who upon examination is found to

be in need of special care, treatment or education may, if it is found by the department to

be in the best interest of the child, be placed in a public or private institution or school,

the primary purpose of which is the special care, treatment or education of children."

Mass. G.L. c. 119, § 32; <u>Isaac</u>, 419 Mass. at 608.  The determination as to a child's

specific placement is within the Department's discretion, as "[p]lacement decisions, as

opposed to custody decisions, fall within the discretionary powers of the legal custodian

as one of the usual incidents of custody."  <u>Manuel</u>, 428 Mass. at 534.  While the "ultimate

decision regarding placement is the custodian's," a Juvenile Court judge "certainly may

'offer guidance to the [custodian] concerning a child's residence.'"  <u>Manuel</u>, 428 Mass. at

534.  A parent or child may challenge the Department's determination regarding

placement by filing a motion pursuant to Mass. G.L. c. 119, § 21, as discussed in

subsection 4 below.

### 2.  Visitation.

As an aspect of its custody powers, the Department also has the authority to

control visits to the child, see Mass. G.L. c. 119, § 21.  That power is not absolute, and

the Department may not terminate parental visitation unless a court issues an order

making specific findings that visitation would be harmful to the child.  110 Code Mass.

Regs. 7.128; Custody of A Minor (No. 2), 392 Mass. 719, 725-726 (1984).  By

regulation, the Department is required to "plan and promote regular and frequent

visitation" between a child in its custody and the child's parents and/or siblings,

consistent with the service plan, see 110 Code Mass. Regs. 7.128; as a matter of practice,

the Department seeks to provide parental visitation on a weekly or bi-weekly basis and at

least once a month.   A parent or a child may challenge any determination by the

Department regarding the frequency of visitation by filing a motion in the Juvenile Court,

pursuant to Mass. G.L. c. 119, § 21.

Visitation between a child and his siblings is governed by Mass. G.L. c. 119,

§ 26B.  The statute provides that, for any child placed in foster care, the Juvenile Court or

the Department "shall, whenever reasonable and practical and based upon a

determination of the best interests of the child," ensure that the child has "access to and

visitation with" siblings, throughout the period of placement in the care and custody of

the Department and after such placements in cases where the children are separated

through adoption or placements in foster care.  Mass. G.L. c. 119, § 26B(b).  A child,

sibling, parent, guardian, or the Department may file a petition in Juvenile Court seeking sibling visitation (except that parents against whom a termination decree has been entered, or who have voluntarily agreed to adoption, are not entitled to seek sibling visitation on behalf of the child in question). Mass. G.L. c. 119, § 26B(b), 4th para.[12]

Orders issued by the Juvenile Court regarding sibling or grandparent visitation[13] may be appealed to the Massachusetts Appeals Court within 30 days of entry of the order. Mass. G.L. c. 119, § 26B(d).

### 3. Medical and Educational Needs.

As noted above, the Department's custody power includes the authority to make determinations regarding a child's medical and educational needs. Mass. G.L. c. 119, § 21; Isaac, 419 Mass. at 607-608. This authority includes the power to make decisions on behalf of the child relating to routine medical needs such as the need for medical check-ups or immunizations, see 110 Code Mass. Regs. 11.04 (routine medical care), as well as to determine, for example, whether a child's behavioral and/or educational needs require a particular residential placement. Isaac, 419 Mass. at 604-14.

---

[12] For a child placed voluntarily in the Department's custody, the Department's determinations regarding sibling and/or grandparent visitation are subject to review through the Department's fair hearing process, see Mass. G.L. c. 119, § 26B(a), (b), but for children committed to the Department's custody by a Juvenile Court through a care and protection proceeding, determinations regarding sibling and grandparent visitation are subject to review directly in the Juvenile Court, pursuant to Mass. G.L. c. 119, § 26B.

[13] The statute also requires that, for any child placed in family foster care, the Juvenile Court and the Department "shall ensure," upon request by the grandparent, "reasonable visitation" with the grandparent, unless the court or Department determines that such visitation "is not in the child's best interests." Mass. G.L. c. 119, § 26B(a). A grandparent of a child placed in the Department's custody may seek visitation by filing a petition in the Juvenile Court with jurisdiction over the child. Id.

### 4.  Juvenile Court Review of Department's Determinations.

Any parent or guardian "who objects to the carrying out of any power conferred [on the Department] by" Mass. G.L. c. 119, § 21, defining the powers that accompany "custody," "may take application to the committing court and the court shall review and make an order on the matter."  Mass. G.L. c. 119, § 21.  Thus, while the Department, in the exercise of its custodial powers, is authorized to make determinations regarding the particular placement of a child, frequency of visitation, medical services, and educational needs, those determinations are subject to review at any time in the Juvenile Court for "abuse of discretion" or "legal error," through a motion made pursuant to Mass. G.L. c. 119, § 21.[14]  Jeremy, 419 Mass. at 618-23 (Juvenile Court reviewed whether residential placement determination by the Department was an abuse of discretion or based on legal error); Isaac, 419 Mass. at 610-611; Manuel, 428 Mass. at 534-35.  Through the adjudication of such "abuse of discretion" motions, the Juvenile Court routinely is called upon to review the Department's determinations, particularly with respect to claims by a parent or child regarding the frequency of visitation, whether the child needs a more or less restrictive placement, and whether the child is receiving necessary services such as mental health treatment.

In conducting such review of the Department's determinations, a Juvenile Court

---

[14]  Although the statute expressly authorizes a "parent or guardian" to seek review of the Department's custody-related decisions in Juvenile Court, the Supreme Judicial Court, in considering the Juvenile Court's authority to review these decisions, under Mass. G.L. c. 119, § 21, did not distinguish between a challenge made by a child and that of his parents, see Isaac, 419 Mass. at 610 and n.7.  The Department has not opposed the use of "abuse of discretion" motions by the child, and, given the Juvenile Court's broad authority to enter orders relating to a child within its jurisdiction, it is self-evident that the Juvenile Court has the power to entertain a child's motion challenging the Department's carrying out of its custody powers.

may, if necessary, take additional evidence.  <u>Isaac</u>, 419 Mass. at 614.  In determining whether the Department has abused its discretion in carrying out its custodial powers, the Juvenile Court should consider, among other factors, whether the Department's challenged action interferes with the goal of reunification for the child; whether appropriate consideration has been given to maintaining connections among siblings and other family members; and whether the Department has complied with its own regulations.  <u>Id.</u>

### D.    Permanency Hearings.

Within 12 months of an initial order transferring custody of a child to the Department, and not less than annually thereafter while the child remains in the Department's care and custody, the Juvenile Court "shall conduct a permanency hearing . . . to determine and periodically review thereafter the permanency plan for the child." Mass. G.L. c. 119, § 29B, 1st para.  Prior to the permanency hearing, the Department is required to file a written permanency plan with the court, detailing the following matters:

- whether and when the child will be returned to the parent;

- whether the child will be placed for adoption and the steps that the Department will take to free the child for adoption and finalize the adoption;

- the services provided to the child and his family, including services currently provided and services to be provided, and, in the case of a child age 16 or older, the services provided to assist the child in making the transition from foster care to independent living;

- the type of placement in which the child resides, including how that placement meets the child's current needs and how the placement furthers the permanency plan;

- a description of the individualized health care plan for the child, in a case of a child who is medically needy;

- the Department's efforts to recruit an adoptive family for the child;

- the visitation for the child, including sibling visitation; and

- the results of any internal reviews by the foster care review panel.

Massachusetts Trial Court Rules, Uniform Rules for Permanency Hearings, Rule 2(H) (attached in Addendum).  The Department is required to provide a copy of its permanency plan, 30 days prior to the hearing, to counsel for the parents and child; and both the parents and the child have a right to be represented by counsel at the permanency hearing.  Mass. G.L. c. 119, §§ 29, 29B; 110 Code Mass. Regs. 6.11.

At the permanency hearing, the Juvenile Court is required to review the plan submitted by the Department in order to "determine the current permanency plan for the child."  Thus, the Juvenile Court is authorized to determine the proper permanency goal (and potentially to order a goal different from that proposed by the Department); order the provision of services for a child; and order the Department to increase visitation.  See Uniform Rules for Permanency Hearings, Rule 7(A).  In determining the proper permanency plan for each child, the court is required to certify (in the case of a child for whom reunification is not the goal) that the Department has made reasonable efforts "to place the child in a timely manner" in accordance with the permanency plan approved by the court.  In other words, in the case of a child for whom adoption is the goal, the court must expressly determine whether the Department has made sufficient and timely efforts toward finding an adoptive home for the child.  Mass. G.L. c. 119, § 29B, 3rd para.[15]

---

[15]  Where the Juvenile Court has approved a permanent goal other than reunification, the Department no longer is required to provide services aimed at reunification.  Adoption of Serge, 52 Mass. App. Ct. 1, 9, review denied, 435 Mass. 1101 (2001).  As a matter of practice, however, the Department ordinarily engages in "concurrent planning," offering services aimed at reunification while simultaneously proceeding to achieve a different

At the permanency hearing, the Juvenile Court is broadly empowered to "make any appropriate order as may be in the child's best interests, including, but not limited to, orders with respect to the child's care or custody."  Mass. G.L. c. 119, § 29B, 3rd para. For example, the Juvenile Court could approve the Department's proposed goal of adoption but order the Department to provide medical, mental health, or dental services to a child if those were not being provided.  In addition, the Juvenile Court "may also make orders it determines to be appropriate to implement the permanency plan in a timely manner," empowering the Juvenile Court to order the Department to take additional steps to identify an adoptive home for a child.  Uniform Rules on Permanency Hearings, Rule 7(A).

A child, parent, guardian, or the Department may appeal the Juvenile Court's permanency decision to the Appeals Court, which reviews the decision under an abuse of discretion standard.  Mass. G.L. c. 119, § 29B, sixth para.

**E.     Hearing on the Merits of the Care and Protection Petition,
and Issuance of Decrees Adjudicating a Child in Need of
Care and Protection and Terminating Parental Rights.**

Following the filing of a care and protection petition, the case proceeds to a hearing on the merits, at which the Juvenile Court must determine whether the child "is in need of care and protection."  Mass. G.L. c. 119, § 26.  In the case of children for whom the Juvenile Court has approved the Department's goal of adoption, and who have been in the Department's foster care for at least 15 of the past 22 months, the Department also

---

(and court-approved) permanent goal such as adoption, in recognition of the possibility that a Juvenile Court, although having approved a permanency goal of adoption, could subsequently determine at a hearing on the merits that parental unfitness was not established insofar as additional services might have enabled the parent to provide proper care for the child.

is required to seek termination of parental rights, by filing a notice of its intent to do so, with limited exceptions. Mass. G.L. c. 119, § 26. The Juvenile Court may consolidate a hearing on the petition to terminate parental rights (formally known as a "petition to dispense with parental consent to the adoption, custody, guardianship or other disposition of the child") with the hearing on the merits of the care and protection petition. Mass. G.L. c. 119, § 26; Mass. G.L. c. 210, § 3.

In order to find that a child is in need of "care and protection" (and thus may be removed permanently from his parents' custody under Mass. G.L. c. 119, § 26), and to terminate parental rights under Mass. G.L. c. 210, § 3, the Juvenile Court must determine whether the Department has established, by clear and convincing evidence, that the parents are currently unfit to care for the child. Care and Protection of Laura, 414 Mass. 788, 790 (1993). A determination of parental unfitness must be based on a showing that the parents "'have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard.'" Petition of Catholic Charitable Bureau of Archdiocese of Boston, 395 Mass. 180, 184 (1985) (internal citation omitted).

In order to grant a petition to terminate the parents' rights, the court, in addition to finding parental unfitness, also must determine that termination of parental rights is in the child's best interests, considering the factors enumerated in Mass. G.L. c. 210, § 3. The inquiries into parental unfitness and the child's "best interests" are "not separate and distinct but cognate and connected." Petition of the Dep't of Public Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 591 (1981) (internal citation omitted).

If the Juvenile Court determines that the child is in need of care and protection, it is empowered to order a broad array of dispositional alternatives. The court may commit

the child to the Department's permanent custody (i.e., until the child reaches age 18) or

until in the Department's opinion the object of his commitment has been accomplished.

Mass. G.L. c. 119, § 26(b).  In transferring a child to the Department's permanent

custody (in a case in which the Department is not also seeking termination of parental

rights), the Juvenile Court must certify in writing that the Department has made

reasonable efforts toward reunification.  Mass. G.L. c. 119, § 26(b).

Alternatively, the Juvenile Court "may make any other appropriate order,

including conditions and limitations, about the care and custody of the child as may be in

the child's best interest," including one or more of the following:  (1) entering a

"conditional custody" order allowing the child to remain in his parents' custody, subject

to "supervision as directed by the court for the care and protection of the child"; (2)

transferring temporary or permanent legal custody of the child to "any person" who the

court finds is qualified to care for the child, to any licensed child care agency, or to the

Department; or (3) ordering "appropriate physical care including medical or dental care."

Mass. G.L. c. 119, § 26(b); Lillian, 445 Mass. at 338 n.10.

If the court further determines that termination is in the child's best interests, the

court may issue a decree dispensing with the parents' rights to consent to adoption,

custody, or guardianship of the child, see Mass. G.L. c. 119, § 26(b)(4), Mass. G.L. c.

210, § 3, which "effectively terminates the legal bond between parent and child."

Adoption of Peggy , 436 Mass. at 697.

A Juvenile Court decree adjudicating a child to be in need of care and protection

and committing the child to the Department's permanent custody, or a decree further

terminating the parents' rights to the child, is subject to appellate review.  See Mass. G.L.

c. 119, § 27; Mass. G.L. c. 210, § 11.

### F.     Review and Redetermination Hearings.

In the case of a child adjudicated to be in need of care and protection under Mass. G.L. c. 119, § 26, but as to whom parental rights have not been terminated, the parent, Department, other person having legal custody of a child, counsel, or guardian ad litem for a child may seek a "review and redetermination of the current needs of such child" every six months.  Mass. G.L. c. 119, § 26(c); <u>Care and Protection of Erin</u>, 443 Mass. 567, 570-72 (2005) (review and redetermination proceeding is a readjudication of the custody order issued under c. 119, § 26, at which the Department bears the burden of proving that the child is still in need of care and protection).  Thus, the review and redetermination hearing provides another opportunity for a child or parent to challenge the Department's exercise of its custodial powers, <u>e.g.</u>, by challenging the visitation or services provided to a child.

### THE ADOPTION ASSISTANCE AND CHILD WELFARE ACT AND FEDERAL OVERSIGHT OF THE COMMONWEALTH'S FOSTER CARE SYSTEM

Because the collaborative state and federal oversight of the Department's foster care system, and federal executive enforcement of the Adoption Assistance and Child Welfare Act, are central to the question of whether the Act provides privately enforceable rights, <u>see</u> <u>infra</u> Argument section IV, defendants discuss below both state-federal oversight and federal enforcement of the Act.  In addition, the Department's collaborative efforts with the federal government, and the federal government's continuation of full funding, also cast doubt on the plausibility of plaintiffs' substantive due process claim, making the following discussion relevant to defendants' Argument section II, <u>infra</u>.

The Adoption Assistance and Child Welfare Act, <u>see</u> 42 U.S.C. § 670, <u>et</u> <u>seq.</u> ("the Act") is a "federal funding statute [that] establish[es] a program of payments to the states for foster care and adoption assistance." <u>Olivia Y. v. Barbour</u>, 351 F. Supp. 2d 543, 557 (S.D. Miss. 2004). The Act "establishes a cooperative federal-state program in which the federal government reimburses the State for certain expenses the State incurs in administering foster care and adoption services if the State satisfies the requirements imposed by the Act." <u>Olivia Y.</u>, 351 F. Supp. 2d at 557; <u>see</u> <u>Suter v. Artist M.</u>, 503 U.S. 347, 350-51 (1992). The principal requirement is "that the state submit for approval by the Secretary [of Health and Human Services] a plan for foster care and adoption assistance which adheres to specific delineated requirements," <u>Olivia Y.</u>, 351 F. Supp. 2d at 558, that are set forth in 42 U.S.C. § 671(a). <u>See</u> <u>Suter</u>, 503 U.S. at 351 ("To participate in the program, [s]tates must submit a plan to the Secretary . . . for approval . . . . Section 671 lists [thirty-three] qualifications which state plans must contain in order to gain the Secretary's approval"). Once a State has an approved plan, it may submit a claim for federal funding covering portions of the cost of care and maintenance provided to each child who would have – prior to his or her removal – otherwise qualified for federal aid to families with dependent children. <u>See</u> 42 U.S.C. § 672(a)(3).

Ultimately, the Act, like "other legislation enacted under Congress's spending power, . . . offers a simple <u>quid</u> <u>pro</u> <u>quo</u>: Congress shall appropriate funds to a State . . . if it agrees to take certain specific actions." <u>Cf.</u> <u>Newark Parents Ass'n v. Newark Public Schs.</u>, 547 F.3d 199, 200 (3d Cir. 2008) (describing No Child Left Behind Act, likewise passed pursuant to Congress's Spending Clause power).

### A.      State Foster Care Plan Requirements.

Title 42 U.S.C. §671(a) delineates the type of foster care assistance the

Commonwealth must agree to provide in order to become "eligible for payment" of

federal funds.   A proposed state plan must include, inter alia, steps the State will take to:

"preserve and reunify families," id. § 671(a)(15)(B); facilitate the placement of foster

children with kin, id., § 671(a)(29); ensure that prospective foster parents have been

properly trained and subjected to background checks, id., § 671(a)(20), (24); limit the

number of children who spend more than twenty-four months in foster care without a

permanent placement, id. § 671(a)(14); enroll eligible children in school, id. § 671(a)(30);

and facilitate sibling visitation, id. § 671(a)(31)(B).[16]

### 1.      Foster Care Maintenance Payments.

State plans must "provide for foster care maintenance payments," which "shall

[be] ma[d]e . . . on behalf of each child who has been removed from the home of a

relative . . . into foster care," as long as the child's removal and subsequent placement are

made in accordance with the Act.  42 U.S.C. §§ 671(a)(1), § 672(a); see id. § 672(a)(2).

The components of foster care maintenance payments are set forth in 42 U.S.C.

§ 675(4)(A), the definitional section of the act.  "The term 'foster care maintenance

payments' means payments to cover the cost of . . . food, clothing, shelter, daily

supervision, school supplies, a child's personal incidentals, liability insurance with

respect to a child, reasonable travel to the child's home for visitation, and reasonable

travel for the child to remain in the school in which the child is enrolled at the time of

---

[16]  Notably, Congress has not elected to impose limits on the caseloads of social workers
or other caseworkers.

placement."  Id.  Payments to institutional foster care providers "shall include the

reasonable costs of administration and operation of the institution as are necessarily

required to provide the [above-described] items."  Id.  The State must also "provide[] for

periodic review of the . . . amounts paid as foster care maintenance payments . . . to

assure their continuing appropriateness."  42 U.S.C. § 671(a)(11).

## 2.   Child-Specific Recruitment Plans.

The state plan must also "provide for the development of a case plan . . . for each

child receiving foster care maintenance payments under the [s]tate plan . . . ."  42 U.S.C.

§ 671(a)(16).  "The term 'case plan' means a written document which includes," inter

alia:  a description of the safety and appropriateness of the child's placement, see 42

U.S.C. §675(1)(A); the health and education records of the child, id. § 675(C); and a plan

for ensuring the educational stability of the child while in foster care, id. § 675(G).

When the Department plans to facilitate the adoption of a child "or placement in

another permanent home," the case plan shall include "documentation of the steps the

agency is taking to find an adoptive family or other permanent living arrangement for the

child" and of the steps it is taking "to place the child" in an "adoptive" home or "planned

permanent living arrangement."  42 U.S.C. §675(1)(E); see id. ("At a minimum, such

documentation shall include child specific recruitment efforts such as the use of State,

regional, and national adoption exchanges . . . to facilitate orderly and timely in-State and

interstate placements").

## 3.   Development and Approval of the State Plan.

The state plan is developed in a collaborative effort with the ACF.  See 45 Code

Fed. Regs. § 1356.20(d)(2); see id. ("The [s]tates are encouraged to obtain consultation of

the [ACF] regional staff when a plan is in [the] process of preparation or revision").[17]
The ACF Regional Administrator then has the power to "approve [s]tate plans and
amendments thereto . . . ."  Id. § 1356.20(d)(4); see id. § 1356.20(d)(5) ("Determinations
as to whether [s]tate plans . . . originally meet[,] or continue to meet, the requirements for
approval, are based on relevant Federal statutes and regulations").  Once a state plan "has
been submitted and approved, it shall remain in effect until amendments are required" by
ACF – or by a change in the law.  Id. § 1356.20(e).

### 4.      Data Collection.

Once the state plan has been approved, the State is required to collect extensive
system-wide data on its foster care delivery system, see 45 Code Fed. Regs. §§1356.82-
86, and ACF will assess penalties "for not meeting certain data standards."  45 Code Fed.
Regs. §1356.86; see 42 U.S.C. §679(c)(3) (requiring ACF to establish a "data collection
system" that "provide[s] comprehensive national information with respect to," among
other things, "the status of the foster care population[] including the number of children
in foster care, length of placement, type of placement . . . and goals for ending or
continuing foster care" and the "extent and nature of assistance provided by Federal,
State and local . . . foster care programs").

### B.      Federal Oversight and Enforcement.

ACF enforces the Act by evaluating participating states to determine whether
their programs are "in substantial conformity with" the requirements set forth in 42
U.S.C. §671(a), the relevant federal regulations, and the approved state plans.  42 U.S.C.

---

[17]   The Administration of Children and Families is a branch of the United States
Department of Health and Human Services.  45 Code Fed. Regs. §1355.20(a).

§1320a-2a.  Where a State has failed to "substantially conform" with the Act, the

governing regulations, or  its own approved plan, federal funds may be withheld.  Id.

§ 1320a-2a(b)(3)(A), (C).  Yet, before funds are withheld the State must be "afford[ed]

. . . an opportunity to adopt and implement a corrective action plan, approved by [ACF],

designed to end the failure to [substantially] conform."  Id. §1320a-2a(b)(4)(A).  The

"witholding of any [f]ederal matching funds" is "suspend[ed]" while "such a corrective

action plan is in effect."  Id. §1320a-2a(b)(4)(C).

### 1.    Child and Family Services Review.

ACF conducted full Child and Family Services Reviews ("Review") of every

State between 2001 and 2003, and began a second round of Reviews in 2007, pursuant to

45 Code Fed. Regs. §§1355.33-34.  The Review is "ACF's results-oriented

comprehensive monitoring system designed to promote continuous improvement in the

outcomes experienced by children and families who come into contact with public child-

welfare agencies.  ACF developed the [Review] in response to a mandate . . . to

promulgate regulations for reviews of [s]tate child and family services programs under

Titles IV-B and IV-E of the Social Security Act."  The Data Measures, Data Composites

and National Standards to be Used in the Child and Family Servs. Reviews, 71 Fed. Reg.

32,969 (June 7, 2006) ("Data Measures"); see 42 U.S.C. §1320a-2a.

Each Review is conducted by a "team of [f]ederal and [s]tate reviewers" that

includes staff of the state child and family services agency, ACF staff, and experts who

aided in the development of the state plans.  Id. § 1355.33(a)(2).  The review is a "two-

phase[d] process that includes a statewide assessment and an on-site review."  Id.

§ 1355(a)(1).  The statewide assessment is based upon the data collected by the

Department, see id. § 1355.33(b)(2), and the "State must . . . analyze and explain its performance in meeting [or falling short of]. . . national standards . . . ." Id. The on-site review involves the collection of extensive first- and second-hand information, including "[i]nterviews with caseworkers, foster parents . . . , service providers," and other "key stakeholders." Id. § 1355.33(c)(4). Most significantly, the on-site review includes an in-depth analysis of a statistically significant number of cases, selected at random. Id. §§ 1355.33(c)(5), (6). The regulations set the sample size at 30 to 50 cases, but the most recent Review involved examination of 65 cases. See Data Measures, 71 Fed. Reg. at 32,969. The individual case reviews also feature interviews with children, families, foster parents, and caseworkers involved. 45 Code Fed. Regs. §1355.33(c)(4).

### a.     Performance Measures.

The Review measures State performance on seven outcome-related criteria, and on seven systemic criteria. See 45 Code Mass. Regs. 1355.34(a). Two outcome-related criteria focus on "the area of child safety," specifically whether: the "[c]hildren are . . . protected from abuse and neglect," and whether they "are safely maintained in their own homes whenever possible and appropriate." Id. § 1355.34(b)(1)(i). Two-outcome related criteria measure the permanency of placements, evaluating whether the "[c]hildren have permanency and stability in their living situations," and whether "[t]he continuity of family relationships and connections [are] preserved for children." Id. § 1355.34(b)(1)(ii). There are three criteria that measure "child and family well-being": whether families have "enhanced capacity to provide for their children's needs," whether the children "receive appropriate services to meet their educational needs," and whether children "receive adequate services to meet their physical and mental health needs." Id.

§ 1355.34(b)(1)(iii).

ACF develops "statewide data indicators" for each of the outcome-related measures, and the State is evaluated to determine whether those benchmarks are met.  45 Code Fed. Regs. 1355.34(b)(3)(i), (4); see Data Measures, 71 Fed. Reg. at 32,969-32,986. Additionally, if the outcome-related goals are met in "95 percent of the cases examined during the on-site review," the State will be found to be in substantial conformity with the federal Act.  See id. § 1355.34(b)(3)(ii).[18]

The Review then proceeds to an analysis of seven systemic factors.  45 Code Fed. Regs. §1355.34(c).  "The systemic factors under review are," first, the "[s]tatewide information system."  Id. § 1355.34(c)(1); see id. ("State [must] operat[e] a statewide information system that, at a minimum, can readily identify the status, demographic characteristics, location and goals for the placement of every child who is . . . in foster care").  Second, the State's case review system is analyzed to ensure that it meets with 42 U.S.C. §671(a), which sets forth the requirements for the State plan.  Id. § 1355.34(c)(2). Third, the State's "[q]uality assurance system" is evaluated to determine whether the "[s]tate has developed . . . standards to ensure that children in foster care are provided quality services that protect the safety and health of the children."  Id. § 1355.34(c)(3). Fourth, the State's "staff development and training program" is evaluated to ensure that, inter alia, the state staff members are trained with the "basic skills and knowledge required for their positions."  Id. § 1355.34(c)(4).  Fifth, the Review assesses whether the

---

[18]  In the event that ACF determines that a State is not in "substantial conformity" with its approved plan, or the Act in general, that determination may be appealed to the Health and Human Services Departmental Appeals Board, and review of an adverse administrative decision is available in federal district court.  See 42 U.S.C. §§ 1320a-2a(c)(2), (3).

State provides "an array of services," meeting the state plan requirements set forth in 42 U.S.C. §671(a), and, sixth, whether the Department is responsive to the community. Id. §§ 1355.34(c)(5), (6).  Lastly, the state system is analyzed to determine whether it properly licenses, recruits, and retains foster and adoptive parents. Id. § 1355.34(c)(7). ACF develops a rating scale applicable to each criteria. Id. § 1355.34(c).

### 2.    Partial Reviews.

ACF is also expressly empowered to conduct "[p]artial reviews based on noncompliance with state plan requirements that are outside the scope of a child and family services review."  45 Code Fed. Regs. §1355.32(d); see § 1355.33(3) (Partial review "[w]ill be planned and conducted based on the nature of the concern").  "When ACF becomes aware of a . . . compliance issue that is outside the scope of the [R]eview process," it:  "[c]onducts an inquiry . . . requir[ing] the State to submit additional data"; if "the additional information confirms that the State may not be in compliance," the State may be "subject to a penalty related to the extent of the noncompliance."  Id. §§ 1355.32(d)(1), (3), (4).

The sufficiency of foster care maintenance payments, although not subject to a full Review, see 45 Code Fed. Regs. §§ 1355.34(b), (c), are subject to partial reviews. See id. § 1355.32(d).

### 3.    Program Improvement Plans.

When a State is "found not to be operating in substantial conformity [with the Act, it] shall develop a [P]rogram [I]mprovement [P]lan."  45 Code Fed. Regs.

§1355.35(a)(1).[19]  The development of a Program Improvement Plan ("Improvement Plan") is collaborative process involving "[s]tate and [f]ederal staff in consultation with the [R]eview team."  Id. § 1355.35(a)(1)(i).  Addressing the areas "in which the State's program is not in substantial conformity," the Improvement Plan sets "forth the goals, the action steps required to correct each identified weakness . . . and dates by which action step is to be completed . . . ."  Id. §§ 1355.35(a)(1)(ii), (iii).  It likewise establishes "benchmarks that will be used to measure the State's progress in implementing the . . . [I]mprovement [P]lan."  Id. §1355.35(a)(1)(v).  In the event the State and ACF cannot come to an agreement on provisions in the Improvement Plan, "ACF retains the final authority to assign the contents of the plan and/or the degree of improvement required for successful completion of the plan."  §1355.35(a)(2).

The approved Improvement Plan, rather than the State plan originally approved under 42 U.S.C. §671(a), becomes the new benchmark to determine whether a State is in substantial compliance with the Act – and, therefore, whether it is eligible for full federal funding.  See 45 Code Fed. Regs. §1355.36(c).  Where a State "is actively implementing the provisions of [an] [Improvement Plan]," ACF "will suspend the withholding of . . . [federal] funds during the time that a[n] [Improvement Plan] is in effect."  Id. § 1355.36(c)(i), (ii).

### 4.     The 2007 Review and the Commonwealth's Program Improvement Plan.

In July 2007, ACF conducted a Review of Massachusetts' child and family

---

[19]  In addition, if a partial review determines "that the State is not in compliance with the applicable [s]tate plan requirement," the State must develop "a[n] . . . [I]mprovement [P]lan designed to bring the State into compliance."  45 Code Fed. Regs. §1355.32(d)(4).

services delivery system.  Compl. ¶ 162.   In its executive summary, ACF acknowledged the aspirational aspect of the Act, stating:  "The focus of the [CFSR] process is on continuous quality improvement; thus, the standards are set high to ensure ongoing attention to the goal of achieving positive outcomes."  See Exhibit A at ES-1.[20]  In other words, the Review is "intended to serve as a basis for continued [Improvement Plans] addressing areas where the State still needs to improve . . . .  The goal is to ensure that program improvement is an ongoing process."  Id. at ES-2.

In the 2007 Review, ACF "identified some areas of exceptional performance in Massachusetts," and stated that the Department "demonstrated consistent efforts in ensuring that the children in the foster care system [were] regularly seen by their caseworkers."  Exhibit A at ES-2.  In addition, ACF found the Department to be "consistently effective in placing children in foster homes that are in close proximity to their parents, extended family members, and communities."  Id. at ES-2.  The array of services established by the Department to "assess the strengths and needs of children . . . and [to] help children in foster care and adoptive placements achieve permanency" was found to be a "strength," in part because the "services system ha[d] been redesigned with extensive input from stakeholders across the State."  Id. at 89.[21]  Furthermore, "because the State . . . continued to invest in the development of new curricula and the

---

[20]  The 2007 Review, which is attached as Exhibit A, is referenced throughout plaintiffs' complaint.  See, e.g., Compl. ¶¶ 160-165, 171, 185, 191.  The content of the Review therefore may be properly considered by this Court at the motion to dismiss stage.  See Watterson, 987 F.2d at 3.

The Executive Summary will be cited as "Exhibit A at ES-[page number]."

[21]  The ACF Review notes that the Department's current quality assurance system also merits a "strength" rating.  Exh. A at ES-81.

enhancement of existing curricula for both pre-serve and in-serve training of staff . . . and

foster caregivers," the Department's training was rated a "strength."  Id. at 83.[22]  The

Department also demonstrated a "high level of performance in the educational realm."

Id. at ES-3.     Applying the specific metrics set forth in 45 Code Fed. Regs. §1355.34,

ACF found the State to be "in substantial conformity with six of the seven systemic

factors" – including "Statewide Information System, Quality Assurance System,

Training, Service Array, Agency Responsiveness to the Community, and Foster Care

Licensing and Recruitment."  Exhibit A at ES-3.  With respect to the State's Quality

Assurance System, ACF noted that "State standards for foster homes and congregate care

foster homes have been enhanced and standardized, and the State has developed and

begun to implement a statewide quality assurance system" – and thus found that the

State's oversight of its services was a "strength."  Id. at 79.

 The Commonwealth was not, however, "in substantial conformity with six of the

seven . . . outcome[-based measures] or the Case Review System systemic factor."  Id. at

ES-3; see id. ("The State . . . exhibited difficulty with regard to ensuring that children

ha[d] permanency and stability in their living situations").[23]  Thus, ACF concluded that

---

[22]  In addition to according a "strength" rating to the Department's training program, the
federal 2007 Review had many positive things to say about the program.  See Exh. A at
ES-16 and 83-86.

[23]  The Commonwealth fell short of meeting certain federal expectations (not necessarily
relating to foster care) in the areas of child safety, 45 Code Fed. Regs.
§§ 1355.34(b)(i)(A)-(B), and permanency, see id. §§ 1355.34(b)(ii)(A)-(B).  While it met
ACF's goals regarding "services appropriate to meet [children's] educational needs," it
did not meet federal goals concerning family support and health care services.  See id.
§ 1355.34(b)(ii)(A)-(C).  Although plaintiffs repeatedly accuse the Department of failing
to meet a "federal benchmark" (e.g., Compl. ¶¶ 199, 204), they do not acknowledge that
ACF starts from the premise that "only the highest standards of performance should be
acceptable."  Exh. A at ES-1.  Indeed, writes ACF, "States are not required to achieve

Massachusetts was not in substantial compliance with its state plan, and likewise did not

fully comply with the aspirational goals of the Act and its implementing regulations.  Id.

at ES-2-3.  In that regard, ACF's review of Massachusetts was similar to its Review of

every other state:  neither the Commonwealth, nor any other state, has been found to be in

"substantial conformity" with all fourteen criteria applied by ACF.[24]  See Exhibit A at 4

("ACF has set a very high standard of performance for the [Review]," because the "goal

of the [Review] is to promote continuous improvement in performance on these

outcomes").[25]

---

these Standards."  Id.

[24]  Pursuant to federal regulations, all full Reviews are publicly available.  See 45 Code
Fed. Regs. § 1355.37; The Administration of Children and Families, Reports and Results
of the Child and Family Services Reviews, http://library.childwelfare.gov
/cwig/ws/cwmd/docs/cb_web/SearchForm.

In the most recent cycle, ACF has completed full Reviews of 43 states, districts, and
territories (including the District of Columbia and Puerto Rico), and not a single Review
has found substantial compliance with more than one of the seven outcome-based factors.
Indeed, only ten states have achieved, like Massachusetts, compliance with one outcome-
based factor.

Only Idaho, Montana, and the District of Columbia have achieved compliance with at
least six of the seven systemic factors, and only those three states/territories and
Massachusetts are substantially in compliance with seven of the fourteen factors
considered by ACF.  See 45 Code Fed. Regs. §§ 1355.34(b), (c).  The complaint, which
alleges that the quality of foster care provided by Massachusetts is grossly deficient, does
not acknowledge that the same document on which it so heavily relies – the 2007 Review
– identifies Massachusetts as exceptional relative to its peers in meeting federal
benchmarks.

[25]  Considering that plaintiffs' case concerns only children in the Department's foster care
– rather than all children and families receiving services from the Department – the most
relevant aspects of the CFSR Review actually reflect commendable performance on the
Department's part.  In conferring on the Department a "strength" rating for its service
array, ACF wrote:  "The State has developed and implemented standards to ensure that
children in foster care are provided quality services that protect the safety and health of
children."  Exh. A at 79.  In 92.5% of reviewed foster cases, ACF found that the
Department's caseworker turned in a strong performance (entailing frequent and
constructive visits that ensured adequate monitoring of the child's safety and well-being,

As is customary, the Department was afforded the opportunity to develop an Improvement Plan.[26]  It engaged in a lengthy process – spanning nearly eighteen months – in conjunction with ACF, "to address the areas identified as needing improvement in the 2007 CFSR," and a final Improvement Plan was promulgated, and approved, in October 2009.  Exhibit B at 4.  Massachusetts is "actively implementing the provisions of the . . . [I]mprovement [P]lan," and, accordingly, ACF has not withheld funding.  45 Code Fed. Regs. §1355.36(c)(1).  Under the Improvement Plan, and the applicable regulation, the Commonwealth "must provide quarterly status reports . . . to ACF."  Id. § 1355.35(d)(4).  "Such reports must inform ACF of progress in implementing the measures of the plan."  Id.

### STATE LEGISLATIVE AND JUDICIAL BRANCH OVERSIGHT

In addition to the extensive, ongoing role played by the Juvenile Court in care and protection proceedings, the Commonwealth has initiated a number of reform efforts aimed at achieving long-term improvements in the delivery of foster care in Massachusetts and in the procedures governing care and protection proceedings in Juvenile Court.

---

focusing on service delivery and goal attainment).  Id. at 53.  The Department's efforts to assess and meet foster children's needs (including, where applicable, mental health needs) also sufficed to achieve a "strength" rating.  Id. at 49, 64.  In 96% of reviewed cases, the Department's caseworkers "made diligent efforts to meet the educational needs of children."  Id. at 59.  As another example of positive performance, ACF's case reviews showed that 98.1% of children exiting foster care not to their home of origin were discharged to a permanent home (placing the Department in the top quartile among its peers nationally).

[26]  The Improvement Plan is a public document pursuant to 45 Code Fed. Regs. § 1355.37.  See id. ("The [s]tate agency must make available for public review and inspection all statewide assessments . . . and [PIPs] developed as a result of a full or partial child and family services review").  It is attached as Exhibit B.

**A.  Legislative Reform.**

The legislative branch exercises ongoing and extensive oversight of the child welfare system in Massachusetts.  In 2006, the House Post Audit and Oversight Committee issued a report setting forth recommendations on ways in which the Department could improve its role in the administration of the foster care system.  The following year, in 2007, the House Committee on Child Abuse and Neglect (appointed by the House oversight committee to investigate the protection of children in foster care) submitted an extensive report to the Legislature, setting forth a comprehensive review of the Commonwealth's efforts to protect children in Massachusetts from abuse and neglect and making recommendations for legislative reform.  <u>See</u> "First, Do No Harm," a Report of the House Committee on Child Abuse and Neglect, dated March 28, 2007, published at www.mass.gov/legis/reports/HCCAN_report_3-28-07_Final.pdf.  That report led to the 2008 enactment of reform legislation, which made significant and important changes in the laws of the Commonwealth to improve the safety, permanency, and well-being of children.  <u>See</u> Child Welfare Reform Act, Mass. St. 2008, c. 176.

Among the more significant changes effected by the Act, it required immediate notification to law enforcement authorities for instances of serious child abuse; required training on child abuse for mandated reporters and Department staff; extended the time for the Department to investigate allegations of abuse and neglect; required internal review by the Department of multiple child abuse reports within a specific family; required notification of relatives of a child removed from parental custody; strengthened procedural protections governing sibling and grandparent visitation; codified the Department's  regulatory requirement to attempt to place siblings together; adopted –

subject to appropriation – the USDA rates for maintenance payments made to foster

payments; and established an interagency child welfare task force, under the authority of

the state's Secretary of Health and Human Services, to establish yearly interagency goals

to improve services to children.  Mass. St. 2008, c. 176.

The Legislature continues to oversee the delivery of foster care in the

Commonwealth.  As recently as November 2009, the Joint Committee on Children,

Families, and Persons With Disabilities convened an oversight hearing, at which the

Department was asked to report on the implementation of the 2008 Child Welfare Act.  In

addition, the Legislature's continuing oversight role is reflected in the provision in the

2008 reform legislation requiring that the Department submit regular reports to the

Legislature, Governor, and Child Advocate, concerning children in the Department's

custody or care.  Specifically, the Department is required to submit, on an annual basis, a

report concerning children in the Department's care, including children in the

Department's custody as a result of abuse and neglect by their parents.  The report

(entitled "Child Welfare Act Report") is required to set forth information by region

concerning the number of children in the Department's care; reasons for placement; type

of services provided; length of placement; and disposition of each child's case.  Mass.

G.L. c. 18B, § 23.[27]

In addition, the Department is required to submit semi-annual reports including

information concerning, among other things, the Department's efforts to address the

needs of "high risk" children.  Mass. G.L. c. 18B, § 24.  The Department also is required

---

[27]  The statute (presumably through an inadvertent error) contains two sections identified
as § 23.  The reference in the text is to the first of the two sections that appear in the
General Laws.

to submit quarterly reports on the number of cases, and resolution of such cases, involving any child for whom more than three reports of abuse or neglect pursuant to Mass. G.L. c. 119, § 51A, have been filed within a three-month period.  Mass. G.L. c. 18B, § 25.  Finally, pursuant to language in the Legislature's annual budget appropriation, the Department is required to submit monthly reports to the Legislature, providing information about the caseloads of social workers.  See FY 2011 General Appropriation Act, Mass. St. 2010, c. 131, § 2, item 4800-0015.

In the 2008 reform legislation, the Legislature also codified the Office of the Child Advocate (which previously had been established by executive order).  The Child Advocate, who is appointed by and reports directly to the Governor, is statutorily charged with  reviewing and making recommendations "with respect to system-wide improvements that may increase the effectiveness of the care and services provided to children and their families" and suggesting legislative and regulatory changes, including undertaking a review of the Department's programs and procedures.  Mass. G.L. c. 18C, § 5(e).  Pursuant to that authority, the Child Advocate is developing a five year comprehensive plan for a coordinated system-wide response to child abuse and neglect. The Child Advocate also is charged with the more specific task of reviewing and attempting to resolve "complaints relative to the provision of services to children by an executive agency" and to "assist . . . children [in the care of the Commonwealth] in resolving problems and concerns associated with their placement" or plans for independent living.  Mass. G.L. c. 118C, § 5(c)-(d).  In addition, the Child Advocate is required to investigate incidents involving children who sustain serious injuries while in the Department's custody.  Mass. G.L. c. 18C, § 5(a)-(b).

**B.  Judicial Reform Initiatives.**

The Massachusetts Supreme Judicial Court, through its Court Improvement Project Committee, has undertaken efforts to improve the role of the judiciary in handling cases involving children, including in particular care and protection proceedings.  The Supreme Judicial Court receives funding from the federal government, pursuant to the Adoption and Assistance and Welfare Act and 42 U.S.C. § 629h, for improving access to and handling of judicial proceedings relating to foster care and adoption.[28]

During the past two years, funding provided to the Supreme Judicial Court under the foregoing grant program has been used by the Department for various court reform initiatives, including to provide a training program for lawyers appointed to represent children who appear in Juvenile Court care and protection proceedings.  The Department has also used this grant money to establish a document-exchange program between the Department and the Juvenile Courts, which facilitates the role of the courts in adjudicating care and protection cases.

Another recent court reform effort in Massachusetts is the issuance by the Juvenile Court, in July 2010, of a standing order intended to ensure the timely completion

---

[28]  The foregoing provision authorizes grants to the highest state courts for the purpose of enabling them to:  (1) conduct assessments of the effectiveness of state courts in care and protection proceedings, including their determinations regarding "the advisability or appropriateness of foster care placement"; (2) implement improvements deemed necessary as a result of the assessments, including improvements "to provide for the safety, well-being, and permanence of children in foster care," as set forth in the "Adoption and Safe Families Act of 1997" and implement "a corrective action plan, as necessary, resulting from reviews of child and family service programs under section 1320a-2a" [i.e., the Reviews discussed supra at pages 37-40] with respect to the role of courts in the foster care system; (3) "to ensure that the safety, permanence, and well-being needs of children are met in a timely and complete manner"; and (4) to provide for training of judges, attorneys, and other legal personnel in child welfare cases.  42 U.S.C. § 629h(a).

of care and protection and termination trials, thereby enhancing the Juvenile Court's role

in achieving stability for children.  See Trial Court, Juvenile Court Department Standing

Order 01-10 ("Scheduling of Care and Protection and Termination of Parental Rights

Trials").  To accomplish that goal, the Standing Order sets mandatory time-frames for

completion of such trials, including the requirement that Juvenile Court judges issue

written findings within 30 days following completion of a proceeding adjudicating a child

in need of care and protection or terminating parental rights.

## ARGUMENT

## I.    THE COURT IS REQUIRED TO ABSTAIN FROM EXERCISING JURISDICTION, UNDER YOUNGER V. HARRIS.

Although federal courts have a "virtually unflagging obligation . . . to exercise the

jurisdiction given them," Colorado River Water Conservation Dist. v. United States, 424

U.S. 800, 817 (1976), it is also well-established, by Younger v. Harris, 401 U.S. 37

(1971), that the "interests of comity and the respect for state processes demand that

federal courts should abstain from interfering with ongoing state judicial proceedings."

Esso v. Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136, 143 (1st Cir. 2008).  While

Younger "itself occurred within the context of a criminal state proceeding," it "has

expanded beyond that context" to apply to civil and administrative proceedings brought

by the state in an enforcement action against an individual, as well as in "situations

uniquely in furtherance of the fundamental workings of a state's judicial system."  Rio

Grande Comty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 69 (1st Cir. 2005).

"Younger is grounded in notions of comity:  the idea that the state courts should

not, in certain circumstances, be interfered with."  Rio Grande, 397 F.3d at 68-69.  As the

Supreme Court explained in Middlesex Ethics Comm. v. Garden State Bar Ass'n, 457

U.S. 423, 431 (1982), "Younger v. Harris . . . and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances."  See 31 Foster Children, 329 F.3d at 1276 (essential to Younger abstention analysis "is whether the federal proceeding will interfere with an ongoing state proceeding."); Carson P., 240 F.R.D. at 523.

Under Younger, a federal court must abstain if (1) there are ongoing state proceedings involving the federal plaintiff that are judicial in nature; (2) the proceedings implicate important state interests; and (3) they provide an adequate opportunity for the federal plaintiff to assert his federal claims.  Colonial Life & Acc. Ins. Co. v. Medley, 572 F.3d 22, 26 (1st Cir. 2009), cert. denied, 130 S.Ct. 1059 (2010); Bettencourt v. Board of Registration in Medicine, 904 F.2d 772, 777 (1st Cir. 1990) (citing Middlesex). "Younger abstention is mandatory if its conditions are met."  Rio Grande, 397 F.3d at 68; see Colonial Life, 572 F.2d at 25 ("If Younger requires abstention, 'there is no discretion to grant injunctive relief'") (quoting Colorado River, 424 U.S. at 817 n.22)).

 The Supreme Court itself has recognized the appropriateness of Younger abstention in matters entrusted to state Juvenile Courts involving the removal of children from their parents and placement in the state's foster care custody.  See Moore v. Sims, 442 U.S. 415, 423-35 (1979) (Younger abstention was required  in a case challenging the constitutionality of Texas statutory provisions governing child protection proceedings, and seeking to enjoin a proceeding involving removal of a child from his parents' custody based on alleged abuse).

Two Circuit Courts and several district courts, confronting similar challenges to foster care systems in other states, held that Younger abstention was required, because

the exercise of federal jurisdiction would interfere with ongoing state court proceedings akin to the care and protection proceedings pending in Massachusetts Juvenile Court for each of the plaintiffs here.  The Eleventh Circuit so held, in 31 Foster Children, 329 F.3d at 1260, 1279, 1281-82 (affirming dismissal, on Younger abstention grounds, of children's claims based on substantive due process, procedural due process, and familial association, in proposed class action alleging "widespread deficiencies" in Florida's foster care system, because federal relief "would interfere extensively with the ongoing state proceedings for each plaintiff").  The Tenth Circuit reached the same conclusion in J.B. v. Valdez, 186 F.3d at 1291-93, holding that Younger abstention was required in an action brought by mentally and developmentally disabled children in state custody, alleging violation of due process and various federal statutes, and seeking "structural reform" of New Mexico's system for provision of services such children, because plaintiffs were subject to periodic review proceedings in the state Children's Court, which was charged with making determinations concerning their custody and treatment plans.  See also Joseph A., 275 F.3d at 1257, 1268, 1272.[29]

District Courts in Nebraska and California have reached the same conclusion. Particularly noteworthy is the comprehensive decision of the Nebraska District Court in Carson P., where plaintiffs broadly challenged the Nebraska foster care system, asserting

---

[29] In Joseph A., a class action seeking "systemic reforms" in New Mexico's foster care system, in which plaintiffs sought enforcement of a federal consent decree incorporating the parties' settlement agreement, the Tenth Circuit declared:  "Younger mandates that the federal courts abstain from enforcing" at least those provisions in the decree that would interfere with the Children's Court "in an insidious way," such as the provisions preventing the state's foster care agency from selecting certain placement and planning options for children.  The Circuit Court remanded the case to the District Court for a determination of which, if any, provisions of consent decree could be enforced "in light of Younger."

claims based on substantive due process, procedural due process, familial association, and the Adoption Assistance and Child Welfare Act, and where the Court held that Younger required abstention as to all of plaintiffs' claims.  See also Laurie Q., 304 F. Supp. 2d at 1186, 1204 (dismissing, on Younger abstention grounds, claims by a class of special needs children in county's foster care custody, who alleged "widespread violations" of the law including their right to adequate case plans under the Adoption Assistance and Child Welfare Act).  In a proposed class action asserting "poor management and gross over-burdening" of a county foster care system in Nevada and alleging numerous constitutional violations, a District Court also issued a decision that, although deferring a determination on whether Younger abstention was required, stayed the hand of the federal court while plaintiffs were given an opportunity to seek relief in pending state juvenile court proceedings, because "[t]he state courts may very well remedy Plaintiffs' circumstances."  Clark K. v. Guinn, 2007 WL 1435428, *20 (D. Nev., May 14, 2007).

Here, all of the Middlesex factors are met, requiring the Court to abstain from exercising jurisdiction over plaintiffs' claims.

> **A.    Each of the Named Plaintiffs, and Every Child in the Proposed Plaintiff Class, Is the Subject of an Ongoing Care and Protection Proceeding in Massachusetts Juvenile Court.**

Each of the six named plaintiffs, and every member of the proposed plaintiff class in the Department's care and custody, is the subject of a pending care and protection proceeding in Massachusetts Juvenile Court.  See Affidavit of Virginia Peel, ¶¶ 4-10.[30]

---

[30]  Plaintiffs' proposed class includes not only children now in the Department's custody but also all children who "will be in the foster care custody" of the Department in the

The state-court proceedings will remain pending at least until such time as the Department's custody ends, as in the case of a child who is adopted or who turns 18 and no longer is in need of Department services.  As detailed above, see supra pages 12-32, for each child in the proposed class, the Juvenile Court exercises continuing jurisdiction and extensive oversight throughout the care and protection proceeding.

The Juvenile Court makes the initial determination to transfer custody of the child to the Department following a temporary custody hearing; and the court reviews the Department's exercise of its custodial powers and enters orders governing the placement, services, and visitation provided to the child by the Department, at an "abuse of discretion" hearing upon motion by the child at any time.  Mass. G.L. c. 119, §§ 21, 24. In addition, the Juvenile Court reviews and enters orders regarding the child's placement, services, and visitation at an annual permanency hearing, at which the Juvenile Court also is required to make a determination as to the child's permanency goal and to make "any appropriate order as may be in the child's best interests," including an order to implement the child's permanency plan in a timely manner.  Mass. G.L. c. 119, § 29B; Uniform Rules on Permanency Hearings, Rule 7(A).  Finally, the Juvenile Court makes the ultimate determination whether to place the child permanently in the Department's custody, including determining whether to approve the particular family proposed by the Department in its permanency plan or to approve a different family or relative proposed

---

future as a result of abuse or neglect.  Compl. ¶ 1.  In opposing class certification, defendants will oppose inclusion in the class of as yet to be identified children who at some future time may be in state custody.  For the purposes of this memorandum, therefore, the Department focuses its discussion on the six individually named plaintiffs and the members of the proposed class who are currently in the Department's custody, all of whom are the subject of ongoing proceedings in Juvenile Court.

by the parent or child, as well as issuing orders governing post-adoption visitation for a child.  Mass. G.L. c. 119, § 26.   In short, the Juvenile Courts "play a critically important role" in care and protection proceedings "from the outset of a child's case."  31 Foster Children, 329 F.3d at 1277 (characterizing role of Florida trial level courts in that state's "dependency" proceedings, which are akin to the Massachusetts care and protection proceedings).

Thus, for each child in the proposed plaintiff class, the pending Juvenile Court care and protection proceeding constitutes an ongoing state court proceeding for purposes of Younger abstention.  See 31 Foster Children, 329 F.3d at 1275 ("the continuing state dependency proceedings involving each of the plaintiffs are ongoing state proceedings for the purposes of Middlesex analysis"); J.B., 186 F.3d at 1291  (continuing jurisdiction of Juvenile Court to modify disposition of disabled children in state custody and six month periodic review hearings constituted ongoing state judicial proceedings for purposes of Younger abstention); Carson P., 240 F.R.D. at 523 (each of the plaintiffs, and every child adjudicated to be  in state custody, "is subject to the continuing jurisdiction of the Nebraska juvenile court system," and thus "the named plaintiffs, and all members of the putative class, are subject to ongoing state proceedings before the Nebraska juvenile court system"); Laurie Q., 304 F. Supp. 2d at 1204 ("the substantial oversight role that the Juvenile Court must play during the pendency of a child's care within the foster system is sufficient to create an ongoing judicial proceeding for the purposes of Younger.").[31]

---

[31]  Even those courts that have declined to abstain have recognized that the state court proceedings constitute ongoing judicial proceedings for purposes of Younger.  See, e.g.,

**B.      The Juvenile Court Proceedings Implicate
         Important State Interests.**

There can be no question that protecting the welfare of children through care and

protection proceedings is a state interest of the highest order.  "Family relations are a

traditional area of state concern," Moore, 442 U.S. at 435, and, as the Supreme Judicial

Court has recognized, "[t]he importance of the policy behind the statutory scheme [in

Mass. G.L. c. 119, §§ 24 and 26] – to protect children of the Commonwealth against

'harmful effects' [resulting from their parents' inability or inadequacy to care for them]

. . . cannot be overemphasized."  Adoption of Peggy, 436 Mass. at 697; see also Petition

of the Dep't of Public Welfare to Dispense with Consent to Adoption, 376 Mass. 252,

264-65 (1978) ("State's interest in protecting the welfare of children" is a "compelling

state interest"); Carson P., 240 F.R.D. at 524 ("[t]he state has a compelling interest in

quickly and effectively removing the victims of child abuse and neglect from their

parents and placing them in safe and suitable homes.").

The Commonwealth's "interest in this issue is evidenced by its current and

ongoing welfare reform efforts," see Carson P., 240 F.R.D. at 524 (discussing state

legislative and judicial branch reform efforts relating to Nebraska's child welfare system

and participation in national reform efforts).  The Commonwealth's reform efforts are

---

Olivia Y., 351 F. Supp. 2d at 567 ("In view of the continuing nature of the duties and
responsibilities statutorily imposed upon the state's youth courts, . . . [the] proceedings
may fairly be said to be 'ongoing' in the case of each child over whom the youth courts
have assumed jurisdiction.").  The court's ruling in Olivia Y. was based on the fact that,
"owing to the generality of plaintiffs' prayer for relief," a determination as to "whether
the federal proceeding will interfere with [the] state proceedings" "is not as readily made
as it might otherwise have been."  Id. at 567-68.  As the court in Carson P. persuasively
reasoned, however, "artful pleading and lack of specificity" in a prayer for relief should
not enable a party to "circumvent" Younger, 240 F.R.D. at 525.

reflected in the Department's implementation of its Improvement Plan, which the

Department developed in collaboration with federal ACF officials following the federal

agency's completion of its most recent Review of the Massachusetts foster care system.

See supra pages 41-45.   In addition, as discussed above, the Massachusetts Legislature

enacted sweeping child welfare reform legislation in 2008, establishing a Child Advocate

to make recommendations "with respect to system-wide improvements that may increase

the effectiveness of the care and services provided to child and their families."  The

Legislature also exercises ongoing oversight of the Department, through the

Department's submission of regular reports; and the judicial branch has undertaken

recent reform efforts aimed at improving the role of the Juvenile Courts in care and

protection proceedings.  These extensive state-wide efforts, undertaken by state

governmental institutions within the unquestioned scope of their power, "address many of

the issues raised by the plaintiffs in this case," Carson P., 240 F.R.D. at 524, as in

Nebraska.  Plaintiffs' complaints should be aired in those venues rather than in this Court.

Thus, "proceedings instituted to protect children from abuse implicate sufficiently

important state interests to justify Younger abstention."  Carson P., 240 F.R.D. at 524

(citing Moore, 442 U.S. at 435); 31 Foster Children, 329 F.3d at 1275 (continuing state

court "dependency" proceedings in Florida involving each of the plaintiffs in the

proposed class involve "important state interests").

### C.    The Exercise of Federal Jurisdiction Will Interfere With the State Court Proceedings.

In determining whether the exercise of federal jurisdiction would interfere with

ongoing state court proceedings, "we look to the relief requested and the effect it would

have on the state proceedings." 31 Foster Children, 329 F.3d at 1276.[32]  Most of the

relief sought by plaintiffs here, if granted, would unquestionably interfere with

determinations routinely made by the Massachusetts Juvenile Courts in the course of the

care and protection proceedings that are currently pending for each child in the proposed

plaintiff class.

> **1.   Federal Court Orders Relating to the Placement and Services Received by Each Child in the Proposed Plaintiff Class Would Require Individualized Determinations That Would Directly Interfere with Decisions Made by the Juvenile Courts in Each Pending Care and Protection Proceeding.**

Much of the relief that plaintiffs seek "would interfere with the ongoing state

[court] proceedings by placing decisions that are now in the hands of the state courts

under the direction of the federal district court." 31 Foster Children, 329 F.3d at 1278.

Specifically, plaintiffs seek an injunction requiring the Department to assess "the need for

additional services and placements" of children; provide for adequate visitation between

children and their parents/siblings through development and implementation of new

policies; take action "to provide adequate and timely case plans and case reviews for

children" and service plans for their parents; "monitor[] the safety of children in

placement"; and require the Department to comply with state law standards governing the

approval of placements.  Compl., Prayer for Relief ¶ (e)(iii)-(vi).  All of these matters –

determining the propriety and safety of placements; the adequacy of services; the

frequency of visitation, and the appropriateness of the Department's service plans,

---

[32] "The relief sought need not directly interfere with an ongoing proceeding or terminate an ongoing proceeding in order for Younger abstention to be required." 31 Foster Children, 329 F.3d at 1276.  Rather, the relevant inquiry is whether "the decree requested by the plaintiffs inevitably would interfere with" the state proceedings. Id.

including whether the Department is making reasonable efforts to achieve permanency for each child – necessarily must be addressed in the ongoing proceedings by Juvenile Court judges, who are vested with the authority and the obligation to render determinations and issue orders on each of these issues.

Where a child in foster care is not receiving necessary services, including for example mental health treatment or other medical care, the Juvenile Court is empowered to order the Department to provide services for the child.  Isaac, 419 Mass. at 610-611; Mass. G.L. c. 119, § 21.  Where the safety or appropriateness of a child's placement is called into question, or where a question arises as to whether the child requires a more restrictive placement, e.g. a residential placement, the Juvenile Court may issue an order if the Department has abused its discretion in selecting the placement, thereby requiring the Department to change the placement.  Jeremy, 419 Mass. at 618-23; Mass. G.L. c. 119, § 21.  The Juvenile Court may also (and often does) issue orders governing the frequency of visitation between a child and his parent, siblings, and grandparents.  Mass. G.L. c. 119, §§ 21, 26B.  In addition, the Juvenile Court is required to determine the permanency plan for the child, which entails a review and determination of the adequacy of the services, placement, and visitation provided to a child by the Department, as well as requiring the Court to determine the appropriate permanency goal for the child.  Mass. G.L. c. 119, § 29B.

Thus, the foregoing relief sought by the plaintiffs plainly "would interfere extensively with the ongoing state proceedings for each plaintiff."  31 Foster Children,

329 F.3d at 1279.[33]  See also Carson P., 240 F.R.D. at 530 ("Exercising federal court

oversight over [the state agency's] conduct on behalf of a child would serve to duplicate

the authority already afforded to the Nebraska juvenile court by the Nebraska legislature.

Federal court injunctive orders against [the state agency] would undermine and interfere

with the Nebraska juvenile court's ability to exercise the full extent of its authority over

juvenile court proceedings.").  In particular, "[t]he federal court relief might effectively

require an amendment to a child's case plan that the state court would not have approved,

and state law gives its courts the responsibility" for such decisions.  31 Foster Children,

329 F.3d at 1278.  Similarly, federal injunctive relief would effectively usurp the role of

the state Juvenile Courts to determine "what is best for a particular plaintiff, such as

whether a particular placement is safe or appropriate or whether sufficient efforts are

being made to find an adoptive family."  Id.; see Laurie Q., 304 F. Supp. 2d at 1207 n.16

("the allegations at issue here reach to the very heart of the Juvenile Court's

responsibility and core competency, viz., determining the best program of services and

placement for each individual child."); see also J.B., 186 F.3d at 1291 (Younger

abstention was required, because the exercise of federal jurisdiction would "place[ ] the

federal court in the role of making dispositional decisions such as whether to return the

---

[33]  In 31 Foster Children, the Eleventh Circuit emphasized that one aspect of the relief
sought by plaintiffs there – appointment by the District Court of a panel authorized to
"implement a systemwide plan to revamp and reform dependency proceedings in
Florida" – was particularly "problematic":  "To say the least, taking the responsibility for
a state's child dependency proceedings away from state courts and putting it under
federal court control constitutes 'federal court oversight of state court operations,'"
requiring Younger abstention.  329 F.3d at 1279 (quoting Joseph A., 275 F.3d at 1271).
While the plaintiffs here do not seek the appointment of such a panel, they do request that
the Court appoint a "neutral expert" to monitor the provisions of any order entered by the
Court, underscoring the breadth of federal relief they are seeking.  Compl., Prayer for
Relief ¶ (e)(x).

child to his parents in conjunction with state assistance or whether to modify a treatment plan.  These are the kind of decisions currently made by the New Mexico Children's Court through the periodic review process.").

### 2.      The Request for Systemic Relief Does Not Enable Plaintiffs to Circumvent <u>Younger</u>.

In addition to the injunctive relief discussed above – which would <u>directly</u> interfere with the pending Juvenile Court proceedings – plaintiffs also seek "systemic" relief requiring the Department to establish limits on the number of caseloads that Department "case-carrying workers" (<u>i.e.</u>, social workers and adoption workers) carry; develop a new training program for caseworkers; implement a new "quality assurance" system to monitor the quality of services that it provides to children; and create a "contract monitoring unit" to oversee the Department's "purchased services," a reference to services that the Department obtains by contract with outside providers.  Compl., Prayer for Relief ¶ (e)(i)-(ii), (e)(vii)-(viii).

Even if this "systemic" relief, if granted, would not directly interfere with the ongoing Juvenile Court care and protection proceedings, this Court <u>nonetheless</u> is required to abstain under <u>Younger</u> as long as the ongoing state court proceedings would provide "an adequate remedy" for plaintiffs' federal constitutional claims.  <u>Pennzoil Co. v. Texaco, Inc.</u>, 481 U.S. 1, 15 (1987).  Where, as here, <u>individual</u> plaintiffs have the opportunity to raise their constitutional claims in pending state court proceedings, and where they are able to obtain "an adequate remedy" in those proceedings, namely, by seeking relief there with respect to placements, services, and visitation, <u>Younger</u> abstention is required – even if the state court remedy does not encompass the systemic relief that plaintiffs seek for proposed class members (all of whom can obtain relief in

their pending state cases).  As the Tenth Circuit explained in <u>Joseph A.</u>, 275 F.3d at 1274,

"we could find no case, and Appellants cite none, that hold that a party is entitled to

avoid the effects of the <u>Younger</u> abstention doctrine in cases where relief is available to

individual litigants in ongoing state proceedings but not to represented parties in a class

action."

The conclusion in <u>Joseph A.</u>, that the unavailability of class-based relief does not

undermine the applicability of <u>Younger</u>, is consistent with (and indeed required by) the

Supreme Court's holding in <u>Juidice v. Vail</u>, 430 U.S. 327 (1977).  In <u>Juidice</u>, the

Supreme Court upheld a District Court's decision to abstain from exercising jurisdiction

over a proceeding brought in federal court by a class of judgment debtors who had been

held in state court to be in contempt of default judgments entered against them; in the

federal action, the judgment debtors sought to enjoin enforcement of the statutory

provisions authorizing the contempt proceeding, based on their Fourteenth Amendment

due process rights.  In holding that the District Court was required to abstain, the Court

relied on the fact that the <u>individual</u>  judgment debtors had an opportunity to raise their

constitutional claims in their state court contempt proceedings (notwithstanding that,

because they had never appeared in the contempt proceedings, they had not actually

raised the claims).  430 U.S. at 329-30.

**D.  The State Court Proceedings Provide an Adequate Opportunity for the Plaintiffs to Raise Their Federal Constitutional Claims.**

A federal court "should assume that state procedures will afford an adequate

remedy, in the absence of unambiguous authority to the contrary."  <u>Pennzoil</u>, 481 U.S. at

15.  "Minimal respect for the state processes, of course, precludes any <u>presumption</u> that

the state courts will not safeguard federal constitutional rights."  <u>Middlesex</u>, 457 U.S. at

431 (emphasis in original).  Thus, "[c]ertainly, abstention is appropriate unless state law

clearly bars the interposition of the [federal statutory] and constitutional claims."  Moore,

442 U.S. at 425-26.  Plaintiffs here, "having failed to raise their federal claims in the

ongoing state court proceedings involving them, must overcome this initial presumption

by demonstrating that the state remedies are inadequate."  31 Foster Children, 329 F.3d at

1279; Pennzoil, 481 U.S. at 17 (where Texaco had not availed itself of the opportunity to

present its constitutional claims in the Texas state courts and could not demonstrate that

the state courts were unable to adjudicate those claims, "there [was] no basis for

concluding that the Texas law and procedures were so deficient that Younger abstention

is inappropriate.").[34]

     "In determining whether the state remedies are adequate,  . . . '[t]he relevant

question is not whether the state courts can do all that Plaintiffs wish they could, but

whether the available remedies are sufficient to meet Pennzoil's requirement that the

remedy be adequate.'"  31 Foster Children, 329 F.3d at 1279.  Thus, the proper inquiry is

not "whether the broad relief the plaintiffs would prefer is available but instead whether

the forum itself is adequate for addressing the claims and providing a sufficient remedy to

the individual plaintiffs."  Id. at 1281-82 n.12.  As the court in Carson P. stated, "[t]he

plaintiffs bear the burden of proving that their individual claims could not be adequately

raised" in state juvenile court.   240 F.R.D. at 530.

     In this context, therefore, "the precise question is not whether a [state] juvenile

court can be called upon to issue a ruling declaring that specific [agency] policies violate

---

[34]  In the Complaint, plaintiffs do not allege that they have ever attempted to raise any of
their federal claims in the ongoing Juvenile Court proceedings.

the constitution or federal law.  Rather, the plaintiffs must prove the juvenile courts

cannot adequately consider evidence of [the agency's] conduct or likely future conduct

toward the individual plaintiffs, determine if such conduct violates their rights under

federal constitutional or statutory law, and enter orders protecting the plaintiffs from [the

agency's] allegedly unlawful conduct."  240 F.R.D. at 531.  As was the case in Nebraska,

in Massachusetts, too, "[t]here is no evidence . . . that juvenile court judges cannot

interpret federal constitutional or statutory laws governing or impacting their rulings, nor

is there evidence that appellate review is unavailable in higher state court."  Id.

Indeed, "it cannot be doubted that the courts of the Commonwealth will give

federal constitutional issues the closest scrutiny."  Johnson v. Board of Bar Overseers of

Mass., 324 F. Supp. 2d 276, 283 (D. Mass. 2004) (quoting Board of Locomotive Eng'rs

v. Mass. Comm. Against Discrimination, 695 F. Supp. 1321, 1323 (D. Mass. 1988)).

Parties to proceedings in the Massachusetts Juvenile Court may raise federal

constitutional and statutory claims and obtain appellate review of judgments in those

cases.  See, e.g., In re Angela, 445 Mass. 55 (2005) (holding that child's right to due

process required evidentiary hearing in Juvenile Court before extending disposition order

for out-of-home placement in CHINS proceedings); Adoption of Willow, 433 Mass. 636

(2001) (discussing mother's constitutional right to family integrity under the federal and

state constitutions); Adoption of Gregory, 434 Mass. 117, 188 (2001) (reviewing decree

terminating father's parental rights, and addressing claim that Department violated

father's rights under federal Americans With Disabilities Act).  And under Mass. G.L. c.

218, § 59, the Juvenile Court has "jurisdiction in equity concurrent with the supreme

judicial court and the superior court" in all matters arising under Chapters 119 and 210.

See also Mass. G.L. c. 119, § 29 (in care and protection proceeding Juvenile Court "may make such temporary orders as may be necessary to protect the child and society."); 44A Mass. Pract. Series § 3.3 (2d ed. 2006) (describing "general equity power" of Juvenile Court in care and protection proceedings").  Thus, the Juvenile Court can issue orders respecting services for children in foster care, the frequency of visitation, effectuating a permanency plan; and even effectively ordering the Department to change a placement, in circumstances in which the court determines that the Department has abused its discretion (e.g., by placing the child in a setting that is found to be too restrictive).  See supra pages 22-29.  Furthermore, final orders of the Juvenile Court may be appealed to the Massachusetts Court of Appeals and further appealed to the Supreme Judicial Court. Both appellate tribunals are capable of addressing of addressing federal constitutional and statutory claims.[35]

Thus, the Juvenile Court proceedings provide plaintiffs with an adequate forum to assert their federal constitutional claims and with an "adequate remedy" under Pennzoil. Similarly, the Juvenile Court, which reviews the adequacy of the Department's permanency plan for each child, can provide an adequate remedy for violation of an asserted federal statutory right to a recruitment plan under the Adoption Assistance Act.[36]

---

[35]  The opportunity to raise federal constitutional or statutory issues at the appellate level itself is enough to require Younger abstention.  See Bettencourt, 904 F.2d at 778 (in civil rights action challenging revocation of plaintiff's medical license, abstention was required where "the review proceedings before the SJC provide an adequate opportunity to raise federal constitutional challenges) (quoting Ohio Civil Rights Comm'n v. Dayton Schools, 477 U.S. 619, 629 (1986), where the Supreme Court held that "[I]t is sufficient under Middlesex that constitutional claims may be raised in state-court judicial review of the administrative proceeding.").

[36]  It appears that the Juvenile Court might not be able to address one aspect of plaintiffs' federal statutory claim – namely, their claim seeking reimbursement of foster care

The fact that every child who is the subject of a care and protection proceeding is represented by counsel also is relevant in establishing the adequacy of the Juvenile Court proceedings.  See , e.g., Carson P., 240 F.R.D. at 532 (in holding that state juvenile court proceedings provided an adequate remedy for plaintiffs, court noted that each of the plaintiffs had a court-appointed attorney/ guardian ad litem who was obligated to act to protect the child's interests).

In sum, the ongoing Juvenile Court proceedings provide an adequate opportunity for the plaintiffs here to assert their federal claims, satisfying the third prong of the Middlesex analysis.  31 Foster Children, 329 F.3d at 1279-82; Carson P., 240 F.R.D. at 530-32; see Laurie Q., 304 F. Supp. 2d at 1206-07 (state juvenile court has power "to address nearly any type of deficiency in the care of a minor").  "[I]t is abundantly clear that [plaintiffs have] an opportunity to present their federal claims in the state proceedings," and "[n]o more is required to invoke Younger abstention."  Juidice, 430 U.S. at 337.  As the Supreme Court has emphasized, "We are unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation."  Moore, 442 U.S. at 435.

Even if, in Juvenile Court, plaintiffs may not be able to obtain class-wide injunctive orders setting, for example, new limits on caseloads, further training qualifications for caseworkers, new policies for "adequate visitation," and a new quality

---

maintenance payments under the Adoption Act – insofar as Juvenile Courts ordinarily play no role in determinations regarding such payments.  But even assuming that this Court were to exercise jurisdiction over that discrete claim, the claim must be dismissed because the Act does not confer a private right of action for enforcement of the provisions governing foster care maintenance payments.  See infra Argument Section IV.

assurance system, this does not enable them to "avoid the effects" of Younger abstention. Joseph A., 275 F.3d at 1274.[37]

In fact, the Supreme Court has pointedly rejected the notion that the breadth of the relief requested in a federal action weighs against abstention. See Moore, 442 U.S. at 427, where the Court stated:  "The District Court suggests that the more sweeping the challenge the more inappropriate is abstention, and thereby inverts traditional abstention reasoning.  The breadth of a challenge to a complex state statutory scheme has traditionally militated in favor of abstention, not against it."  442 U.S. at 427 (emphasis in original).  The "pertinent issue is whether . . . [plaintiffs' federal] claims could have been raised in the pending state court proceedings," id. at 425 (emphasis added), not whether plaintiffs could obtain from a state court all the relief that desire.

The "breadth" of plaintiffs' challenge here, and the highly intrusive nature of the relief sought – which would inject the federal court into policy-making and budget-allocating decisions best left to the other branches of government – require abstention. As the court observed in Carson P., 240 F.R.D. at 530, "[f]ederal lawsuits seeking orders to 'fix' portions of the state's integrated system raise substantial abstention issues."  This point was powerfully underscored in a recent decision of a California District Court, E.T. v. George, 681 F. Supp. 2d 1151, 1155 (E.D. Cal. 2010), where plaintiffs alleged that their federal and state constitutional and statutory rights were violated by excessive

---

[37]  For the same reason, to the extent that the plaintiffs' requested relief discussed in subsection 1, above, relating to the appropriateness of placement, services, visitation, and case planning, is understood as a request to require the Department to adopt "policies" or "practices" relating to these matters, the presence of this more broadly-framed request for relief likewise does not provide a basis for the Court to exercise jurisdiction, because the availability of "an adequate remedy" to the individual plaintiffs is sufficient for Younger abstention purposes.

caseloads of judges and court-appointed counsel in the state's "dependency courts," which adjudicated the disposition of children removed from their parents based on abuse or neglect.  The Court held that, under the doctrines of <u>Younger</u> abstention and equitable abstention, it was required to abstain, because the injunctive relief requested would have necessitated that the federal court "consider through a generalized inquiry how many cases are constitutionally and/or statutorily permissible" and "whether some types of cases require more investigation or preparation" than others.  681 F. Supp. 2d at 1165, 1166.

Further, the Court emphasized that such relief would "require this court to impose it[s] views on the budgeting priorities of the [state] legislature generally," <u>E.T.</u>, 681 F. Supp. 2d at 1167, a statement that applies with equal force to the systemic relief requested by plaintiffs here, which would require that this Court determine how many caseworkers are constitutionally required; what level of training should be required for such caseworkers; and what type of "quality assurance" system and "contract monitoring" system are required to oversee the Department's provision of services.  This sort of exceptionally broad-reaching relief would run afoul of the Supreme Court's recent caution that "institutional reform injunctions often raise sensitive federalism concerns," as "[s]uch litigation commonly involves areas of core state responsibility," and those concerns "are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."  <u>Horne v. Flores</u>, -- U.S. --, 129 S.Ct. 2579, 2593-95 (2009).

Plaintiffs do not allege that they unsuccessfully attempted to obtain relief in their individual Juvenile Court proceedings (by, <u>e.g.</u>, challenging the Department's placement decisions, seeking to increase visitation, or seeking services).  But their failure to do so

does not enable them to avoid the effects of <u>Younger</u> here, as a party "cannot escape

<u>Younger</u> abstention by failing to assert its state remedies in a timely manner," <u>Pennzoil</u>,

481 U.S. at 16; <u>Juidice</u>, 430 U.S. at 337 (judgment debtors' "failure to avail themselves"

of "opportunity to fairly pursue their constitutional claims in the ongoing state

proceedings . . . does not mean that the state procedures were inadequate.").

**E.**     **Cases Involving Similar Claims in Which Courts Declined to Abstain on the Basis That Plaintiffs Sought Broad-Based Relief Are at Odds With the Core Concerns at the Heart of <u>Younger</u>.**

Contrary to the holdings of the Tenth and Eleventh Circuits, as well as the district

court decisions cited above, the D.C. Circuit and a handful of district courts, addressing

similar claims broadly challenging a number of other states' foster care systems, have

declined to abstain from exercising jurisdiction, citing the fact that the systemic relief

requested was not available in the ongoing state juvenile court proceedings.  Defendants

urge this Court to reject the reasoning of those cases, which are at odds with the core

concerns of comity and federalism underlying <u>Younger</u> – in particular the Supreme

Court's warning that "[m]inimal respect for the state processes . . . precludes any

<u>presumption</u> that the state courts will not safeguard federal constitutional rights."

<u>Middlesex</u>, 457 U.S. at 431 (emphasis in original).

Courts that have declined to abstain in similar class-wide challenges to foster care

systems, on the grounds that state juvenile courts could not issue the systemic relief

sought by plaintiffs, are contrary to the principles underlying <u>Younger</u> and are at odds

with the Court's later holding in <u>Juidice</u>.  In <u>LaShawn A. v. Kelly</u>, 990 F.2d 1319, 1321

(D.C. Cir. 1993), <u>cert. denied</u>, 510 U.S. 1044 (1994), the D.C. Circuit Court declined to

apply <u>Younger</u> abstention in a class action on behalf of foster children in the District of

Columbia who alleged widespread failures by the District's Department of Human Services in initially investigating reports of abuse and neglect and in its provision of foster care.  The plaintiffs asserted that the District's officials had violated plaintiffs' rights under the Fifth Amendment due process clause, the Adoption Assistance Act and other federal statutes, and several D.C. statutory provisions.  Id.

In holding that abstention was not warranted, the D.C. Circuit reasoned that proceedings in the District's family courts were a "questionable vehicle for adjudicating the claims raised in the present case," given the plaintiffs' "multifaceted request for broad-based injunctive relief."[38]  But the premise of the D.C. Circuit's holding – that the unavailability of class-wide, systemic relief in the state court rendered the state court remedy "inadequate" – is inconsistent with Younger and the Court's later decision in Juidice.  The holding of Juidice leaves no doubt that the unavailability of class-wide

---

[38]  The District Court's decision in LaShawn A. did not address the issue of abstention, see 762 F. Supp. 969 (D. D.C. 1991), and, on appeal, the Circuit Court, after first noting that it had not yet had occasion to rule on whether Younger applied to the District of Columbia, went on to conclude that even if Younger "applied with full force" to the District, abstention was not required because state family court proceedings did not provide "an appropriate forum for this multifaceted class-action challenge" to the District's foster care system.  990 F.2d at 1323 ("The Family Division has explicitly rejected the use of review hearings to adjudge claims requesting broad-based injunctive relief based on federal law") (citing decision by the D.C. Superior Court, Family Division in In re Brim (D.C. Super. Ct. July 20, 1984)); see id. at 1323 (neglect proceedings in family court "contemplate issues centering on the care of a child by his or her parent," and "'[a]nything broader is inconsistent with the nature of the proceedings.'" (quoting In the Matters of N.P. and L.W. (D.C. Super. Court. June 14, 1982), as quoted in Family Div. Trial Lawyers v. Moultrie, 725 F.2d 695, 703 (D.C. Cir. 1984)).  It thus appears that the D.C. Circuit Court's decision on the abstention issue was based on the unavailability in family court of class-wide, systemic injunctive relief, as distinct from a determination that the family court did not have jurisdiction to consider constitutional claims raised by an individual.  Of course, Younger abstention would not apply in a circumstance in which a state's juvenile courts lacked jurisdiction to entertain a constitutional claim, but that is decidedly not the case in Massachusetts, where the Juvenile Court is fully empowered to consider constitutional claims.

relief in state court does not render the state court remedies "inadequate" for <u>Younger</u>

purposes.  430 U.S. at 328-30.

The other cases involving similar claims in which courts have declined to abstain

under <u>Younger</u> either are also based on the incorrect analysis of the D.C. Circuit in

<u>LaShawn A.</u> or are factually distinguishable from the present case.  Two cases simply

adopt the incorrect analysis in <u>LaShawn A.</u>.  <u>See</u> <u>Brian A. v. Sundquist</u>, 149 F. Supp. 2d

941, 957 (M.D. Tenn. 2000) (declining to abstain from exercising jurisdiction in a case

broadly challenging Tennessee's foster care system, because, "[a]lthough technically

Plaintiffs could raise constitutional questions in their individual juvenile proceedings,"

those proceedings did not "serve 'as an adequate forum for the class of children in this

case to present its multifaceted request for broad-based injunctive relief'") (quoting

<u>LaShawn A.</u>, 990 F.2d at 1323); <u>Dwayne B. v. Granholm</u>, 2007 WL 1140920 (E.D.

Mich. 2007).[39]

---

[39]  In <u>Dwayne B.</u>, the court, citing with approval the analysis in <u>Brian A.</u>, declined to abstain from exercising jurisdiction over a challenge to Michigan's foster care system, based on the same grounds as those in <u>Brian A.</u>.  The court's statement in <u>Dwayne B.</u> that the exercise of jurisdiction did not present any comity or federalism concerns, "because the State of Michigan has voluntarily agreed to federal oversight of its foster care system in exchange for federal funding," 2007 WL 1140920 * 5 n.5, turns the concept of federalism on its head.  The fact that all of the States are subject to oversight as a consequence of the federal funding that they receive in connection with their foster care systems does not make the state interest in administering those systems any less compelling.  <u>See</u>, <u>e.g.</u>, <u>31 Foster Children</u>, 329 F.3d at 1275 (Florida, which received federal funding for its foster care system, had "important state interests" in its foster care system).  If anything, the existence of the state's comprehensive reform efforts, undertaken with federal executive branch oversight and approval, favors abstention.  <u>Carson P.</u>, 240 F.R.D. at 524 n. 41 (Nebraska's state reform efforts, as well as its participation in collaborative "national and multi-state efforts to develop welfare reform plans" "should be considered" in the abstention analysis).  The further statement in <u>Dwayne B.</u> (adopted from <u>Brian A.</u>) that abstention was unwarranted because the relief sought was directed at an executive branch agency, rather than the juvenile court itself,

Two other cases involving similar claims in which courts have declined to abstain are distinguishable from this case, either because the defendants did not establish the existence of ongoing state court proceedings, as in <u>Marisol A. v. Guiliani</u>, 929 F. Supp. 662 (S.D.N.Y. 1996), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 126 F.3d 372 (2d Cir. 1997), or because the case presented a question as to whether the state court proceedings were inadequate for <u>Younger</u> purposes based on a claim of ineffective assistance of counsel.  <u>See</u> <u>Kenny A. v. Perdue</u>, 218 F.R.D. 277 (N.D. Ga. 2003).[40]

---

also is plainly wrong.  As the Supreme Court has made clear, the relief sought need not "directly" interfere with an ongoing state court judicial proceeding; it is enough that federal injunctive relief would "'<u>indirectly</u> accomplish the kind of interference that <u>Younger v. Harris</u> . . . and related cases sought to prevent.'"  <u>31 Foster Children</u>, 329 F.3d at 1276 (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 500 (1974) (emphasis in <u>31 Foster Children</u>)).  <u>See also</u> <u>Carson P.</u>, 240 F.R.D. at 529 (injunctive orders that "attempt to impose parameters" on state foster care agency's determinations regarding placement and services would "directly and indirectly interfere with the plenary jurisdictional and decision-making authority of the Nebraska juvenile courts.").

[40]  <u>See</u> <u>Marisol A.</u>, 929 F. Supp. at 689-690 ("existence of an ongoing state court proceeding is crucial to" the <u>Younger</u> analysis, and the defendant state officials "do not refer this Court to any pending state proceeding in which plaintiffs will have the opportunity to present the federal claims," instead merely "summarily" arguing for abstention on the ground federal claims were "cognizable" in New York family court); <u>Kenny A.</u>, 218 F.R.D. at 284, 287, 289 (relying in part on the fact that the plaintiffs alleged ineffective representation by their court-appointed counsel based on allegedly excessive attorney caseloads – an assertion that plaintiffs do not make here).  Moreover, because the court in <u>Kenny A.</u> held that the state defendants had waived their right to raise <u>Younger</u> abstention, having removed the case to federal court, "the court's cursory analysis of the applicability of <u>Younger</u> abstention is merely dicta."  <u>E.T. v. George</u> 681 F. Supp. 2d at 1174.  The decision in <u>Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476, 514 (D.N.J. 2000), likewise contained only the most cursory analysis of <u>Younger</u> abstention, and, in declining to abstain on plaintiffs' substantive due process claim under <u>Younger</u>, the Court specifically acknowledged that its holding did not "foreclose . . . the possibility that other abstention doctrines may apply," emphasizing that "[i]t would be the height of federal judicial arrogance for this Court to supplant the efforts of New Jersey's legislative, executive, and judicial branches with respect to the everyday functioning of the child welfare system in the broad, over-reaching way suggested by Plaintiffs."  Finally, in <u>L.H. v. Jamieson</u>, 643 F.2d 1351 (9th Cir. 1981) (per curiam), although the Ninth Circuit held that <u>Younger</u> abstention was inapplicable in a class action seeking

**II.     PLAINTIFFS HAVE FAILED TO SUFFICIENTLY ALLEGE THAT DEFENDANTS HAVE ENGAGED IN "CONSCIENCE-SHOCKING," EGREGIOUS, AND DELIBERATELY WRONGFUL CONDUCT THAT WOULD VIOLATE THE LIMITED SUBSTANTIVE DUE PROCESS RIGHTS AFFORDED TO FOSTER CHILDREN IN STATE CUSTODY.**

"A Due Process Clause claim requires that there be a deprivation of life, liberty, or property by the government." J.R. v. Gloria, 593 F.3d 73, 79 (1st Cir. 2010). Because the Clause generally "does not require the State to provide its citizens with particular protective services," an alleged failure to provide those services generally does not state a claim for a constitutional deprivation. DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989). Yet, the Supreme Court has stated that "in certain limited circumstances," substantive due process "imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198 (emphasis added). In the case of foster care, the Commonwealth has "create[d] a 'special relationship' because of 'the limitation which [it] has imposed on [the children's] freedom to act on [their] own behalf," which gives rise to a narrow obligation to "protect" the children. J.R., 593 F.3d at 79 (quoting DeShaney, 489 U.S. at 200). The Supreme Court, and the First Circuit, have expressed continued "reluctance to expand" that narrow obligation. Id. (quoting Chavez v. Martinez, 538 U.S. 760, 775 (2003)).

Thus, in the case of foster children, the Constitution establishes a "minimum" standard of care, see K.H. v. Morgan, 914 F.2d 846, 853 (7th Cir. 1990), which imposes

---

additional funding for children placed in private, child-caring facilities in Arizona, the Court further held that the district court should have abstained under Railroad Commission v. Pullman, 312 U.S. 496 (1941), because the appellants "propose interjecting the federal courts into issues affecting the proper care of juveniles held in the state's custody. These issues have traditionally been left exclusively to the states. These issues are also shot through with serious budgetary, sociological, and political questions." 643 F.3d at 1355.

on the State "some responsibility for the child's safety and general well-being."  Doe v.

South Carolina Dep't of Social Servs., 597 F.3d 163, 175 (4th Cir. 2010); see K.H., 914

F.2d at 849 ("Once the state assumes custody . . . it owes [the child] a rudimentary duty

of safekeeping . . ."). But "[t]he mere creation of a [custodial] relationship . . . is not

enough to make out a due process claim for any harm that may follow."  J.R., 593 F.3d at

80.  "Even then, the claim against the defendants must also involve conscience shocking

conduct by state officials, and the official conduct most likely to rise to the conscience-

shocking level is the conduct intended to injure in some way unjustifiable by any

government interest."  Id. at 79-80 (quotation marks and citations omitted).

The Commonwealth may, of course, pursue a higher level of care than the

constitutional minimum, cf. G.L. c. 119, § 1, and Congress may encourage that pursuit,

see generally 42 U.S.C. § 670, but substantive due process does not require it.  See

DeShaney, 489 U.S. at 202 ("A State may, through its courts and legislatures, impose

such affirmative duties of care . . . as it wishes.  But not all common-law duties . . . were

 . . . constitutionalized by the Fourteenth Amendment") (quotation marks and citations

omitted).  Here, plaintiffs assert that the improvements that they seek in the

Commonwealth's allegedly flawed foster care system are constitutionally-required.  Yet,

because "the Fourteenth Amendment does not mandate an optimal level of [foster] care

and treatment," their substantive due process rights are far narrower than they allege.

B.H. v. Johnson, 715 F. Supp. 1387, 1397-98 (N.D. Ill. 1989); see K.H., 914 F.2d at 853

(describing the "right to safe foster care" as "exceedingly narrow").  Accordingly, as

described in greater detail below, three of the seven "rights" asserted by plaintiffs, see

Compl. ¶ 303, are not rooted in the Due Process Clause and are not constitutionally

protected at all.  See Charlie H. v.  Whitman, 83 F. Supp. 2d 476, 507 (D.N.J. 2000).

     In addition, plaintiffs cannot plausibly claim that the remainder of the rights they

assert – that is, those that fit within the narrow substantive due process entitlement to

"safety and general well-being," Doe, 597 F.3d at 175 – have been infringed by the

defendants, who are the Commonwealth's highest level of child services policy-makers.

This action is brought not against the individual social workers who are directly

responsible for plaintiffs' care, but against the Commissioner of the Department, the

Secretary of the executive agency in which the Department sits, and the Governor.  It is

well established that "a superior official cannot be held vicariously liable under 42 U.S.C.

§1983 on a respondeat superior theory," because liability arises only from the officials'

"own acts or omissions."  Maldonado-Denis v. Castillo–Rodriguez, 23 F.3d 576, 581-82

(1st Cir. 1994) (emphasis added).  Thus, any potential liability of policy-makers must

arise from the formulation of a policy, or the establishment of a custom, that causes or

tacitly endorses the deprivation of constitutional rights.  Id.; see O'Neill v. Baker, 210

F.3d 41, 47 (1st Cir. 2000) (quoting 1 Sheldon H. Nahmond, CIVIL RIGHTS AND CIVIL

LIBERTIES LITIGATION, THE LAW OF SECTION 1983, §391, at 3-241 (4th ed. 1999))

(plaintiffs must assert that defendants "possessed either the state of mind for the

particular constitutional violation or deliberate indifference, and . . . [that they] played a

causal role in [the] constitutional deprivation").  In this context, however, "[n]egligence,

and even carelessness, on the part of such officials that results in harm to [foster]

child[ren] will not support a claim [for violation of substantive due process]."  Doe, 597

F.3d at 175.  Rather, "the burden to show state conduct that 'shocks the conscience' is

extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends

beyond '[m]ere violations of state law, even violations resulting from bad faith' to

'something more egregious and more extreme.'"  J.R., 593 F.3d at 80 (quoting DePoutot

v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005)).  Because plaintiffs have not, and cannot,

plausibly assert that these defendants have developed "conscience-shocking" policies, or

made "reasoned decision[s] to deliberately ignore" the allegedly conscience-shocking

behavior of their subordinates, J.R., 593 F.3d at 80-81, they have failed to state a claim of

deprivation of substantive due process.[41]

### A.    Count I Seeks to Impose Affirmative Obligations Upon the Commonwealth Beyond What the Constitution Requires.

"In order to survive a motion to dismiss, [plaintiffs] must allege sufficient facts to

show . . . a plausible entitlement to relief."  Sanchez v. Pereira-Castillo, 590 F.3d 31, 41

(1st Cir. 2009) (citing Iqbal, --- U.S. ---, 129 S.Ct. at 1949).  To state a claim for the

deprivation of substantive due process under 42 U.S.C. §1983, plaintiffs must assert the

"deprivation of a right [guaranteed by substantive due process], a causal connection [with

a sufficient degree of culpability] between the actor and the deprivation, and state

action."  See id.; see also Nicini v. Morra, 212 F.3d 798, 808 (3rd Cir. 2000) (en banc)

("[W]hen the state places a child in state-regulated foster care, the state has entered into a

special relationship . . . which imposes upon it certain affirmative duties.  The failure to

perform such duties can give rise, under sufficiently culpable circumstances, to liability

---

[41]  Given the exceedingly high "burden to show state conduct that 'shocks the
conscience,'" it is quite unlikely that the individual social workers – that is, the decision-
makers in plaintiffs' individual cases – deprived them of substantive due process, absent
some indication that they knowingly placed the plaintiffs at substantial risk of imminent
harm, which has not been alleged. See J.R., 593 F.3d 81 ("there is no [assertion] that
[social workers] made a reasoned decision to deliberately ignore the risk of harm to the
[children] in the course of supervising [their] foster care placement").

under §1983") (emphasis added).

As an initial matter, plaintiffs claim that defendants have deprived them of a bevy of rights that, they assert, are grounded in substantive due process.  Where the rights are not so grounded, they cannot form the basis of a claim for relief.  See Charlie H., 83 F. Supp. 2d at 507.  In Count I, plaintiffs assert that defendants' "actions and inactions . . . constitute a policy, pattern, practice or custom" that deprive foster children of "substantive due process rights . . . to":  protection from unnecessary harm, Compl. ¶ 303(a); placement in a living environment protective of physical and emotional health, id. ¶ 303(b); services necessary to prevent deterioration and physical or emotional harm, id. ¶ 303(c); care consistent with the purpose of state custody, id. ¶ 303(d); the shortest possible stay in foster care, id. ¶ 303(e); "care, treatment, and services provided through the exercise of accepted professional judgment," id. ¶ 303(f); and placement in the "least restrictive [i.e., most family-like] placement," id. ¶ 303(g).  Substantive due process does not extend as far as plaintiffs allege – the latter three "rights" they assert, see id. ¶¶ 303(e), (f), (g), are not guaranteed by the Constitution.[42]

Because foster children are "substantially dependent upon the State to meet [their] basic needs," substantive due process "imposes upon [the state] certain affirmative duties."  Nicini, 212 F.3d at 808 (quotation marks and citations omitted); see DeShaney, 489 U.S. at 197.  The scope of the State's constitutional responsibility is shaped by Youngberg v. Romeo, 457 U.S. 307, 317-24 (1982), where the Supreme Court addressed the substantive rights of involuntarily-committed, mentally-challenged persons.  See Doe,

---

[42]  In any event, as described infra in Argument section II-B, plaintiffs do not, and cannot, plausibly claim that defendants have infringed any of the seven "rights" they assert.

597 F.3d at 172 (right to a certain level of safety and security is "analogous to that recognized . . . in Youngberg for the involuntarily committed").  In Youngberg, the parties agreed that the State had a "duty to provide reasonable safety for all residents . . . within the institution," 457 U.S. at 317, and that it had a "duty to provide adequate food, shelter, clothing and medical care."  Id. at 324.  The Court held that the State was under a duty to provide such "minimally adequate" treatment "as an appropriate professional would consider reasonable to ensure [a resident's] safety and facilitate his ability to function free from bodily restraints."  Id. at 322, 324; see id. at 321 ("the Constitution only requires that the courts make certain that professional judgment in fact was exercised") (quotation marks and citation omitted).

The Circuits have applied the substantive due process rights set forth in Youngberg to the context of foster care, and, in the process, have stressed their limited scope.  See J.R., 593 F.3d at 80; see also Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 893 (10th Cir. 1992) (citing Youngberg and holding that foster children only "had a constitutional right to be reasonably safe from harm"); K.H., 914 F.2d at 849 ("the state removed a child from the custody of her parents; and having done so, it could no[t] . . . place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment"); cf. James v. Friend, 458 F.3d 726, 730 (8th Cir. 2006) ("The state is required . . . to protect individuals who are in its custody or are subjected to a state-created danger").  Accordingly, substantive due process requires the State to refrain from engaging in "conscience-shocking" behavior that shows disregard for its "responsibility for . . . [the] safety and general well-being" of foster children and its duty

to meet their "basic human needs." <u>DeShaney</u>, 489 U.S. at 200; <u>see</u> <u>J.R.</u>, 593 F.3d at 79-80.

Addressing claims similar to those made here, several district courts have noted a "consistent[] refus[al] to recognize the [breadth of] constitutional rights advocated by plaintiffs." <u>B.H.</u>, 715 F. Supp. at 1398; <u>see</u> <u>Del A. v. Roemer</u>, 777 F. Supp. 1297, 1318-19 (E.D. La. 1991) (rejecting breadth of similar substantive due process claims).  In <u>Charlie H.</u>, for example, the court held that "[p]laintiffs do not have a substantive due process right not to be housed in the least[-] restrictive, most appropriate and family-like placement while in state custody."  83 F. Supp. 2d. at 507; <u>see</u> <u>Del A.</u>, 777 F. Supp. at 1319-20 ("children in State custody also have no right to be placed in the least restrictive foster care arrangement"); <u>Marisol A.</u>, 929 F. Supp. at 675 (same).[43]  Because the State is "required to provide individuals" with only their "basic human needs" and to reasonably protect their safety, <u>Charlie H.</u>, 83 F. Supp. 2d at 507, the failure to provide plaintiffs with the precise type of placement they desire "deprives [them] of nothing guaranteed by the constitution; [the State] simply fails to grant a benefit of optimal treatment that it is under no constitutional obligation to grant."  <u>See</u> <u>Society for Good Will to Retarded Children v. Cuomo</u>, 737 F.2d 1239, 1250 (2d Cir. 1984).

Furthermore, foster children's limited substantive due process rights arise from their "special relationship" with the Commonwealth and do not include a right to cessation of that relationship at the earliest possible time.  <u>See</u> <u>Charlie H.</u>, 83 F. Supp. 2d

---

[43]  The district courts have not, however, reached a consensus on the legal sufficiency of the substantive due process rights asserted by plaintiffs.  Two district courts did not distinguish between the rights asserted by plaintiffs, summarily concluding that all of the rights were rooted in substantive due process.  <u>See</u> <u>Olivia Y.</u>, 351 F. Supp. 2d at 556; <u>Brian A.</u>, 149 F. Supp. 2d at 953-54 (same).

at 507.  As Judge Posner stated, the Constitution does not "place child welfare workers,"

who are exercising professional judgment, "on a razor's edge – damned if they return the

child to its family [too early, subjecting him or her to future abuse], and damned if they

retain custody of the child or place him in a foster home or an institution." K.H., 914

F.2d at 853; Clark K. v. Guinn, 2007 WL 1435428, *15 (D. Nev. 2007, May 14, 2007)

("Plaintiffs do not . . . have a substantive due process right to not be retained in state

custody longer than is necessary") (quotation marks and citations omitted); cf. Del A.,

777 F. Supp. at 1318 ("Such a requirement would place an undue burden on the

administration of programs and would restrict the exercise of professional judgment").

But see Marisol A., 929 F. Supp. at 675 (holding that foster children have a substantive

due process right to the shortest duration of time in custody).

In addition, plaintiffs assert that they have a "right to receive care . . . provided

through the exercise of accepted professional judgment," Compl. ¶ 303(f), and that this

right entitles them to a constitutionally-guaranteed level of care that is in line with

national standards promulgated by private child advocacy groups.  They allege, for

example, that social workers in Massachusetts are responsible for more children than the

Child Welfare League of America and the Council on Accreditation recommend, Compl.

¶¶ 216-21, and that substantive due process entitles them to "caseload limits" based on

those standards.  See Compl., Prayer for Relief ¶ (e)(i).  Yet, Youngberg requires only the

"exercise of professional judgment" by policy-makers – that is, that foster care decisions

are a product of such judgment, and not arbitrariness and caprice; substantive due process

does not guarantee a standardized level of services.  See 457 U.S. at 321 (emphasis

added); see also Yvonne L., 959 F.2d at 894 ("Failure to exercise professional judgment

does not mean mere negligence as we understand <u>Youngberg</u> . . . . [I]t implies <u>abdication of the duty to act professionally</u>") (emphasis added).[44]  Thus, plaintiffs' "claims to . . . [a standardized number of] caseworkers are not cognizable under the substantive due process reach of the Fourteenth Amendment," <u>B.H.</u>, 715 F. Supp. at 1397-98, nor are any similar claims that the Department's services allegedly have fallen below the levels advocated by various national organizations.  Cf. <u>J.R.</u>, 593 F.3d at 80 ("[T]he Court has made it clear that state officials' negligence, without more, is simply insufficient to meet the conscience-shocking standard"); <u>Butera v. District of Columbia</u>, 235 F.3d 637, 651 (D.C. Cir. 2001) ("This stringent requirement exists to differentiate substantive due process, which is intended to protect against arbitrary government action, from local tort law.").  Rather, plaintiffs are constitutionally entitled to services only insofar as those services are fundamentally necessary to meet their basic needs—in other words, where the failure to provide services would be "so ill-conceived or malicious [as to] 'shock the conscience.'"  <u>Nicini</u>, 212 F.3d at 810 (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998)); Cf. <u>K.H.</u>, 914 F.2d at 853 ("The allocation of the nation's – even of a single state's resources – is not a realistic assignment for the federal courts.  Any standard of foster care that the courts declare in the name of the Constitution is likely to be a minimum one that will do little for the plight of the . . . abandoned, neglected, or abused

---

[44] Children's Rights elsewhere has attempted to assert a very similar claim in a different setting – namely by contending that 42 U.S.C. § 671(a)(10) gives rise to a privately enforceable right to foster care in accord with "recommended standards of national organizations."  Yet, 42 U.S.C. § 671(a)(10) is not privately enforceable.  <u>See</u> <u>Charlie H.</u>, 83 F. Supp. 2d at 491-92 (collecting cases).  Accordingly, plaintiffs recast the right – seeking to anchor it in the Constitution rather than the federal Act.  Despite that re-framing, substantive due process protects plaintiffs only from "inherently egregious conduct," <u>J.R.</u>, 593 F.3d at 81, and does not transform goal-oriented professional standards into constitutional mandates.

child").

### B.   Plaintiffs Cannot Plausibly Demonstrate that Defendants Have Adopted Conscience-Shocking Policies or Deliberate Indifference to Alleged Ongoing Constitutional Violations.

Defendants in this action are policy-makers, who inhabit the highest supervisory roles in the Executive branch, and plaintiffs cannot plausibly contend that they have directly engaged in conscience-shocking conduct.  See Iqbal, --- U.S ---, 129 S.Ct. at 1950 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of conduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief") (quotation marks and citations omitted); see id. at 1952 (holding that blanket allegation that high level officials engaged in discriminatory conduct did not cross "the line from conceivable to plausible").  "Section 1983 does not impose purely supervisory liability; it aims at persons who have actually abused their positions of authority, and hence only persons who were directly involved in the wrongdoing may be held liable."  Martinez-Valez v. Rey-Hernandez, 506 F.3d 32, 41 (1st Cir. 2007) (quotation marks and citations omitted).  Thus, plaintiffs must assert an "'affirmative link' between the conduct of the supervisor[s] and that of the employee[s]."  Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir. 1985), cert. denied 474 U.S. 1100 (1986); see Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995) ("The 'affirmative link' requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation").[45]

---

[45]  The standard for establishing "the liability of a supervisory official" for a constitutional deprivation under 42 U.S.C. § 1983, is akin to the standard for municipal liability set forth in Monell v. Dep't of Social Servs., 436 U.S. 658, 694-95 (1978).  See Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 & n. 23 (1st Cir. 1988); see also

In this context, the "affirmative link" may involve action – that is, the

"forumulati[on] [of] a policy . . . that leads to the challenged occurrence" – or deliberate

inaction – that is, "behavior demonstrat[ing] deliberate indifference to conduct that is

itself violative of . . . plaintiff[s'] constitutional rights."  See Maldonado-Denis, 23 F.3d

at 582.[46]  Plaintiffs cannot plausibly allege that defendants actively developed a plan for

---

Hegarty, 53 F.3d at 1379-80 ("Absent participation in the challenged conduct, a
supervisor can be held liable only if (1) the behavior of his subordinates results in a
constitutional violation and (2) the supervisor's action or inaction was affirmatively
linked to the behavior") (quotation marks and citations omitted).

As a District Court has stated, in a case brought against the Secretary of the New
Mexico Children, Youth and Families Department, a policy-making state official is not
liable under 42 U.S.C. §1983 "unless the plaintiff shows an affirmative link between the
constitutional deprivation and the supervisor's personal participation, exercise of control
or direction, failure to supervise, or actual knowledge and acquiescence."  Whitley v.
New Mexico Children, Youth & Families Dep't, 184 F. Supp. 2d 1146, 1152-53 (D.
N.M. 2001); see also Wendy H. v. City of Phila., 849 F. Supp. 367, 377 (E.D. Pa. 1994)
("a plaintiff's allegations must both identify officials with ultimate policy authority in the
area in question and adduce scienter-like evidence . . . with respect to them") (quotation
marks and citations omitted).

[46]  Plaintiffs must plausibly allege that the defendants, through their own actions rather
than those of their supervisees, are responsible for constitutional violations even when
seeking prospective injunctive relief.  See Dirrane v. Brookline Pol. Dep't, 315 F.3d 65,
71 (1st Cir. 2002); Reynolds v. Giuliani, 506 F.3d 183, 198 (2d Cir. 2007) ("Even greater
caution is appropriate where a federal court is asked to interfere by means of injunctive
relief with a state's executive functions, a sphere in which states typically are afforded
latitude . . . .  In such cases, we must keep in mind the integrity and function of state
institutions, as well as the delicate balance that must be maintained between a federal
court's exercise of its equitable power and a state's administration of its own affairs")
(quotation marks and citations omitted); see also World Wide Street Preachers F'ship v.
Town of Columbia, 591 F.3d 747, 753 n.3 (5th Cir. 2009) (collecting cases).

As the Supreme Court stated in Rizzo v. Goode, "the principles of equity [and
federalism] militate heavily against the grant of an injunction [against executive officials]
except in the most extraordinary circumstances."  423 U.S. 362, 379 (1976); see id.
(federalism "principles have applicability where injunctive relief is sought . . . against
those in charge of an executive branch of an agency of state . . . governments such as
[defendants] here").

In J.R., the First Circuit did not address "whether any such [substantive due process]
'right' would have been clearly established at the time of the alleged violation," 593 F.3d

the provision of foster care services that was itself conscience-shocking, or that they directly encouraged conscience-shocking behavior.  Instead, plaintiffs base their claim on alleged conduct by subordinates within the Department.  They assert, inter alia, that Department social workers:  placed Connor B. in a home where he was foreseeably abused by his foster brother and thereafter failed to provide him with needed therapy, Compl. ¶¶ 15-34; placed Adam S. in an institutional treatment home where he was foreseeably physically and sexually assaulted by fellow foster children, Compl. ¶¶ 35-56; failed to provide necessary treatment for Camila R. and Rakeem D., improperly shuttled both children between numerous placements, and caused them to develop runaway tendencies, Compl. ¶¶ 57-78, 111-134; and failed to find a permanent placement, and appropriate treatment, for Andre S. and Seth T., Compl. ¶¶ 79-110.  Setting aside whether the alleged conduct engaged in by the plaintiffs' social workers rises to the "extremely high" conscience-shocking standard established by the First Circuit in J.R., 593 F.3d at 80 – which is highly doubtful – plaintiffs cannot and do not plausibly allege that the alleged actions were the result of an affirmative system-wide policy developed by defendants.

Instead, plaintiffs allege that defendants have "demonstrate[d] deliberate indifference toward the safety and well-being in their custody," by overseeing what they allege to be "a system burdened with high [social] worker case loads, inadequate . . .

---

at 79, concluding simply that defendants had not violated the plaintiff foster children's right to freedom from "conscience-shocking conduct by state officials."  Id.  The same analysis applies here.  That plaintiffs are seeking injunctive relief rather than money damages is immaterial to the question of the rights they are afforded, and to establish any entitlement to relief, they must allege that those rights have been violated.  Thus, J.R. cannot be distinguished on qualified immunity grounds.  593 F.3d at 80.

training . . . and an inadequate array of appropriate foster homes and attendant support services."  Compl. ¶¶ 9, 166.[47]  That oversight, they allege, results in continuous infringement  of "the constitutionally-protected rights and liberty and privacy interests of all . . . [p]laintiffs and [putative] class members."  Compl. ¶ 302.  These allegations, however, fail to describe "deliberate indifference."  Deliberate indifference, in First Circuit case law, is a "reasoned decision to deliberately ignore" a "known or likely" constitutional violation.  See J.R., 593 F.3d at 81; see Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) ("[S]upervisory liability under a theory of deliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights") (quotation marks and citations omitted).  In this context, deliberate indifference is a complete "abdication of the duty to act professionally" in making decisions concerning the foster care system.  Yvonne L., 959 F.2d at 894; see Del A., 777 F. Supp. at 1318 ("Liability is imposed only when a decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the professional actually did not base the decision on such a judgment"); cf. Porto v. Town of Tewksbury, 488 F.3d 67, 73 (1st Cir. 2007)) (quoting Board of the County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) ("The Supreme Court has described deliberate indifference as 'a stringent standard of fault, requiring proof that a [state official] disregarded a known or obvious consequence of his action' or inaction") (emphasis in the original).[48]

---

[47]  Plaintiffs repeat the same general systemic deficiencies throughout the complaint. See, e.g., Compl. ¶¶ 166, 174, 180, 186, 194, 215, 222-228, 249-43, 260-275, 289-90.

[48]  In J.R., the First Circuit considered whether the conduct of two social workers was "conscience-shocking" when they failed to perform background checks on two adult

Here, plaintiffs do not and cannot plausibly contend that defendants "made a reasoned decision to deliberately ignore" known or obvious risks of alleged maltreatment in foster care. See J.R., 593 F.3d at 81. Indeed, this is apparent from the same federal review upon which the plaintiffs purport to base their claims. The Department, as it must pursuant to federal regulations, collects extensive data on foster children, see, e.g., 45 Code. Fed. Regs. pt. 1355, App. A, and, using that data, it is required to "analyze and explain its performance" in meeting federal standards of foster care delivery. See id. § 1355.33(b)(2). In addition, in cooperation with Department officials, the federal ACF conducts a full Review to determine whether the State's foster care system is meeting national systemic and outcome-based goals. See id. §§ 1355.33(b), (c).

Among the performance measures evaluated during that Review are whether foster children in the State's custody: are "protected from abuse and neglect," id. § 1355.34(b)(1)(i)(A); "have permanency and stability in their living situations," id. § 1355.34(b)(1)(ii)(A); and "receive adequate services to meet their physical and mental health needs," id. § 1355.34(b)(1)(iii)(C).[49] Where the full Review identifies areas that

---

males who lived with plaintiff foster children, in violation of Rhode Island law. 593 F.3d at 78-79. The two adult males subsequently abused plaintiffs. Id. The court concluded that the social workers' failure did "not amount to inherently egregious conduct," and that no constitutional violation occurred because they did not "make a reasoned decision to deliberately ignore the risk of harm to plaintiffs." Id. at 81.

In the present action, defendants are not the social workers responsible for plaintiffs' care but rather the Department's policy-makers, and "plaintiffs must allege facts which indicate problems which are 'systemic in nature' such that knowledge of or deliberate indifference to their occurrence can be imputed to the [supervisory officials]." B.H., 715 F. Supp. at 1398. Thus, plaintiffs must allege that defendants are either aware of – or should be aware of – widespread conscience-shocking behavior and that they deliberately allow such behavior to continue. See Yvonne L., 959 F.2d at 894.

[49] Furthermore, the Department's foster care system is evaluated to determine whether it includes: "standards to ensure that children in foster care placements are provided

fall short of national standards established by ACF – which surpass the minimal standards required by the Constitution, see Charlie H., 83 F. Supp. 2d at 507 – the Department faces the choice to forgo federal funding or to enter into an Improvement Plan specifically-tailored, again in collaboration with ACF officials, to address any shortcomings.  See 45 Code Fed. Regs. § 1355.35(a)(1).  The Improvement Plan sets forth "goals, [and] the action steps required to correct each identified weakness," id. §§ 1355.35(a)(1)(ii), (iii), and establishes benchmarks to determine whether those steps are being taken.  Id. §1355.35(a)(1)(v).  It further requires that the Department "provide quarterly status reports . . . to [ACF]" to "inform [it] of progress in implementing the measures of the plan."  Id. § 1355.35(d)(4).  The Department entered into an Improvement Plan in October 2009, which seeks to address the areas of weakness in its foster care system that it jointly identified with ACF officials, and it continues to "actively implement[] [its] provisions."  Id. §1355.36(c)(1); see id. § 1355.32(b)(2)(ii) (requiring a complete federal Review two years after the approval of a program improvement plan).  Accordingly, the Department continues to receive full federal funding under the Act.  See 45 Code Fed. Regs. § 1355.36(c)(1).[50]

The federal Review process, which is expressly referenced in plaintiffs' complaint, see Compl. ¶¶ 160-65, demonstrates the Deparatment's acutely-detailed

---

quality services that protect the safety and health of the children," including proper "measures implemented to address identified problems," id. 1355.34(c)(3); an adequate "staff development and training program," id. § 1355.34(c)(4); and an adequate array of services "individualized to meet the unique needs of children . . . served by the agency" and "designed to help children achieve permanency," id. § 1355.34(c)(5).

[50]  In addition, see supra pages 46-48, the Department must extensively report to the State Legislature concerning, among other things, social worker caseloads and the fate of children who have been subjected to repeated, reported abuse.

attention to the foster care services it provides – the opposite of the "reasoned decision to deliberately ignore" potential constitutional harm required to establish deliberate indifference.  See J.R., 593 F.3d at 80-81; see also Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) ("Under 42 U.S.C. §1983, a supervisory official may be held liable . . . only if . . . the supervisor's action or inaction was affirmatively linked to [his subordinate's] behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence . . . amounting to deliberate indifference") (quotation marks and citations omitted).  Furthermore, rather than establishing a custom of disregard for constitutional rights, the Department has developed an Improvement Plan that calls for an ever-higher level of care – and the Department is bound to continually monitor the effectiveness of that Plan.  See 45 Code Fed. Regs. § 1355.35(d)(4).  That consistent effort to improve foster care is the antithesis of the conscience-shocking inaction that J.R. states is necessary to establish a substantive due process violation.  See 593 F.3d at 80.

Post-Iqbal, plaintiffs' assertions must "nudge" their claims of substantive due process deprivation "across the line from conceivable to plausible," see --- U.S. ---, 129 S.Ct. at 1950-51, and they have fallen far short of the mark.  But cf. Charlie H., 83 F. Supp. 2d at 507-08 (holding, pre-Iqbal, that plaintiffs had stated a claim to deprivation of substantive due process); B.H., 715 F. Supp. at 1394 (same).  Their allegations of system-wide constitutional deficiencies and defendants' indifference to those deficiencies are "mere conjecture," see S.E.C. v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010), in light of the extensive federal oversight of foster care services in the Commonwealth, and the Department's continued effort to compile data on, and improve the results of, foster care

in the Commonwealth.  They do not amount to "a claim to relief that is plausible on its

face."  See Iqbal, --- U.S. ---, 129 S.Ct. at 1949.

### III.    THE ELEVENTH AMENDMENT BARS ALL OF THE CLAIMS AS AGAINST THE GOVERNOR.

In an action seeking relief under 42 U.S.C. § 1983, based on alleged violations of

plaintiffs' constitutional rights, "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."

Iqbal, 129 S.Ct. at 1948.  In the Complaint, plaintiffs do not meaningfully differentiate

between the three defendants; in some places, they challenge action by "the defendants"

generally, see, e.g., Compl. ¶¶ 165, 177, 215, 225, 250, while in most places, they assert

that the conduct of the Department violated their rights.  See, e.g., Compl. ¶¶ 158-159,

175-176, 185, 206-207, 210-214, 230-232, 242-243, 253-255, 257-258, 268, 276, 279,

281, 286, 288-289, 298.

Plaintiffs do not allege that the Governor engaged in any specific action beyond

being the Commonwealth's chief executive officer; that he appointed defendant Secretary

of the Office of Health and Human Services; that the Secretary, with his approval,

appointed the defendant Commissioner of the Department; and that he has "ultimate

authority" over these officials.  Compl. ¶¶ 141-143.  Similarly, in the four Counts of the

Complaint, plaintiffs merely allege that "Defendants" Governor Patrick, Secretary Bigby,

and Commissioner McClain violated plaintiffs' rights, through their unspecified "actions

and inactions."  Compl. ¶¶ 301-302, 305, 207, 309.  Because the Complaint does not set

forth any factual allegations establishing a sufficient connection between the Governor

and the challenged conduct, the Complaint as against the Governor is barred by the

Eleventh Amendment to the Constitution.  U.S. Const. amend. XI.

89

"The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." Frew v. Hawkins, 540 U.S. 431, 437 (2004). Although the Supreme Court has recognized an exception to the Eleventh Amendment in the case of certain "official capacity" "suits for prospective injunctive relief against state officials acting in violation of federal law," id. (citing Ex Parte Young, 209 U.S. 123 (1908)), there must be a "sufficiently intimate" link between the defendant official and enforcement of the challenged law or conduct. Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979). As the Fourth Circuit explained in Waste Management Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001), cert. denied, 535 U.S. 904 (2002), Ex Parte Young "requires a 'special relation' between the state officer sued and the challenged statute to avoid the Eleventh Amendment's bar." A "general duty" of the state's top executive officer to enforce state laws is not sufficient to overcome Eleventh Amendment immunity. Waste Mgmt., 252 F.3d at 331 (Governor's general duty to enforce state law, by virtue of his position as top executive branch official, was insufficient to render him subject to suit, where he was "not directly involved in enforcing" the challenged statute).

Plaintiffs' allegations do not establish a sufficient connection between Governor Patrick and the challenged conduct of the Department in delivering foster care to children in Massachusetts and, accordingly, the Complaint as against the Governor is barred by the Eleventh Amendment. Federal courts confronting similar challenges to other states' foster care systems have dismissed claims against the Governors of those States, based on the Eleventh Amendment. See, e.g., D.G. v. Henry, 591 F. Supp. 2d at 1188-89 (Governor's certification of state plan submitted by Oklahoma to federal government and

his ultimate authority over officials with direct responsibility for administering the state's foster care system were insufficient to meet the requirements of Ex Parte Young, because the Governor "is in no sense responsible for actually administering the foster care system" and an injunction against him "would be essentially meaningless"; claims against Governor therefore must be dismissed).  See also Clark K., 2007 WL 1435328, *22-23 (under Eleventh Amendment, Governor was immune from suit in a case challenging county-wide foster care system in Nevada, because "the Governor's general duties in this case do not establish the requisite connection between him and the unconstitutional acts that Plaintiffs allege").

**IV.   THE ADOPTION ASSISTANCE AND CHILD WELFARE ACT DOES NOT UNAMBIGUOUSLY CONFER A PRIVATELY ENFORCEABLE RIGHT UPON PLAINTIFFS AND, ACCORDINGLY, THE ACT CANNOT BE THE BASIS OF AN ACTION UNDER 42 U.S.C. §1983.**

Plaintiffs assert that the Adoption Assistance and Child Welfare Act (the "Act") bestows upon them rights – specifically, rights to a certain level of foster care maintenance payments and to documentation of the steps the Department is taking to find a permanent living arrangement for them – that are privately enforceable pursuant to 42 U.S.C. §1983.  Yet, "where, [as here], the text and the structure of a statute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit . . . under [42 U.S.C.] § 1983 . . . ."  Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002); see Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50, 57 (1st Cir. 2004) ("[N]othing short of 'an unambiguously conferred right' c[an] support a claim under section 1983 based on a federal funding statute") (citation omitted).

A.    **A Statute Passed Pursuant to Congress' Spending Power Does Not Give Rise to Privately-Enforceable Rights Except in Rare and Clearly-Delineated Cases.**

"Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of any 'rights, privileges, or immunities secured by the Constitution and the laws.'" Rio Grande, 397 F.3d at 72 (quoting 42 U.S.C. § 1983).  As the plain language of § 1983 makes clear, "[n]ot all violations of federal law give rise to § 1983 actions." Id.  "[I]t is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." Gonzaga, 536 U.S. at 283 (emphasis in original); see Blessing v. Freestone, 520 U.S. 329, 340 (1997) ("plaintiff must assert the violation of a federal right, not merely a violation of federal law") (emphasis in original).

Legislation passed pursuant to Congress' spending power – like the Act – typically does not give rise to the concrete rights referenced in 42 U.S.C. §1983. See Gonzaga, 536 U.S. at 279-80.  Instead, "the typical remedy for State non-compliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28 (1981) ("Pennhurst I").  In order for Congress to create a private right of action, its establishment of a privately-enforceable, remedy must be clear.  See 31 Foster Children, 329 F.3d at 1268 ("Congress must speak with a clear voice and manifest an unambiguous intent to confer individual rights before federal funding provisions will be read to provide a basis for private enforcement") (quotation marks and citations omitted).[51]

---

[51]   As the Supreme Court noted in Suter v. Artist M., 503 U.S. 347, 356 (1992), partially superseded by statute, 42 U.S.C. § 1320a-2, "Congress has the power to fix the terms

The central inquiry, therefore, is "whether Congress <u>intended to create a federal right</u>." <u>Gonzaga</u>, 536 U.S. at 283, 285 (emphasis in original).  The Court must look to the "text and structure of a statute" to discern Congressional intent, <u>id.</u> at 286; the analysis "begin[s]" and "end[s]" with those two sources.  <u>See</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 289 (2001) ("Statutory intent . . . is determinative," because "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter").

In <u>Blessing</u>, 520 U.S. at 340-41, the Supreme Court "set forth three 'factors' to guide judicial inquiry into whether or not a statute confers a right." <u>Gonzaga</u>, 536 U.S. at 282.  The three factors were:  whether Congress intended that the provision in question benefit the plaintiffs; whether plaintiffs have demonstrated that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence; and whether the provision giving rise to the asserted right is couched in mandatory, rather than precatory, terms.  <u>Blessing</u>, 520 U.S. at 340-41.

---

under which it disburses federal money to the states," by forming what is essentially a contract:

> The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys [such as private enforcement of the statute], it must do so unambiguously.

<u>Id.</u> at 356 (quoting <u>Pennhurst I</u>, 451 U.S. at 24); <u>cf.</u> <u>Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy</u>, 548 U.S. 291, 296 (2006) ("[L]egislation enacted pursuant to the spending power is much in the nature of a contract, and, therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly.  States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain") (quotation marks and citations omitted).

Concerned that the <u>Blessing</u> factors were insufficiently clear, and that the resulting confusion led to an overly-broad recognition of federal rights enforceable pursuant to 42 U.S.C. § 1983, the <u>Gonzaga</u> Court "tightened [them] up."  <u>Rio Grande Cmty. Health Ctr.</u>, 397 F.3d at 73; <u>see</u> <u>Gonzaga</u>, 536 U.S. at 283.

Under <u>Gonzaga</u>, the Court's analysis is guided by three touchstones:  "whether the [statutory] provision contains 'rights-creating language'[;] whether the provision ha[s] an aggregate as opposed to an individualized focus[;] and the other sorts of enforcement provisions that Congress has provided for."  <u>Rio Grande Cmty. Health Ctr.</u>, 397 F.3d at 73 (citing <u>Gonzaga</u>, 536 U.S. at 287-90); <u>see</u> <u>Boston and Marine Corp. v. Town of Ayer</u>, 330 F.3d 12, 18 (1st Cir. 2003) ("Acknowledging some ambiguity in its precedent, the <u>Gonzaga</u> Court further clarified when an action is cognizable under 42 U.S.C. § 1983 . . ."); <u>cf.</u> <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 116 n.4 (1st Cir. 2003) (noting in dicta that the <u>Gonzaga</u> Court expressed "cautious[ness] about finding implied § 1983 causes of action").[52]

---

[52]  Where plaintiffs are able to demonstrate that a statute "confers an individual right, the right is presumptively enforceable by §1983."  <u>Gonzaga</u>, 536 U.S. at 284 n. 4.  That presumption is rebuttable by a "showing that Congress specifically foreclosed a remedy under § 1983."  <u>Smith v. Robinson</u>, 468 U.S. 992, 1004-05 & n.9 (1984), <u>superseded in part by</u> 20 U.S.C. § 1415(f).  The State, then, has the "burden to demonstrate that Congress shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' <u>Wright v. Roanoke Redevelopment and Housing Auth.</u>, 479 U.S. 418, 423 (1987), or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under §1983,' <u>Blessing</u>, 520 U.S. at 341."  <u>Gonzaga</u>, 536 U.S. at 285.  If the sections of the Act upon which plaintiffs rely provide a privately enforceable right, the Act's enforcement provisions would not preclude an action under 42 U.S.C. §1983 – and the First Circuit has so found, <u>see</u> <u>Lynch</u>, 719 F.2d at 511.  But <u>here</u>, there is no enforceable right to begin with.

Hence, the threshold, and dispositive, inquiry is therefore whether plaintiffs have an enforceable right.  As the <u>Gonzaga</u> Court demonstrates, the "mechanism . . . Congress [established] to provide for enforcing" the Act is a factor in <u>that inquiry</u> as well.  <u>See</u>

**B.     The Plain Language and Structure of the Act Do Not**
**Evince an Intent to Create Privately-Enforceable Rights.**

Plaintiffs allege that 42 U.S.C. §§ 671(a)(1), 671(a)(11)-(12), 672(a)(1), and

675(4)(A), establish an enforceable right to foster care maintenance payments and that 42

U.S.C. §§ 671(a)(16) and 675(1)(E) establish a right to a child-specific recruitment plan.

Their assertion of an impliedly enforceable right is significantly undercut by the fact that

Congress has established an expressly enforceable right elsewhere in the Act – in a

section prohibiting race discrimination – but has not done so in the sections upon which

plaintiffs rely.  Title 42 U.S.C. §674(d)(3)(A) provides that "[a]ny individual who is

aggrieved by a violation of section 671(a)(18) of this title by a State . . . may bring an

action seeking relief from the State . . . in any United States district court."  See id.

§671(a)(18) (the State may not "deny to any person the opportunity to become an

adoptive foster parent on the basis of the race, color or national origin of the person, or of

the child, involved" nor may it "delay or deny the placement of a child for adoption into

foster care" on those bases).[53]

---

Gonzaga, 536 U.S. at 289-90 & n. 8 (The "administrative procedures [set forth in the statute and regulations] . . . further counsel against finding a congressional intent to create individually enforceable rights").  Thus, while the federal oversight established in the Act would not preclude the enforcement of an expressly and clearly established right, it does counsel against implying such a right where it is not present in the text.  See id.

[53]  Congress amended the Act in 1996 to add 42 U.S.C. § 674(d)(3)(A) at the same time that it established 42 U.S.C. § 671(a)(18).  See Pub. L. 104-188, §1808 (1996).  The amendment specifically creating the private right was labeled "enforcement":  it specifically provided that states failing to comply with 42 U.S.C. §671(a)(18) would be penalized by the withholding of federal funds and that "[a]ny individual who is aggrieved by a violation of [6]71(a)(18) by a State . . . may bring a[] [private] action."  See Pub. L. 104-188, §1808 (1996); see also 142 Cong. Rec. H9661 (Aug. 1, 1996) ("Any individual who is harmed by a violation of this provision may seek redress in any United States district court").  Significantly, Public Law 104-188, §1808 did not provide a private right of action for a violation of any other provision of the act.

Congress could have enacted a similar provision expressly establishing privately enforceable rights to foster care maintenance payments and child-specific recruitment plans. It did not. A fundamental inference of statutory interpretation is "that omissions are intentional." Norman J. Singer & J.D. Shambie Singer, 2A STATUTES & STATUTORY CONSTRUCTION § 47.25, 31 (7th ed. 2007). Indeed, "[t]he force of the maxim expression unis est exclusion alterius is strengthened where a thing is provided in one part of a statute but excluded in another." Id. at § 47:23, 417. As the District Court of New Jersey stated: "That Congress recently chose to amend [the Act] to include a private right of action under §1983 for a state['s] . . . failure to comply with 42 U.S.C. §671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and relied upon by plaintiffs, is strong evidence that Congress did not intend these other various plan elements . . . to confer rights enforceable pursuant to § 1983." Charlie H., 83 F. Supp. 2d at 489; see Olivia Y., 351 F. Supp. 2d at 565 n. 5; see also Clark K., 2007 WL 1435428, *9 (limited nature of private right established by 42 U.S.C. § 674(d)(3)(A) strongly counsels against implying other "rights enforceable pursuant to § 1983").[54]

---

As originally adopted in 1980, the Act expressly created only one enforcement mechanism: if a State failed to substantially conform to the provisions of its approved plan, it would be subject to reduced federal funding. See H.R. Conf. Rep. No. 96-900, 4 (1980). The language of the original Act did not expressly empower individuals to privately enforce it, and that language has not been materially altered, except by the addition of 42 U.S.C. § 674(d)(3)(A).

[54] In Suter, the Supreme Court addressed whether plaintiffs had an enforceable right under a different provision of the Act – specifically, under 42 U.S.C. § 671(a)(15), which provided that a state plan must include "reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred." 503 U.S. at 352. The Court found that plaintiffs did not have such a right, in part because "[n]o . . . statutory guidance is found as to how 'reasonable efforts' are to be measured." Id. at 360. The Court also noted the Act's systemic focus: "the Act does place a requirement on the [s]tates, but that requirement only goes so far as to ensure that the

### C.   The Structure of the Act Reflects an Aggregate and Aspirational Focus That Is Fundamentally Inconsistent with the Creation of Individually Enforceable Rights.

The Act does not simply direct the Commonwealth to establish a foster care system that meets certain requirements.  See 42 U.S.C. §§ 670, 671(a).  Rather, it provides that a State must establish a child and family services plan, with certain requisite provisions, in order "to be eligible for [federal] payments."  Id. § 671(a) (emphasis added).  Some eligibility requirements are quite clear and concrete, see, e.g., id. § 671(a)(20)(B) (State must check "any child abuse and neglect registry" prior to placing a child with a foster family), and others are less so.  See, e.g., § 671(a)(15)(B) (requiring that "reasonable efforts shall be made to preserve and reunify families").

Regardless of their nature, all of the requirements established by the Act are goal-oriented, and federal funds are not conditioned on full compliance.  Instead, the Act

---

State have a plan approved by the Secretary which contains the [then-] 16 listed features."  Id. at 358.

Because many federal spending statutes operate by requiring a State to promulgate a state plan to be approved by the federal executive, Suter – if broadly read – could have effectively precluded private enforcement of a number of federal statutes.  In the wake of Suter, Congress passed legislation, colloquially known as "the Suter fix," to ensure that the decision would be read more narrowly.  Title 42 U.S.C. § 1320a-2 states that it is "not intended to alter the holding in Suter that section 671(a)(15) . . . is not enforceable in a private right of action" but that:  "In an action brought to enforce a provision of this chapter, such provision is not to be deemed [privately] unenforceable because of its inclusion in a section of this chapter requiring a state plan or specifying the required contents of a state plan."

Accordingly, the mere fact that the provisions addressing foster care maintenance payments and child-specific recruitment plans are embedded within the requirements for a state plan does not, by itself, make those provisions unenforceable through a private action.  See Rio Grande, 397 F.3d at 74 (citing 42 U.S.C. § 1320a-2).  Instead, the conclusion that those provisions do not create privately enforceable rights is supported by a number of other elements of the Act, including its provisions establishing wide-ranging federal oversight to determine whether the State has complied with the goals set forth in the Act.

provides for the establishment of a comprehensive review and enforcement infrastructure to determine whether states are in "in substantial conformity with . . . [s]tate plan requirements under [inter alia § 671(a)] . . . the implementing regulations . . . and the relevant approved state plans." See 42 U.S.C. §1320a-2a(a) (emphasis added).  That infrastructure has since been established, see 45 Code Fed. Regs. §§ 1355.31-37, and ACF conducts in-depth and data-driven Reviews to determine whether the Department is in substantial conformity with its approved plan, the Act, and its implementing regulations.  See id. § 1355.34 (setting forth the criteria for determining substantial conformity).  The most recent Review found that the Department was in substantial compliance with seven of the fourteen factors considered by ACF.  See Ex. A at ES-3.  Massachusetts has lots of company in that regard:  "[a]fter its initial review, ACF found that all fifty states plus the District of Columbia were not in substantial compliance with the federal guidelines."  Carson P., 240 F.R.D. at 489.[55]

When a state child services department is not in substantial conformity with its approved plan, the Act, or the implementing regulations, it must be "afford[ed] . . . an opportunity to adopt and implement an [Improvement Plan], approved by the Secretary, designed to end the failure to so conform," and while that Plan is in effect ACF must "suspend the withholding of any Federal matching funds."  42 U.S.C. §§ 1320a-2a(b)(4)(A), (C).  The Improvement Plan, which is jointly developed by the State and ACF, establishes, among other things, "benchmarks that will be used to measure the State's progress in implementing the program improvement plan and describe[s] the

---

[55] Indeed, see supra footnote 24, only Massachusetts, Idaho, Montana, and the District of Columbia have achieved substantial conformity with as many as seven of the fourteen factors; no state has demonstrated a greater level of conformity.

methods that will be used to evaluate progress."  45 Code Fed. Regs. § 1355.35(a)(1)(v).

If a State is "actively implementing the provisions of the . . . [I]mprovement [P]lan,"

federal funds will not be withheld.  Id. § 1355.36(c)(1)(ii).

Thus, as expressly contemplated by the Act, when a State is not in substantial

conformity, the requirements of 42 U.S.C. § 671(a) – the requirements upon which

plaintiffs rely – are no longer the operative conditions on federal funds; instead, they are

replaced by the benchmarks set forth in the Improvement Plan.  See 42 U.S.C. §§ 1320a-

2a(b)(4)(A), (C); see also 45 Code Fed. Regs. § 1355.35(e)(4) (noting that under several

widely-met conditions, the "State and ACF may jointly renegotiate the terms and

conditions of the program improvement plan as needed").  That process, expressly

established by the Act, see 42 U.S.C. §§ 1320a-2a(b)(4)(A), (C), underscores the

aspirational nature of 42 U.S.C. §671(a), because the benchmarks set forth therein are

replaced by benchmarks in the Improvement Plan.

In sum, plaintiffs' claim that the Act grants them privately enforceable rights to

foster care maintenance payments and child-specific recruitment plans is undermined by

the very structure of the Act:  the Act sets forth conditions on federal funding, to which

the states must "substantially conform"; in the event that the State insufficiently conforms

to those requirements, ACF must work with the State to develop new conditions on

federal funding; and, as long as those latter conditions are followed, federal funding

continues.  See 42 U.S.C. §§ 1320a-2a(b)(4)(A), (C).  Thus, the individual rights asserted

by plaintiffs are instead more properly understood as system-wide goals – goals that

continued ACF enforcement, and State and federal cooperation, are designed to meet.

Cf. Bonanao v. East Caribbean Airline Corp., 365 F.3d 81, 85 (1st Cir. 2004) ("[T]he

scheme of enforcement actually spelled out in [different federal statute] counsel[ed]

against implying a private[ly enforceable] right").[56]

---

[56]  Both <u>Blessing</u> and <u>Gonzaga</u> bolster that conclusion.  <u>See</u> <u>Carson P.</u>, 240 F.R.D. at 544 ("Federal statutes requiring operation of a program in 'substantial compliance' with federal law are not intended to benefit individuals, and cannot create federal rights").  In <u>Blessing</u>, plaintiffs contended that Arizona had failed to take "adequate steps to obtain child support payments from the fathers of their children" and that its failure ran afoul of Title IV-A of the Social Security Act which conditioned receipt of certain federal funds on the "operat[ion] [of] a child support enforcement program that conform[ed] with the requirements set forth in . . . 42 U.S.C. §§ 561-669b."  <u>Blessing</u>, 520 U.S. at 333, 337.  Specifically citing the enforcement provision of Title IV-D that required "substantial compliance," plaintiffs alleged that the State had failed to substantially comply with the relevant requirements.  520 U.S. at 346.  The Supreme Court rejected plaintiffs' argument, stating: "[i]n short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of [federal] audits and reduce the State's [federal] grant . . . .  As such, it does not give rise to individual rights."  <u>Id.</u> at 344.

Similarly, in <u>Gonzaga</u>, the Supreme Court addressed whether the Family Educational Rights and Privacy Act ("FERPA") gave rise to a privately enforceable right.  536 U.S. at 276.  FERPA is likewise a spending statute, which "condition[s] [an educational institution's] receipt of federal funds on certain requirements relating to the access and disclosure of student educational records."  <u>Id.</u> at 278.  It states, in relevant part, that "[n]o funds shall be made available . . . to any educational . . . institution . . . which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ."  <u>Id.</u> at 279 (quoting 20 U.S.C. § 1323g(b)(1)).  The Court expressly noted that "[t]he Act directs the Secretary of Education to enforce [the above-quoted provision]," to establish "an office and review board" for that purpose, and to withhold funds "only if the Secretary determines that a recipient institution is failing to comply substantially with any requirement . . . and that such compliance cannot be secured by voluntary means."  <u>Id.</u> (quotation marks and citations omitted).  Noting that educational "institutions can . . . avoid termination of [federal] funding so long as they 'comply substantially,' with the Act's requirements," the Court concluded that such provisions counsel against finding a  "congressional intent to confer individual rights enforceable by § 1983."  <u>Id.</u> at 288.

Similar reasoning should prevail here.  Where "Congress expects states to 'substantially' [conform to the Act] in exchange for federal funds," the Act's provisions "have an 'aggregate' focus," "are not concerned with 'whether the needs of any particular person have been satisfied,'" "and they cannot 'give rise to individual rights.'"  <u>Carson P.</u>, 240 F.R.D. at 544 (quoting <u>Gonzaga</u>, 536 U.S. at 288-89).

**D.      Foster Care Maintenance Payments Are Benefits Rather
            Than Privately Enforceable Rights.**

It "is <u>rights</u>, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority" of 42 U.S.C. § 1983, <u>Gonzaga</u>, 536 U.S. at 283 (emphasis in original), and plaintiffs do not have a specific right to foster care maintenance payments.  <u>Cf.</u> 42 U.S.C. §671(a)(12) (providing for a "fair hearing before the [s]tate agency to any individual whose claim for <u>benefits</u> available pursuant to this part is denied . . .") (emphasis added).  A number of district courts have addressed whether the Act gives rise to a privately enforceable right to foster care maintenance payments – five have found a privately enforceable right,[57] while two have not[58] – and their decisions are relevant only insofar as their reasoning is persuasive.  <u>Gonzaga</u>, by contrast, provides the controlling precedent, and adherence to its rationale yields a conclusion that the foster care maintenance payment sections of the act are not privately enforceable.

The Act provides that a state plan must "provide for foster care maintenance payments," which "shall" be made "on behalf of each child who has been removed from the home of a relative . . . into foster care," as long as the child's removal and placement are procedurally sound and the child's family previously qualified for federal aid to families with dependent children.  42 U.S.C. §§ 671(a)(1), 672(a); <u>see</u> 42 U.S.C.

---

[57]  District Courts found a privately enforceable right in the following cases:  <u>C.H. v. Payne</u>, 683 F. Supp.2d 865, 877 (S.D. Ind. 2010); <u>California Alliance of Child & Family Servs. v. Allenby</u>, 459 F. Supp. 2d. 919 (N.D. Cal. 2006) ("<u>Allenby I</u>"); <u>Kenny A. v. Perdue</u>, 218 F.R.D. 277, 303-04 (N.D. Ga. 2003); <u>Missouri Child Care Assoc. v. Martin</u>, 241 F. Supp. 2d 1032 (W.D. Mo. 2003); <u>California State Foster Parent Assoc. v. Wagner</u>, 2008 WL 191283 (N.D. Cal., Jan. 22, 2008).

[58]  Two district courts have concluded that the Act does not give rise to a privately enforceable right to foster care maintenance payments.  <u>See</u> <u>D.G. v. Henry</u>, 594 F. Supp. 2d 1273, 1278 (N.D. Okla. 2009); <u>Carson P.</u>, 240 F.R.D. at 540-41.

§675(4)(A) (defining the payments as "[p]ayments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance . . . reasonable travel to the child's home for visitation, and reasonable travel for . . . school . . ."). District courts have disagreed concerning whether the above-quoted provisions establish privately enforceable rights. Compare D.G. v. Henry, 594 F. Supp. 2d 1273, 1278 (N.D. Okla. 2009) (Congress has not "manifested an unambiguous intent to confer individual rights"), with C.H., 683 F. Supp. 2d at 877 (provisions "clearly and unambiguously confer[] a right to receive foster care maintenance payments"). Those finding a privately enforceable right have concentrated on use of "shall" and other "mandatory terms." See, e.g., C.H., 683 F. Supp. 2d at 877.

Yet, the overall structure of the Act reveals a different picture – and the broader canvas brings the sections relied on by plaintiffs into relief. Congress expressly stated that a different portion of 42 U.S.C. § 671(a) was privately enforceable, see id. §674(d)(3)(A), and it made no such statement concerning foster care maintenance payments. Thus, plaintiffs ask this Court to find that Congress "sp[oke] with a clear voice" concerning one portion of the Act by explicitly creating a privately enforceable right, see Gonzaga, 536 U.S. at 280, but that it also clearly implied such a right elsewhere in the Act. See 31 Foster Children, 329 F.3d at 1270 ("Ambiguity precludes enforceable rights"). The internal inconsistency of that argument "counsel[s] against . . . finding a congressional intent to create individually [and implicitly] enforceable private rights." Gonzaga, 536 U.S. at 290.

Furthermore, the district courts that have found a privately enforceable right to foster care maintenance payments have done so by miscasting the right in a concrete form

that is inconsistent with the Act.  See Kenny A., 218 F.R.D. at 303 ("[T]he statutory

provisions indisputably impose a binding obligation on the State to provide sufficient

foster care maintenance payments for each plaintiff foster child").  But see D.G., 594 F.

Supp. 2d at 1280 ("nowhere in the provisions . . . is there language suggesting a clear

Congressional intent to confer a private right of action on foster children").[59]  Contrary to

the Kenny A. decision, the Act does not "indisputably impose a binding obligation on the

[S]tate," 218 F.R.D. at 303 – rather, it provides that the State must "substantially

conform" to a certain level of payments as a condition on the receipt of federal funds.

Whether the State has done so is a matter subject to federal oversight:  ACF may

investigate and review any complaint of insufficient payment and if it finds an

insufficiency it must, in cooperation with the State, develop an Improvement Plan

establishing the necessary steps towards substantial compliance.  45 Code Fed. Regs.

§1355.32(d).  In that regard, 42 U.S.C. §§ 671(a)(1), 672(a), and 42 U.S.C. §675(4)(A),

are yardsticks by which aggregate State performance is to be measured, and they  do not

create individually enforceable rights.[60]

---

[59]  One of the decisions was likely based, in substantial part, on a misreading of the Act.
See Allenby I, 459 F. Supp. 2d at 923.  In Allenby I, the court appeared to be unaware
that the Act conditioned federal funding on "substantial conformity" with the elements of
a state plan, 42 U.S.C. §1320a-2a.  The court expressly stated that such language, which
it apparently believed was not included in the Act, would "suggest that Congress intended
only to provide a 'yardstick' for measuring systemwide performance." 459 F. Supp. 2d at
923.  Instead, it held that the 42 U.S.C. § 675(4)(A) set forth a "specific, objective
monetary entitlement" that was privately enforceable.  Id.  Although the district court's
holding was not appealed, it was extensively addressed in a concurring opinion in
California Alliance of Child and Family Servs. v. Allenby, 589 F.3d 1017 (9th Cir. 2009),
as described below.

[60]  In addition, on a systemic level, the State "must provide for periodic review of the . . .
amounts paid as foster care maintenance payments to assure their continuing
appropriateness."  42 U.S.C. § 671(a)(11).

The Ninth Circuit has noted, in a later iteration of the <u>Allenby</u> case, that "district courts across the country have split on whether the [Act] creates a private right of action" to foster care maintenance payments, <u>see</u> <u>California Alliance of Child and Family Servs. v. Allenby</u>, 589 F.3d 1017, 1020 n.5 (9th Cir. 2009), and although the matter was not raised in that appeal, a concurring judge addressed the issue at some length.[61]  <u>See</u> <u>id.</u> at 1023 (Wu, J., concurring).  Referring to the "importance of th[at] question and that analysis," the concurring judge stated:  "[G]iven that the applicable statute (42 U.S.C. § 1320a-2a) and its concomitant regulations provide that the Secretary is to initially determine whether a State's program is in 'substantial conformity' with the requirements of the [Act], its regulations and the relevant approved State Plan, the issue of whether [a State] . . . is in substantial compliance . . . should be addressed by the Secretary [of HHS] before this [C]ourt interjects itself into the fray."  <u>Id</u>. at 1026 (Wu, J., concurring).

Because the Act's foster care maintenance payment "provisions . . . have an aggregate, not individual, focus, and they serve primarily to direct [ACF's] distribution of public funds to [approved states,] [t]hey . . . create no rights enforceable under § 1983." <u>Gonzaga</u>, 536 U.S. at 290.  Thus, plaintiffs' claim should be dismissed.

**E.      Permanency Recruitment Is Traditionally the Province of State Juvenile Courts, and in the Absence of An Express Statement by Congress, This Court Should Not Infer a Congressional Intent to Depart from That Tradition.**

As the District Court of New Jersey stated, "[t]his Court does not sit to oversee

---

[61]  After the district court in <u>Allenby I</u> held that plaintiffs had a privately enforceable right to foster care maintenance payments, it later granted summary judgment in favor of the State, concluding that, in paying approximately 80 percent of the costs covered by foster parents, the State had substantially complied with the Act.  <u>See</u> <u>Allenby II</u>, 589 F.3d at 1018.  Plaintiffs appealed that holding, and the State did not cross appeal the district court's holding that the Act was privately enforceable.  <u>See</u> <u>id.</u> at 1020 n.5.

[the State] child welfare system to determine whether the implementation of case plans is 'appropriate' or 'successful,'" and it should not assume such a role absent a clear directive from Congress.  Charlie H., 83 F. Supp. 2d at 488-89.  The sections of the Act upon which plaintiffs rely to assert a privately enforceable right to child-specific recruitment plans do not provide that directive.  An approved State plan must "provide[] for the development of a case plan (as defined in section 675(1) . . . ) for each child receiving foster care maintenance payments . . . ."  42 U.S.C. §671(a)(16).  "The term 'case plan' means," in relevant part, "a written document which includes . . . , [i]n the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child . . . to place the child [in that permanent arrangement] . . . and to finalize the adoption or legal guardianship."  42 U.S.C. § 675(1)(E).  "At a minimum, such documentation shall include child specific recruitment efforts . . . to facilitate orderly and timely in-State and interstate placements."  Id.

Although the inquiry whether plaintiffs have privately enforceable right to child-specific recruitment plans has yielded "a clear split of authority," Brian A., 149 F. Supp. 2d at 946, the statutory language plainly does not establish such a right.  The courts that have addressed this discrete issue have done so without extensive discussion.  Compare D.G., 594 F. Supp. 2d at 1279 (summarily finding no privately enforceable right), with Kenny A., 218 F.R.D. at 292 (finding, with limited discussion, that nine case plan

elements are privately enforceable).[62]  The plain language of the statute, therefore,

provides the surest guide – and it indicates that a case plan must be "develop[ed]," 42

U.S.C. §671(a)(16), strongly suggesting that the requirement is a work in progress rather

than a clearly-established, enforceable  right.  The definitional language in 42 U.S.C.

§ 675(1)(E), which provides a baseline for what the case plan "shall" include, cannot

create an enforceable right.  See 31 Foster Children, 329 F.3d at 1271 ("Because §[] 675 .

. . [is] definitional in nature, [it] alone cannot and do[es] not supply a basis for conferring

rights enforceable under §1983"); see also B.H., 715 F. Supp. at 1401 ("It would be

strange for Congress to create enforceable rights in the definitional section of a statute").

Moreover, that language is still qualified by the use of the word "development" in 42

U.S.C. § 671(a)(16).

         Furthermore, plaintiffs do not merely assert a privately enforceable right to the

documentation of child-specific recruitment; rather, they challenge the sufficiency of the

recruitment efforts described in the documentation.  See Compl. ¶¶ 189, 193-94, 215,

288, 290, 291.  What they seek, in other words, is nothing less than federal court

oversight of the sufficiency of the Department's efforts to find permanent placements for

---

[62]  In a decision that has since been implicitly limited by Suter, Blessing, and Gonzaga,
the First Circuit concluded that 42 U.S.C. § 671(a)(16) gave rise to a privately
enforceable right to a case plan containing several elements.  See Lynch v. Dukakis, 719
F.2d at 511.  The court's holding rested in part on its "view of the [case law]
consistent[ly] holding that section 1983 provides a cause of action for violations of the
Social Security Act, and its view . . . that the [Supreme Court] has required express
statutory language" to preclude private enforcement.  Id.  In other words, the First Circuit
presumed that 42 U.S.C. § 671(a)(16) granted a privately enforceable right.  See id.  That
presumption is no longer operable.  See Gonzaga, 536 U.S. at 280 ("Since Pennhurst [I],
[decided in 1981, two years before Lynch], only twice have we found spending
legislation to give rise to enforceable rights'); see id. ("We now reject the notion that our
cases permit anything short of an unambiguously conferred right to support a cause of
action brought under § 1983") (emphasis added).

foster children. As described herein, see supra pages 12-32, such oversight is already

extensively performed by State courts, and has been recognized as a fundamentally local

responsibility.  See Mass. G.L. c. 119, §29B (expressly providing for Juvenile Court

review of permanency planning for foster children); see also T.W. v. Brophy, 124 F.3d

893, 896 (7th Cir. 1997) ("Domestic relations in general, and child custody in particular,

are . . . the primary responsibility of the states"); cf. Ankenbrandt v. Richards, 504 U.S.

689, 704 (1992) (noting, in the context of domestic relations, "the special proficiency

developed by state tribunals over the past century and a half in handling [domestic]

issues"); cf. also Charlie H., 83 F. Supp. 2d at 488 ("This is especially true where

whether a child has a plan satisfying each provision [of § 675] is as individual as each

child and there is no way to measure the normal or average [permanency] needs of a child

in foster care") (quotation marks and citation omitted).   Had Congress intended to

displace state judicial monitoring of permanency recruitment, placement, and finalization,

it would have expressly said as much.  That it did not counsels against implying the right

of action plaintiffs seek under 42 U.S.C. §§ 671(a)(16) and 675(1)(E).  See Olivia Y., 351

F. Supp. 2d at 564 (holding that the asserted right to "planning and services to secure [a]

permanent placement . . . including documentation of the steps taken to secure

permanency under 42 U.S.C. § 675(1)(E) w[as] not cognizable").

**V.     PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM IS BARRED BY
        THE ELEVENTH AMENDMENT, BECAUSE IT SEEKS RELIEF
        AGAINST STATE OFFICIALS BASED ON ALLEGED VIOLATIONS OF
        STATE LAW AND BECAUSE THE STATE LAWS UPON WHICH
        PLAINTIFFS RELY DO NOT GIVE RISE TO CONSTITUTINALLY
        PROTECTED INTERESTS.**

In Count IV, plaintiffs contend that the Department is failing to follow state law,

by failing to provide them certain medical services, and by denying them the opportunity

for kinship placements, private-home placements, and sibling visitation.  See Compl.

¶¶ 308-09.  At base, they seek to establish that the Commonwealth is failing to comply

with its own law.  They are, however, barred by the Eleventh Amendment from asserting

that claim in federal court.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89,

121 (1984) ("Pennhurst II") ("a claim that state officials violated state law in carrying out

their official responsibilities is a claim against the state that is protected by the Eleventh

Amendment").  As the Pennhurst II Court stated:  "[I]t is difficult to think of a greater

intrusion on state sovereignty than when a federal court instructs state officials on how to

conform their conduct to state law."  Id. at 106; see Diaz-Fonseca v. Puerto Rico, 451

F.3d 13, 43 (1st Cir. 2006) (the Eleventh Amendment "does not allow injunctive relief

against state officials for violation of state law"); O'Brien v. Massachusetts Bay Trans.

Auth., 162 F.3d 40, 44 (1st Cir. 1998) ("It is not the proper purview of a federal court to

supervise state officials' compliance with state law").  "[N]either pendent jurisdiction nor

any other basis of jurisdiction may override the Eleventh Amendment."  Pennhurst II,

465 U.S. at 121.

Attempting to side-step Pennhurst II, plaintiffs allege that Massachusetts law has

created constitutionally protected liberty and property interests that, under the Fourteenth

Amendment, cannot be deprived without due process.  Compl. ¶ 309.  Yet, "not every

violation of state law infringes upon constitutional rights."  Doe v. Milwaukee County,

903 F.2d 499, 504 (7th Cir. 1990); see id. at 504-05 (were it otherwise, "[s]uch a rule

would trivialize the Constitution and circumvent the Supreme Court's decision in

Pennhurst [II]"); Doe v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996) (holding

that "the proper means by which a plaintiff may seek redress for an alleged failure to

comply with state and local child protection statutes is an action for damages under state law" because "the Eleventh Amendment bars federal courts from ordering state officials to comply with state law.").

Even assuming for argument that plaintiffs correctly allege that defendants have failed to provide them benefits afforded them by state law, their effort to frame the state law violations as deprivations of procedural due process suffers from two central defects: first, several of the interests they assert are not protected by the Due Process Clause; and, second, they have not alleged that the process they are provided by state law – which is extensive – is insufficient.  As the First Circuit has forcefully stated:  "The Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations."  Fournier v. Reardon, 160 F.3d 754, 757 (1st Cir. 1998) (quotation marks and citations omitted).

**A.     Plaintiffs' Asserted Interests in Private Placements, Kinship Placements, and Sibling Visitation Are Not Protected by the Due Process Clause.**

In this Circuit, courts "'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  Gonzalez-Fuentes v. Molina, 607 F.3d 864, 886 (1st Cir. 2010) (quoting Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989)).  The first inquiry reveals that half of the interests asserted by plaintiffs do not give rise to due process protection.  See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972).

Plaintiffs contend that they have a "constitutionally protected interest" in the

"following state-law entitlements":  placement in private families, Compl. ¶ 309(a);

sibling visitation, id. ¶ 303(c); consideration of kinship families for potential placement,

id. ¶ 303(d); medical screenings, id. ¶ 303(a); an individualized health care plan, id.

¶ 303(a); and a "medical passport" describing that plan, id. ¶ 303(b).  The first three

asserted "entitlements" do not trigger constitutional protections at all.

    "[T]o determine whether due process requirements apply in the first place, we

must look not to the weight but to the nature of the interest at stake.  We must look to see

if the interest is within the Fourteenth Amendment's protection of liberty and property."

Roth, 408 U.S. at 571.  State law may give rise to a protected property interest, see id. at

577, but not where the benefit is discretionary.  See Town of Castle Rock v. Gonzales,

545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected

entitlement if government officials may grant or deny it in their discretion"); Lowe v.

Scott, 959 F.2d 323, 334 (1st Cir. 1992) ("To have a property interest . . . a person . . .

must have more than a unilateral expectation of it.  He must, instead, have a legitimate

claim of entitlement to it") (quoting Roth, 408 U.S. at 577); cf. Picard v. Members of

Employee Retirement Bd., 275 F.3d 139, 144 (1st Cir. 2001) ("In evaluating whether a

purported . . . property right is entitled to constitutional protection . . . this Court

generally looks to state law as interpreted by the state's highest court").

    Plaintiffs lack a property interest in placement in a private home because they

placement in a private home is conditional.  See G.L. c. 119, § 32 ("Children in the . . .

custody of the [D]epartment shall be placed in private families; provided, that any child .

. . may . . . if it is found by the [D]epartment to be in the best interest of the child, be

placed in a public or private institution or school") (emphasis added).  Sibling visitation

is likewise subject to the Department's determination whether such visitation is "reasonable and practical . . . based upon a determination of the best interests of the child." G.L. c. 119, § 26B(b). Kinship placements also must be considered only insofar as they are in the best interest of the child. G.L. c. 119, § 23(c).

Plaintiffs also lack a protected liberty interest in a private or kinship placement, and in sibling visitation. "To qualify as a liberty interest, and thus to invoke the procedural guarantees contained in the Due Process Clause, 'a right or status previously recognized by state law [must be] distinctly altered or extinguished' by state action." Johnson v. Rodriguez, 943 F.2d 104, 109 (1st Cir. 1991), cert. denied 502 U.S. 1063 (1992). As described above, private placement is entirely dependent upon the circumstances. See G.L. c. 119, § 32. The same holds for sibling visitation, see Adoption of Pierce, 58 Mass. App. Ct. 342, 347-48 (2003) ("The United States Supreme Court has never concluded that there exists a fundamental liberty interest in the sibling relationship" and, thus, it is not entitled to any heightened protection) (quotation marks and citations omitted) and Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997) (finding no clearly established liberty interest in sibling association), and kinship placements. See Adoption of Irene, 54 Mass. App. Ct. 613, 622-23 (2002) ("A biological and/or cultural match between child and caretaker is a desirable aim; but it is a single factor among many. It cannot be permitted to generate a placement decision that is not otherwise in the child's best interest").

Although state law amore directly provides for medical screening services, an individualized health care plan, and a medical passport for children in foster or substitute care, it is doubtful that these benefits rise to the level of a constitutionally protected

property or liberty interest.  See G.L. c. 119, § 32 ("The [D]epartment shall insure that

every foster child . . . shall be screened and evaluated  under the early and periodic

screening, diagnostic and treatment standards established by Title XIX"); id. ("A

medically needy child who is in foster care . . . may not be placed in another foster home

. . . without an individualized health care plan"); 110 Code Mass. Regs. 7.124 ("The

Department shall implement a program of utilization of a 'medical passport' for all

children in substitute care").  In any event, plaintiffs have not claimed – and cannot claim

– that they have been denied a process to address any alleged deficiency in the provision

of such benefits.

### B. The Commonwealth Provides Foster Children With Extensive Process, and Plaintiffs Do Not Allege Otherwise.

"Assuming, arguendo, that defendants [did] deprive[] [plaintiffs] of a cognizable

property [or liberty] interest, the complaint nevertheless fails to allege that available

remedies under [Massachusetts] law were inadequate to redress any deprivation . . . ."

Rumford Pharma. v. City of E. Providence, 970 F.2d 996, 999 (1st Cir. 1992) (emphasis

in original); see id. (describing the "critical importance attached to the requirement that a

procedural due process claimant allege the unavailability of constitutionally-adequate

remedies under state law").  Where a "complaint fails to allege that constitutionally

adequate remedies were unavailable under [state] law," that "pleading omission[] alone

. . . warrant[s] dismissal of [a] procedural due process claim."  Id.

As this Court has stated, "[w]hen a complaint alleges violations of procedural due

process and asserts that those violations are actionable under 42 U.S.C. § 1983, the

existence of state remedies is especially important."  Hoostein v. Collins, 679 F. Supp. 2d

169, 181 (D. Mass. 2010) (citing Zinermon v. Burch, 494 U.S. 113, 125 (1990)).  Here

plaintiffs are afforded extensive process to address all of the wrongs that they allege in

Count IV; they neither allege that they have availed themselves of those processes nor

that the processes are somehow inadequate.  Rumford Pharma., 970 F.2d at 1000

(affirming dismissal of a due process claim where the court was "given no reason to

believe that [state] law does not provide constitutionally adequate . . . remedies in such

circumstances").

Plaintiffs, each of whom are represented by counsel in their ongoing state

proceedings, are permitted to challenge the type of placement selected by the Department

in Juvenile Court, see G.L. c. 119, § 21, and if the Department has abused its discretion in

moving the children from a private placement, the Juvenile Court has the express power

to provide a remedy.  Furthermore, the Department, pursuant to its regulations, see 110

Code Mass. Regs. 7.101(2)(a), must consider placement in a kinship family before all

other possible placements "consistent with the best interests of the child."  Where a child

believes that a kinship placement has not been properly considered, he or she may seek a

fair hearing on the matter pursuant to 110 Code Mass. Regs. 10.06(1), (3), (7), and an

adverse fair hearing decision is subject to judicial review in Massachusetts Superior

Court, pursuant to Mass. G.L. c. 30A, § 14; 110 Code Mass. Regs. 10.30.  A child

seeking greater sibling visitation is expressly afforded, by statute, access to the Juvenile

Court, which, in turn, is empowered to order greater visitation.  See G.L. c. 119,

§ 26B(b), para 4.

The adequacy of the medical services provided to foster children is considered

every six months during the foster care review process, 110 Code Mass. Regs. 6.10(2),

and any failure to provide periodic medical screenings, see generally id. 7.121, may be

appealed through the fair hearing process, and through further judicial review of an

adverse fair hearing decision.  See id. 10.06(1)(a), (7).  Whether the process to which

plaintiffs have access is sufficient under Mathews v. Eldridge, 424 U.S. 319 (1976),

cannot be seriously doubted, and, in any event, it is not challenged by plaintiffs, who fail

to allege that they have availed themselves of the extensive available state remedies.[63]

Because "[p]laintiff[s] here ha[ve] not and cannot allege that available remedies

under Massachusetts law are inadequate to redress any deprivation [allegedly] caused [by

defendants' conduct]," their procedural due process claim should be dismissed.

Auburchon v. Commonwealth of Massachusetts, 933 F. Supp. 90, 93 (D. Mass. 1996).

## VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF A RIGHT TO FAMILIAL ASSOCIATION.

In addition to their substantive due process claim, plaintiffs allege, in Count II of

the Complaint, that defendants' actions deprived plaintiffs of liberty, privacy, and

associational rights protected by the First, Ninth, and Fourteenth Amendments.  Compl.

¶ 305.  More specifically, they allege that the Department has failed to timely and

appropriately make use of kinship placements, Compl. ¶ 250; that the Department has

---

[63] Plaintiffs do not plead facts that demonstrate that they were "depriv[ed]" of state law benefits, but instead that they are eligible for benefits that they have not received. Assuming that those who have not yet received entitlements are entitled to some process, see Hoffman v. City of Warwick, 909 F.2d 608, 619 n. 10 (1st Cir. 1990) and Kapps v. Wing, 404 F.3d 105, 115 (2d Cir. 2005) (collecting cases), they are not entitled to pre-deprivation process, which would be impossible.  Cf. Lowe, 959 F.2d at 340 ("No matter how significant the private interest at stake . . . the state cannot be required constitutionally to do the impossible by providing predeprivation process") (quotation marks and citations omitted); cf. also Herwins v. City of Revere, 163 F.3d 15, 18 (1st Cir. 1998), cert. denied 526 U.S. 1087 (1999) ("where feasible, the opportunity [to be heard] . . . is expected to be pre-deprivation . . . but this is not always feasible").  Ultimately, "[t]he due process clause is 'flexible and calls for such procedural protections as the particular situation demands.'"  Penobscot Air Servs., Ltd. v. F.A.A., 164 F.3d 713, 723 (1st Cir. 1999) (quoting Mathews, 424 U.S. at 334)).

failed to "sustain family ties and support reunification" when safely possible, by failing to provide adequate reunification services, Compl. ¶¶ 277-278; and that the Department has failed to provide sufficient visitation with siblings and parents.  Compl. ¶¶ 198, 285. Because the Constitution's protection of plaintiffs' familial interests does not encompass a right to a certain level of reunification services or visitation, or a right to kinship placement, the Complaint fails to state a claim for relief on Count II.

While "the Supreme Court has held the parent-child relationship to be constitutionally protected, courts nevertheless have been loathe to impose a constitutional obligation on the state to ensure a particular type of family life or to create such an obligation 'through the penumbral constitutional . . . right to familial privacy.'"  Marisol A., 929 F. Supp. at 676 (quoting B.H. v. Johnson, 715 F. Supp. at 1397).  Thus, "[c]ourts have held . . . that plaintiffs 'do not have a constitutional right to rely on an agency to strengthen and reunite their families even if that agency has a statutory duty to do so.'" Marisol A. , 929 F. Supp. at 677.

Consequently, several courts have held that, absent facts establishing that a state denied all visitation, claims asserting only that the state provided an insufficient level of visitation or that the state provided insufficient services aimed at reunifying a family, must be dismissed.  Marisol A., 929 F. Supp. at 676-677 (dismissing claim challenging "defendants' general failure to provide services that function to preserve the family unit" where plaintiffs did not allege facts suggesting that they had been denied visitation rights).  See also Charlie H., 83 F. Supp. 2d at 513-14 (dismissing plaintiffs' First and Ninth Amendment claims based on allegations that state had provided insufficient visitation, as "the so-called right to family integrity will not be extended to situations

where a plaintiff . . . alleges limited familial contact, as compared to no contact," and similarly dismissing claim that defendants failed to provide sufficient training to foster parents to enable siblings to remain together and claim that state failed to assist biological father in obtaining housing for his children); <u>B.H. v. Johnson</u>, 715 F. Supp. at 1396-98 (dismissing substantive due process claims alleging that state failed to provide training necessary to reunite children with their families or to ensure sufficient parental and sibling visitation).

<b><u>CONCLUSION</u></b>

For the foregoing reasons, defendants respectfully request that the Court dismiss the Complaint in its entirety.

Respectfully submitted,

THE HON. DEVAL L. PATRICK, GOVERNOR, SECRETARY JUDYANN BIGBY, AND COMMISSIONER ANGELO MCCLAIN,

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Amy Spector
Amy Spector, BBO No. 557611
Robert L. Quinan, Jr., BBO No. 553010
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 963-2076
amy.spector@state.ma.us

August 20, 2010

<u>Certification Pursuant to Local Rule 7.1(A)(2)</u>

I certify that I have conferred with counsel for plaintiffs, prior to the filing of this motion, but we did not reach agreement on the issues presented in the motion.

<u>/s/ Amy Spector</u>
Amy Spector

<u>Certificate of Service</u>

I hereby certify that the above motion was filed through the Electronic Case Filing (ECF) system on August 20, 2010, and thus copies will be sent electronically to plaintiffs' counsel, who are identified as registered participants on the Court's Notice of Electronic Filing.

<u>/s/ Amy Spector</u>
Amy Spector

117